# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 5596 | **DATE** | 5/25/2000 |
| **CASE TITLE** | ARTHUR L. LEWIS, JR., et al. vs. CITY OF CHICAGO | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's Motion for Summary Judgment [64] is denied. Plaintiff's Motion to Strike and to Deem Certain Facts Admitted [84] is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

MAY 2 6 2000
date docketed

docketing deputy initials

date mailed notice

RJ    courtroom deputy's initials

Date/time received in central Clerk's Office

Document Number

94

mailing deputy initials

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ARTHUR L. LEWIS, JR.; GREGORY S. FOSTER,    )
ARTHUR C. CHARLESTON, III; PAMELA B.    )
ADAMS; WILLIAM R. MUZZALL; PHILIPPE H.    )
VICTOR; CRAWFORD M. SMITH; ALDRON R. REED; )
and AFRICAN AMERICAN FIRE FIGHTERS LEAGUE )
OF CHICAGO, INC.; individually, and on behalf of all    )
others similarly situated,    )    **No. 98 C 5596**
   )
              Plaintiffs,    )    Judge Joan B. Gottschall
   )
      v.    )
   )
CITY OF CHICAGO,    )
   )
              Defendant.    )

DOCKETED
MAY 2 6 2000

## MEMORANDUM OPINION AND ORDER

    Plaintiffs, several African-American applicants for positions as firefighters with the Chicago

Fire Department, have brought suit on behalf of themselves and all other African-American

firefighter applicants who took and passed the City of Chicago's 1995 written firefighter

examination. Plaintiffs allege that the examination had a disparate impact on African-American

applicants. Defendant, the City of Chicago, has moved for summary judgment, alleging that

plaintiffs' suit is time-barred because they failed to file the required discrimination charges with the

Equal Employment Opportunity Commission (EEOC) within the limitations period. Resolution of

the City's motion turns on a single issue: Does the City's ongoing reliance on a discriminatory

examination's results in making hiring decisions constitute a continuing violation of Title VII?

Because the court believes that it does, the City's motion for summary judgment is denied.

### Background

    On July 26 and 27, 1995, the Chicago Fire Department administered the written component

94

of the 1995 firefighter entrance examination to applicants for firefighter positions with the Department. More than 26,000 applicants – including each of the named plaintiffs – took the July 1995 written component.

In January 1996, the City sent "Firefighter Examination Final Score Notices" to all applicants, including the named plaintiffs. The City grouped the scores into categories: Applicants who scored at or above 89 on the examination were considered "well qualified" and were eligible to advance through the hiring process. Applicants who scored between 65 and 88 were considered "qualified"; and applicants who scored below 65 failed the examination. Neither the "qualified" applicants or those who failed the examination continued in the hiring process, with two exceptions: certain incumbent paramedics who were eligible pursuant to a collective bargaining agreement and veterans.

The examination scores of the eight named plaintiffs ranged from 70 to 87. On January 26, 1996, the City sent plaintiffs written notifications of their examination results. The form notification letter advised plaintiffs that:

> You have achieved a score of ___ out of a possible 100 on the written/video portion of Firefighter Examination #39501. This means that you have been rated "Qualified" for the position of Firefighter. While this means you have passed the examination, you are not in the group of candidates who received a rating of "Well Qualified" on the examination. Due to the large number of candidates who received higher scores and were rated as "Well Qualified," and based on the operational needs of the Chicago Fire Department, it is not likely that you will be called for further processing. However, because it is not possible at this time to predict how many applicants will be hired in the next few years, your name will be kept on the eligible list maintained by the Department of Personnel for as long as that list is used.
>
> If you recently moved or are planning to move, or have changed your name, you must notify the City of Chicago Department of Personnel in writing. . . . Failure to notify the City of Chicago Department of Personnel may result in the removal of your name from the eligibility list.

2

. . . . ALL FUTURE COMMUNICATIONS YOU RECEIVE WILL BE FROM THE
CHICAGO FIRE DEPARTMENT - PERSONNEL DIVISION AND THE CITY OF
CHICAGO DEPARTMENT OF PERSONNEL. KEEP THIS NOTICE FOR YOUR
RECORDS!

(Exh. I to Pls.' Resp. to Mtn. for Summ. J.)

The form notification letter that the City sent to candidates who had failed the written

examination advised:

> We regret to inform you that you did not achieve a passing score on Firefighter
> Examination #39501. Your score was ____ out of a possible 100, which is below 65,
> the passing score for the examination. As a result, you will no longer be considered
> for this position. . . . THIS IS THE LAST COMMUNICATION YOU WILL
> RECEIVE REGARDING FIREFIGHTER EXAMINATION #39501.

(Exh. J to Pls.' Resp. to Mtn. for Summ. J.)

On January 26, 1996, Mayor Richard Daley announced the examination results in a news

release. The release contained a breakdown of the examination results by race, national origin and

sex. According to the release, the "well qualified" group was 75.8 percent white and 24.2 percent

minority, of which 11.5 percent were African-American. (Exh. 1 to Def.'s Mtn. for Summ. J.) The

release reported that "[o]f the more than 26,000 people who took the test, 1782 (or 6.8 percent) have

been deemed 'well-qualified' and each will be contacted by the city, in random order, for the next

round of tests." (*Id.*) In the release, the Mayor acknowledged his concern with the results, stating

that "[a]fter all our efforts to improve diversity, these test results are disappointing." (*Id.*)

Chicago's major newspapers, including the *Chicago Sun-Times*, *Chicago Tribune*, and

*Chicago Defender*, reported the examination results and impact on minority applicants, as well as

reaction and protests from applicants, firefighters, and members of the African-American

community. Among these reports was a front-page article published by the *Chicago Sun-Times* on

January 27, 1996 with the headline: "Fire, Police Exams Leave Racial Divide – Daley's Decision

3

Angers Whites, Minorities Alike." (Exh. 2 to Def.'s Mtn. for Summ. J.) The article featured a graph titled "Fire Exam Finalists" that illustrated the racial breakdown in percentage terms of the exam takers and those in the "well qualified" category. (Id.) The article reported that "[s]ix hundred firefighters will be hired from the 'well-qualified' pool over the next three years." (Id.)

Around April 1996, representatives of plaintiff African American Fire Fighters League and a number of class members met with former lead counsel for plaintiffs, Judson Miner. Miner concluded from his meeting with plaintiffs that the type of lawsuit that they could bring would be an "adverse impact" lawsuit and that, assuming that the examination actually had an adverse impact on African-Americans, the case would largely turn on the "job relatedness" or "validity" of the examination. According to Miner, he could not determine whether the candidates had a possible claim without some information on the test and its validity. On November 6, 1996 – after discussions with the City and the filing of a Freedom of Information Act request with the Chicago Fire Department – Miner was provided with a copy of the "final technical report prepared by the test consultant," as well as "a copy of the appendices to the validation report" from the City's law department. (Exh. K to Pls.' Resp. to Mtn. for Summ. J.)

After receiving these materials, Miner retained a consulting expert to analyze the examination's validity. Over the next two months, the consultant requested additional information, which Miner obtained from the City and forwarded to the consultant. On March 15, 1997, Miner received a preliminary report from the consultant concluding that the examination had substantial adverse impact and was invalid. Miner then met with a number of the firefighter candidates and advised them that they had a possible disparate impact claim against the Chicago Fire Department.

Six of the eight named plaintiffs filed Charges of Discrimination with the EEOC: Crawford

4

M. Smith filed on March 31, 1997; Aldron R. Reed filed on April 1, 1997; Gregory S. Foster, Jr. filed on April 14, 1997; Pamela Adams filed on April 14, 1997; Arthur C. Charleston, III filed on July 8, 1997; and William R. Muzzall filed on September 17, 1997. The EEOC issued right to sue letters on July 28, 1998. Arthur Lewis and Philippe Victor did not file charges of discrimination with the EEOC.

Plaintiffs filed this suit on September 9, 1998. The plaintiff class is now composed of over six thousand African-American firefighter candidates who took and passed the City's 1995 written examination. The City admits that the Chicago Fire Department has been processing firefighter candidates for hire from the "well qualified" pool of candidates on the firefighter eligibility list since approximately April 1996.

## Analysis

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, it is unlawful for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

Plaintiffs may prove a violation of Title VII by demonstrating either that the City's failure to hire them was "disparate treatment" or that the procedures by which the City has made its hiring decisions have a "disparate impact." Disparate treatment "occurs when a plaintiff is intentionally treated less favorably than others simply because of his race, color, religion, sex, or national origin." *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir. 1996). It requires plaintiffs to prove that the City acted with actual discriminatory intent. *Id.*

Establishing disparate impact, on the other hand, does not require a showing of discriminatory intent. Rather, a disparate impact "exists where a specified employment practice, although neutral on its face, has a disproportionately negative effect on members of a legally protected class." *Id.* The disparate impact theory may be utilized to challenge both objective and subjective hiring processes. *See id.* In challenging the City's use of the results from the 1995 written examination in its hiring of firefighters, plaintiffs' claims arise under the disparate impact theory of Title VII liability.

Regardless of a plaintiff's theory of discrimination, before bringing a suit for employment discrimination in federal court, the plaintiff must first file a discrimination charge with the EEOC. In Illinois, in order for the federal court action to be timely, the EEOC charge must be filed within 300 days after the allegedly discriminatory act occurred. 42 U.S.C. § 2000e-5(e)(1); *Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 707 (7th Cir. 1995). "The limitations periods, while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect

employers from the burden of defending claims arising from employment decisions that are long past." *Delaware State College v. Ricks*, 449 U.S. 250, 256-57 (1980).

The City argues that summary judgment is warranted because none of the named plaintiffs filed a timely charge of discrimination with the EEOC. According to the City, the alleged adverse action against plaintiffs occurred in January 1996, when they were notified of their placement by the City in the "qualified" category of candidates, rather than the "well qualified" category. The City argues that the January 1996 notification letters, the Mayor's news release and the Chicago media coverage provided notice to plaintiffs of the examination's alleged disparate impact on African-Americans. Because none of the plaintiffs filed EEOC charges until March 31, 1997 – more than 420 days after they received notice – the City argues that plaintiffs failed to satisfy the administrative prerequisites to filing this suit.

In response, plaintiffs argue that the 300-day limitations period for filing their EEOC charges has not begun to run because the City's ongoing refusal to process plaintiffs' firefighter applications constitutes a continuing violation. According to plaintiffs, "The City's continued refusal to permit members of the plaintiff class to advance to the next stage of the hiring process is a systemic continuing violation because it is rooted in a discriminatory policy or practice." (Pls.' Resp. to Mtn. for Summ. J. at 5) The court agrees.

"The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period." *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). In determining the timeliness of the plaintiff's claim, the court treats the linked acts as one continuous act that ends within the limitations period. *Id.* The Seventh Circuit has discussed three viable continuing violation theories. The first theory "stems from 'cases, usually involving

hiring or promotion practices, where the employer's decision-making process takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred.'" *Id.* at 565 (quoting *Stewart v. CPC Int'l, Inc.*, 679 F.2d 117, 120 (7th Cir. 1982)). The second theory "stems from cases in which the employer has an express, openly espoused policy that is alleged to be discriminatory." *Id.* (citing *Stewart*, 679 F.2d at 121). Such policies are also referred to as "systemic" continuing violations. *Id.* at 565 n.5. The third theory "stems from cases in which 'the plaintiff charges that the employer has, for a period of time, followed a practice of discrimination, but has done so covertly, rather than by way of an open notorious policy . . . . In such cases the challenged practice is evidenced only by a series of discrete, allegedly discriminatory, acts.'" *Id.* (quoting *Stewart*, 679 F.2d at 121).

The second continuing violation theory is the only one relevant here. Plaintiffs allege that the City has maintained an ongoing discriminatory policy by continuing to make hiring decisions based on the results of the discriminatory 1995 examination. While the Seventh Circuit has not spoken directly on this issue, this court believes that, based on relevant case law, the nature of plaintiffs' claims, and the proffered evidence construed in plaintiffs' favor, plaintiffs have established a continuing violation.[1]

In *Delaware State College v. Ricks*, 449 U.S. 250 (1980), the Supreme Court addressed a continuing violation claim in determining the timeliness of an EEOC discrimination charge. Ricks,

---

[1] The court rejects the City's assertion that "plaintiffs have not pleaded the continuing violation doctrine, nor have they set forth any factual basis supporting the applicability of the doctrine." (Def.'s Mtn. for Summ. J. at 10) Plaintiffs' EEOC charges list the date of the discrimination as "3/97 and continuing." (Exh. 3 to Def.'s Mtn. for Summ. J.) Further, plaintiffs' complaint alleges that the City "has used and continues to use" the results from the discriminatory examination (Compl. ¶ 1), that plaintiffs "have been and continue to be denied the opportunity" to be hired as firefighters (*Id.* ¶ 7), and that the City "has violated, and is continuing to violate" Title VII. (*Id.* ¶ 30)

a college professor, was denied tenure, but was then given a one-year "terminal" contract by the college. In attempting to delay the accrual of his cause of action, Ricks argued that the college's conduct constituted a "continuing violation" of the civil rights laws because "discrimination motivated the College not only in denying him tenure, but also in terminating his employment" upon the expiration of his subsequent one-year contract. *Id.* at 257. As a result, according to Ricks, the limitations period did not begin to run until his one-year contract expired.

The Court initially observed that "[d]etermining the timeliness of Ricks' EEOC complaint, and this ensuing lawsuit, requires us to identify precisely the 'unlawful employment practice' of which he complains." *Id.* The Court found that Ricks' complaint did not support his continuing violation argument because it did not allege discriminatory conduct by the college after denying Ricks tenure. "If Ricks intended to complain of a discriminatory discharge, he should have identified the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment." *Id.*

The fact that Ricks did not feel the effect of the college's alleged discrimination until he was discharged was insufficient to postpone his claim's accrual. The *Ricks* Court recognized a crucial distinction between the present effects of a one-time violation and the continuation of the violation into the present:

> It appears that termination of employment at Delaware State is a delayed, but inevitable, consequence of the denial of tenure. In order for the limitations periods to commence with the date of discharge, Ricks would have had to allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure. But no suggestion has been made that Ricks was treated differently from other unsuccessful tenure aspirants. Rather, in accord with the College's practice, Ricks was offered a 1-year "terminal" contract, with explicit notice that his employment would end upon its expiration.

> In sum, the only alleged discrimination occurred – and the filing limitations periods therefore commenced – at the time the tenure decision was made and communicated to Ricks. That is so even though one of the *effects* of the denial of tenure – the eventual loss of a teaching position – did not occur until later.

*Id.* at 257-58 (emphasis in original). The Court thus concluded that "the limitations periods commenced to run when the tenure decision was made and Ricks was notified." *Id.* at 259.

Plaintiffs insist that "*Ricks* does not change the fact that the City's continued use of the results of its discriminatory exam is a continuing violation" because the case merely "stands for the proposition that a plaintiff may not rely on the continuing violation theory to advance claims about an isolated, past instance of discrimination, even though the effects persist into the present." (Pls.' Resp. to Mtn. for Summ. J. at 8-9) The cases cited by plaintiffs in their effort to distinguish *Ricks* highlight the difficulty in discerning whether an injury stems from an ongoing pattern or policy of discrimination, or whether it merely reflects the impact of a single, time-barred discriminatory act.

In *Palmer v. Board of Educ.*, 46 F.3d 682, 683 (7th Cir. 1995), a class of African-American parents and children sued their school board for racial discrimination, alleging that the board closed a junior high in University Park – a predominately African-American town – because white residents did not want to send their children there. The board claimed that the closing was temporary, until renovations could be completed. *Id.* The plaintiffs pointed out that renovations had yet to be scheduled, and the school remained closed. *Id.*

The Seventh Circuit rejected the school board's statute of limitations argument, ruling that "a claim of racial discrimination arises each day a child is assigned to school under a racially discriminatory policy." *Id.* The court distinguished *Ricks* as involving a single discriminatory act, rather than "[a] series of wrongful acts," which "creates a series of claims." *Id.* at 686. The court reasoned:

> A public employer that applies different salary schedules to black and white employees commits a new wrong every pay period, and the fact that the employer has been violating the Constitution for a generation does not permit it to commit fresh violations. . . . Just so here. Every fall the school board decides which buildings to use and which children shall be assigned to which schools. If, as plaintiffs believe, the school board's explanation for closing Deer Creek is a pretext for discrimination, then each year's decision to leave the building shuttered is a new violation – as is each assignment plan that compels black pupils to board busses for a distant junior high school that they would not be required to attend if the population of University Park had a lighter complexion.

*Id.* (citations omitted).

Similarly, in *Webb v. Indiana Nat'l Bank*, 931 F.2d 434, 436 (7th Cir. 1991), the court acknowledged the uncontroversial notion that "[f]oreknowledge [of an injury] does not set the statute of limitations running." The court recognized that in *Ricks*, the injury was the denial of tenure, but that "[t]he statute of limitations would not have begun to run when Ricks was told (if he had been told) that he would be denied tenure at the next faculty meeting, because that would have been a prediction of injury, not the injury itself." *Id.* The *Ricks* Court did not abolish the principle that "in the case of a continuing unlawful practice, every day that the practice continues is a fresh wrong for purposes of the statute of limitations." *Id.* at 438.

The Seventh Circuit's analyses in *Palmer* and *Webb* – viewed against the background of *Ricks* – clarify the continuous injury inquiry in this case. The determination as to whether the continuous injury theory applies boils down to one question: Has the City engaged in a continuing unlawful practice toward plaintiffs? According to plaintiffs, the City has done so by continuing to base its hiring decisions on the results of the discriminatory examination.

At first glance, this notion – that an employer's reliance on results generated by a discriminatory examination constitutes ongoing discrimination – appears to have been rejected by the Seventh Circuit. In *Huels v. Exxon Coal USA, Inc.*, 121 F.3d 1047, 1048 (7th Cir. 1997), Huels

claimed that his employer, Exxon, discriminated against him based on his alcoholism in violation of the Americans with Disabilities Act. Huels alleged that Exxon ranked him dead last in job performance because Huels had sought alcohol treatment, not because of his job performance. *Id.* Based on Huels' position on the job performance list, Exxon laid him off, then failed to recall him when it asked many of its other laid-off workers back. In attempting to defeat Exxon's statute of limitations argument, Huels argued that Exxon's conduct amounted to a continuing violation of the ADA. According to Huels, each employment decision amounted to a fresh act of discrimination by Exxon. *See id.* at 1049.

The Seventh Circuit disagreed, finding that any claim based on Huels' "allegedly discriminatory position on the list would have accrued when he was assigned that ranking." *Id.* at 1050. The court reviewed cases in which courts held that employees' discrimination claims accrued at the time of their loss of seniority, rather than when they felt the consequences of the loss of seniority. *See id.* at 1050-51 (discussing *Lorance v. AT&T Technologies, Inc.*, 490 U.S. 900 (1989); *Kennedy v. Chemical Waste Management, Inc.*, 79 F.3d 49 (7th Cir. 1996)). The court held that the same reasoning applied to Huels' claim:

> In each case, an employer committed a single dispositive (and allegedly discriminatory) act – it assigned certain employees poor positions on relative seniority lists. And although those employees only felt the most painful consequences of the employer's conduct down the road (when the lists were used in a nondiscriminatory manner to fire or demote employees), their claims accrued when the discriminatory act was committed. . . . We see no compelling reason to treat the neutral application of an allegedly discriminatory employee-ranking list compiled using performance evaluations differently from a list based upon relative seniority. As a result, even though Huels' low ranking was not a "certain prelude" to being laid off and then not being recalled, his claim – to the extent he ever had one – accrued when he, like the plaintiffs in *Lorance* and *Kennedy*, was assigned an allegedly discriminatory position on the ranking list.

*Id.* at 1051 (citations omitted).

Despite this seemingly relevant language, the court believes that the City's reliance on *Huels* is misplaced. Huels alleged that Exxon discriminated against him by giving him a poor performance ranking based on his alcoholism. Exxon's subsequent use of that ranking – in conjunction with the other employees' non-discriminatory rankings – did not amount to a separate act of discrimination against Huels. Further, Huels did not allege that he was injured as a result of a discriminatory Exxon policy. Huels did not allege that Exxon's ranking system was discriminatory, nor that Exxon's reliance on that ranking system constituted discrimination. Because Huels' claim centered on his individualized treatment by Exxon, it accrued at the time of that individualized treatment – not when Huels felt the effects of that treatment pursuant to a neutral, generalized, and unchallenged lay-off and rehiring policy.

Here, by contrast, plaintiffs are not alleging any individualized adverse treatment by the City. Rather, they allege that the 1995 examination had a disparate impact on African-American firefighter candidates, and that the City's reliance on the examination's results continues to have a disparate impact on African-American candidates. The City cannot simply explain away the disparate impact of the hiring process as "the present consequences of a one-time past violation." (Def.'s Reply at 8) If plaintiffs establish that the City's examination had a disparate impact on African-American candidates, then the City's ongoing use of the examination's results – rather than some other, non-discriminatory criteria for candidate selection – has the same disparate impact.

The City's motion for summary judgment is premised on the notion that, in analyzing a disparate impact claim based on an employment examination, the disparate impact reflected in the examination results can be separated from the disparate impact arising from the employer's use of those results. This notion is not supported by logic or case law. In *Guardians Ass'n v. Civil Service*

*Comm'n*, 633 F.2d 232, 235 (2d Cir. 1980), *aff'd*, 463 U.S. 582 (1983), black and Hispanic police officers challenged the written examinations used in making appointments to the New York City Police Department, alleging that the examinations had a racially disparate impact. The officers did not file suit until New York City laid off over 2,500 officers pursuant to the police department's "last-hired, first-fired" policy. *Id.* The officers alleged that, if not for the discriminatory entry-level examinations, they "would have been hired earlier and thus would have accrued sufficient seniority to withstand being fired." *Id.* at 236. The defendants argued, as the City does here, that the utilization of the examination-based eligibility lists was "merely the non-actionable perpetuation of the effects of past" discrimination. *Id.* at 249. The court rejected this argument, holding that:

> By utilizing the tainted test results for years after becoming subject to the commands of Title VII, defendants continued a course of discriminatory conduct that had indeed begun before the effective date of the Act but did not cease until defendants abandoned the practice of making hiring decisions in this manner. Even if the unjustified refusals to hire did not comprise the core of defendants' discriminatory conduct, at the very least they represented the culmination of a continuously maintained illegal employment policy.

*Id.* Similarly, in *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241, 249 (5th Cir. 1980), the Fifth Circuit held that the employee's EEOC charge was timely if his employer, within the limitations period, "continued to base its selection of employees to receive job opportunities upon scores from an unvalidated battery of tests."

The City unjustifiably downplays *Guardians* and *Gonzalez* by pointing out that both decisions predate the Supreme Court's decision in *Ricks*. This court does not interpret *Ricks* as calling into question – much less repudiating – the approaches taken by the *Guardians* and *Gonzalez* courts. As discussed above, the *Ricks* Court held that an employee's disparate treatment claim accrued at the time of his discriminatory treatment, not at the time he felt the effect of that

treatment. *Ricks* has not been interpreted as establishing that a disparate impact claim accrues at the genesis of the policy giving rise to the disparate impact, regardless of how long that policy is perpetuated. The fact that the City has overstated the demise of *Guardians* and *Gonzalez* is underscored by the fact that the decisions continue to be cited favorably in the wake of *Ricks. See, e.g., Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 658 (11th Cir. 1993) (applying *Gonzalez*'s continuing violation analysis); *United States E.E.O.C. v. City of Chicago*, No. 85 C 7281, 1989 WL 134788, at *5 (N.D. Ill. Oct. 13, 1989) (citing *Guardians* favorably).

As noted, the Seventh Circuit has yet to speak directly on the particular issue raised by the City's motion. In a factually analogous case, Judge Will rejected an argument similar to the one raised here by the City. In *United States E.E.O.C. v. City of Chicago*, the EEOC sued the City for violating the Age Discrimination in Employment Act by refusing to hire or take applications for police officer positions from anyone age thirty-five or older. *See id.* at *1. Judge Will held that "[a] roster created from a discriminatory exam, and used for purposes of hiring, constitutes a continuing violation over the entire period of its use." *Id.* at *6. He reasoned that:

> If there was discrimination in these claimants' exclusion from the exam, that discrimination did not occur only when the roster was posted. It did occur then, but it also continued to occur for as long as the roster barred the claimants from an opportunity to be hired. Each decision to hire from the roster perpetuated any violation begun by their initial exclusion and made it an act of present discrimination.

*Id.*

Judge Will's reasoning is not rendered inapplicable to this case merely because the City's age-35 policy was facially discriminatory, whereas the City's reliance on the 1995 examination results is facially neutral. Such a distinction may be dispositive where the employee's claim is based on disparate treatment, but not where it is based on disparate impact. *See Vitug*, 88 F.3d at

15

513 ("A disparate impact exists where a specified employment practice, although neutral on its face, has a disproportionately negative effect on members of a legally protected class.").

Judge Plunkett took a different path in determining the timeliness of the plaintiffs' claims in *In re Matter of Chicago Police Officer Promotions*, No. 91 C 668, 1993 WL 322834 (N.D. Ill. Aug. 23, 1993). In that case, white candidates for detective promotions alleged that they were intentionally excluded from the promotions list because of their race. *Id.* at *2. In order to qualify for the oral boards, the City required that white candidates achieve a higher minimum score on a written examination than the score required of minority candidates. *Id.* at *1. The results from the oral boards, in combination with the written examination results, were used to compose the promotions list. *Id.* at *2. Based on *Ricks*, Judge Plunkett concluded that:

> [T]he discriminatory act with respect to Plaintiff's eligibility for promotion was the July 1990 compiling of the 1990 detective's promotions list, for it was not until this time that the Plaintiffs could be certain that the oral boards, from which they were excluded based on their race, would be used in future promotion decisions (or, put another way, that they would be denied promotions based on their race). Denial of the . . . promotions in 1992 is but a later effect of Plaintiffs' earlier exclusion from the 1990 list.

*Id.* at *6. In finding that the plaintiffs' claims were untimely, Judge Plunkett echoed the principle set forth in *Ricks* that "the clock starts to run when the discriminatory act takes place, not when the plaintiff is affected by it." *Id.* at *7; *see also Kuan v. City of Chicago*, 563 F. Supp. 255, 256-57 (N.D. Ill. 1983) (holding that, where plaintiff alleged that he received a discriminatory performance evaluation, his claim accrued at the time of the evaluation, not when the evaluation was later used as part of a promotion examination).

Regardless of whether Judge Plunkett's approach can be harmonized with Judge Will's, Judge Plunkett's approach is not inconsistent with finding a continuing violation in this case. The

plaintiffs in *Chicago Police Officer Promotions* alleged that they were intentionally discriminated against because of their race. 1993 WL 322834, at *2. Their only allegation that could have amounted to intentional discrimination was the City's decision effectively to exclude them from the promotions list by requiring a higher score from them on the written examination. The City's subsequent use of the promotions list was not a new instance of intentional discrimination. There is nothing in Judge Plunkett's analysis, however, to suggest that the use of a promotion roster or candidate rankings could not amount to an ongoing discriminatory policy where the nature of the discrimination alleged is that the use has a disparate impact on a protected class of candidates.

The other cases relied on by the City do not alter the court's conclusion. In *Lorance v. AT&T Technologies, Inc.*, 490 U.S. 900, 903 (1989), three women who worked as testers for AT&T alleged that an alteration to the rules governing tester seniority was designed to protect incumbent male testers and to discourage women from promoting into tester positions. Significantly, the Court observed that the plaintiffs' "allegation of a disparate impact on men and women would ordinarily suffice to state a claim" under Title VII, but that Title VII affords seniority systems special treatment. *Id.* at 904; *see* 42 U.S.C. § 2000e-2(h) (providing that employment differences arising from operation of seniority system are unlawful only if they are a result of intentional discrimination). The Court went on to hold that when an employer's "seniority system is nondiscriminatory in form and application, it is the allegedly discriminatory *adoption* which triggers the limitations period." 490 U.S. at 911 (emphasis in original).

The City correctly points out that, although *Lorance*'s specific holding has been abrogated by statute, *see* 42 U.S.C. § 2000e-5(e)(2) (allowing employees injured by application of intentionally discriminatory seniority system to measure limitations period from date of that

application), the Seventh Circuit has recognized that *Lorance*'s "reasoning remains persuasive outside of the Title VII/intentionally discriminatory seniority system context." *Huels*, 121 F.3d at 1050 n.1. Nevertheless, the court does not believe that the Seventh Circuit's embrace of *Lorance*'s reasoning can – without further guidance from the court – be construed as a blanket rejection of the continuing violation theory as applied to an employer's ongoing use of rankings generated by a discriminatory examination.

In *Kennedy v. Chemical Waste Mgmt., Inc.*, 79 F.3d 49 (7th Cir. 1996), the court held that the statute of limitations began to run on an employee's adverse treatment claim at the time he was deprived of seniority, not at the time he was laid off as a result of that deprivation. The court reasoned that:

> Seniority is an important employee benefit because, like academic tenure, which it resembles, it provides job protection. Its deprivation is an injury that sets the statute of limitations running . . . even though the injury is contingent rather than actual unless and until job protection is needed.

*Id.* at 50 (citing *Ricks*). *Kennedy*'s analysis does not bear on the statute of limitations inquiry in this case because plaintiffs' claims are based not on the single deprivation of an employment benefit or opportunity, but on a continuing policy that has a disparate impact on African-American firefighter candidates. The disparate impact is not limited to the initial promulgation of the examination results, but arises every time the City decides to hire based on the results of the discriminatory examination.

A factual pattern more similar to this case is presented by *Bronze Shields, Inc. v. New Jersey Dep't of Civil Service*, 667 F.2d 1074, 1077-78 (3d Cir. 1981), in which the plaintiffs alleged that the eligibility roster used to hire Newark police officers was racially discriminatory because the written examination on which it was based had a disparate impact on minorities. Once plaintiffs

were notified that they were not on the roster, they "knew they would not be hired by the Newark police department for the next three years because they were not on the eligibility roster." *Id.* at 1083. The Third Circuit rejected plaintiffs' argument that Newark continued to discriminate against them by continuing to use the eligibility roster. First, the court observed that "Newark never used the list prior to plaintiffs' filing charges with the EEOC." *Id.* On this basis, the court distinguished *Guardians*, noting that "had Newark used the list and hired recruits within 180 days before plaintiffs filed, their filings would have been timely." *Id.* at 1083 n.23. Second, the court found that, "even if Newark had used the list, plaintiffs do not allege that Newark would have followed anything but a neutral, non-discriminatory procedure in hiring from the list." *Id.* at 1083.

To the extent that the *Bronze Shields* holding is based on Newark's failure to use the eligibility roster after its promulgation, its reasoning does not apply to this case. The City admits that "the Chicago Fire Department has been processing firefighter candidates for hire from the well-qualified pool of candidates on the firefighter eligibility list since approximately April 1996." (Def.'s Resp. to Pls.' Rule 56.1(b)(3)(B) Statement of Additional Facts ¶ 7)

However, to the extent that the *Bronze Shields* holding is based on the fact that Newark neutrally applied rankings generated by a discriminatory examination, this court declines to follow it.[2] The *Bronze Shields* court followed the *Ricks* analysis, finding that "Newark's non-

_____

[2] Judge Will found *Bronze Shields* similarly unhelpful in *United States E.E.O.C. v. City of Chicago*, 1989 WL 134788. Judge Will first factually distinguished the case before him from *Bronze Shields*, observing that the City had already relied on the discriminatory age-35 roster to hire police recruits by the time the claimants filed charges, whereas Newark's roster had not been used at the time charges were filed. *See id.* at *5. He went on to find that the Third Circuit's reliance on *Ricks* was misplaced because "the holding in *Ricks* does not apply to cases where the allegations charge a continuing policy and practice of discrimination rather than just isolated instances of it." *Id.* Finally, Judge Will concluded that the *Bronze Shields* court reached "a result not compelled by any prior Third Circuit or Supreme Court precedent," and one which is "inconsistent with the purposes of the ADEA." *Id.* at *6.

discriminatory policy as to the use of the roster is similar to Delaware State's non-discriminatory policy in discharging all faculty denied tenure." *Id.* at 1084. In drawing this analogy, the Third Circuit overlooked the fundamentally different natures of the discrimination alleged in the two cases. In *Ricks*, the discrimination consisted of the college's racially motivated rejection of Ricks' bid for tenure. Once tenure was denied, the college did not further discriminate against Ricks, but simply treated him as it did any other professor denied tenure – granting him a one-year terminal contract, then discharging him.

By contrast, in *Bronze Shields*, the discrimination occurred not because minority police officer candidates were required to take an examination that had a disparate impact on them, but because Newark's subsequent use of the examination's results in hiring police officers had a disparate impact on minority candidates. If Newark had jettisoned the tainted results and substituted some other employment criteria before beginning the hiring process, there would have been no actionable discrimination – regardless of the timing of the plaintiffs' EEOC filings. Because the claims brought by plaintiffs here and in *Bronze Shields* centered on the disparate impact arising from the cities' *use* of the examinations' results, Title VII was violated for as long as the cities continued using those results.

## Conclusion

The court concludes that, if plaintiffs establish that the 1995 written examination used in the City's firefighter selection process had an unlawful disparate impact on African-American candidates, then the City's ongoing reliance on those results constitutes a continuing violation of Title VII. In light of this conclusion, the court need not address the other arguments raised by plaintiffs in opposition to the City's motion for summary judgment based on the statute of

limitations.  Pursuant to the continuing violation doctrine, the court finds that plaintiffs' EEOC

charges were timely, and that, as a result, this suit is not time-barred.  Accordingly, the City's

motion for summary judgment is denied.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED:   May 25, 2000