UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARTHUR L. LEWIS, JR.; et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 98 C 5596 |
| ) | |
| ) | |
| CITY OF CHICAGO, ) | Judge Joan B. Gottschall |
| ) | |
| Defendant. ) | |

**PLAINTIFFS' PROPOSED**
**FINDINGS & CONCLUSIONS WITH RESPECT TO REMEDIES**

Plaintiffs, by counsel, submit the following proposed findings and conclusions with respect to monetary and non-monetary remedies to be ordered in this case, together with a draft injunctive order, attached hereto as Exhibit A.

**PROPOSED FINDINGS AND CONCLUSIONS**

1. On March 22, 2005, after a bench trial, the Court entered a judgment of liability against defendant City of Chicago ("the City"), concluding that the City's use of its 1995 entry-level firefighter examination ("the 1995 Test") with a cut-off score of 89 had been "a manifest violation of Title VII." Docket R. 274 at 27. Remedies remain to be specified and are the subject of these findings and conclusions.

2. For purposes of remedial proceedings, plaintiffs moved for joinder of and the Court joined, as non-aligned parties, both Chicago Fire Fighters Union Local No. 2 ("the Union") and the Firemen's Annuity and Benefit Fund of Chicago ("the Fund"). Fed. R. Civ. P. 19 & 21. Docket R. 357. See generally *Quinones v. City of Evanston*, 58 F.3d 275, 277-78 (7th

Cir. 1995); *United States v. City of Chicago and Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago,* 978 F.2d 325, 332 (7th Cir. 1992) . Joinder of the Fund occurred over the Fund's objection.

3. With all necessary parties joined, discovery with respect to remedies having been taken and evidence received both through live testimony and through filed submissions, the Court now addresses the scope of appropriate relief to be provided to class members in this case.

I. **Remedial Hiring**

4. The parties are in agreement that but for the City's violation of Title VII, as adjudged by this Court, 132.4 additional African Americans, members of the plaintiff class in this case, would have been hired by the Chicago Fire Department.

5. The Court finds that remedying unlawful discrimination in this case requires the hiring of 132 class members ("the shortfall group").

6. Plaintiffs have proposed procedures and a timetable for remedial hiring of the shortfall group. Their motion for proposed injunctive relief (Docket R. 333) provides in part as follows:

> **Rightful Place Hiring**
>
> Eligibility. Within ten days after the entry of this Order, a database shall be created containing the names of all members of the class who either have not yet advanced to subsequent steps in the selection process that follow the 1995 Test or, having advanced, have not yet been offered a position at the Quinn Fire Academy and have not been disqualified through subsequent screening by failing the background check on a basis that would also have caused the termination of an incumbent firefighter, failing the drug screen, or failing the medical examination.[1]

---

[1] The Court has previously ruled "that proposed provisions that would allow class members more lenient standards for passing the PAT [Physical Abilities Test] and the Background Check are not properly among the relief the court should grant in this case." Docket

Lottery. Within 20 days after the entry of this Order, the names entered into the database (referred to in paragraph A1, above) shall be placed on an eligibility list in random order, using a software application intended for that purpose. The random ordering of the names shall be performed by, and on a computer owned by, an outside party that is not an agent of the City.

Offers to Class Members to Advance to the Next Steps of the Hiring Process. Within 30 days after entry of this Order, the City shall extend offers to class members to advance to the remaining steps of the entry-level firefighter hiring process (consisting of the physical abilities test, background investigation, drug screen and medical examination) – beginning with the first name on the randomized list created by the lottery process (referred to in paragraph A2 above) and thereafter proceeding in rank order down the list. These offers shall be made by first-class certified mail. The City shall continue extending offers to class members to advance to the next steps of the hiring process until there exists a pool of at least 132 class members who have undergone and passed all steps of the City's pre-employment screening for firefighters. All pre-employment screening of class members shall be completed within 120 days after entry of this Order.

Offers of Employment. Within 130 days after entry of this Order, the first 132 class members to undergo the background investigation, physical abilities test, drug screen and medical examination and to pass all of them shall be offered employment by the City as Chicago Fire Department ("CFD") candidate firefighters at the Quinn Fire Academy ("the Academy"). The City shall continue making offers of employment to class members pursuant to this Order until 132 class members have accepted such offers.

Timing of Entry into the Academy. All class members hired pursuant to paragraph A4 of this Order shall enter the Academy no later than 12 months after the entry of this Order.

No Prejudice to Other Hiring Opportunities. All class members not offered employment by the City as CFD candidate firefighters at the Quinn Fire Academy pursuant to ... this Order, and who have not been disqualified by the City from advancing in the selection process (i.e., by failing the background check ~~on a basis that would also have caused the termination of an incumbent firefighter,~~ by failing the drug screen or the medical examination, ~~twice~~ failing the physical abilities test, or by failing to report for any of these after being invited to do so), shall continue to compete for positions at the Quinn fire Academy on the same basis as all other eligible persons with scores between 65 and 88 on the 1995 Firefighter Test. Nothing in this Order shall in any way affect or

---

R. 349. Accordingly, plaintiffs' request that class members who fail the background test should be ineligible only if they fail it "on a basis that would also have caused the termination of an incumbent firefighter" has been denied, for which reason that language appears in "strikeout" in the text above.

3

>prejudice class members' rights to be considered for employment with the CFD as part of the City's ongoing hiring of firefighters by random selection from the pool of persons with scores of 65 through 88 on the 1995 Firefighter Test.

R. 333 (strike-outs added).

    7.    On December 12, 2006, the Court conducted an evidentiary hearing with respect to non-monetary relief. At that hearing, the City introduced no evidence with respect to the above provisions of plaintiffs' proposed injunction.[2] The Court independently finds these provisions reasonable – with the modifications indicated above by the language highlighted and stricken through. The Court also agrees that the following additional provision should be inserted: "The City shall, with the approval of plaintiffs' counsel, employ a skip tracing service to update class members' address information before offers to advance to the next steps of the hiring process are mailed, rather than simply relying on addresses provided by class members in 1995 at the time they registered for the 1995 Firefighter Test."

## II.    Retroactive Seniority

    8.    Adequate relief under Title VII presumptively includes retroactive seniority. *Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 765-66 (1976) ("Adequate relief may be well be denied in the absence of a seniority remedy slotting the victim in that position in the seniority system that would have been his had he been hired at the time of his application. It can hardly be questioned that ordinarily such relief will be necessary to achieve the 'make-whole' purposes of the Act"); *Thomas v. City of Evanston*, 610 F. Supp. 422, 435 (N.D. Ill. 1985) ("Under

---

[2]The City provided no discovery on these subjects, refusing to permit its designated 30b6 witness to answer questions on these topics and failing to designate any other 30b6 witness for these topics. City 30b6 Dep. (Derrick Jackson) (9-6-2006) at 16:11 - 26:18, attached hereto as Exhibit C.

*Franks,* we must presume that retroactive seniority is appropriate").

9. Indeed, an award of full retroactive seniority is to be withheld "only on the basis of unusual adverse impact arising from facts and circumstances that would not be generally found in Title VII cases." *Franks*, 424 U.S. at 779 n.41. The Supreme Court has specifically rejected the view that such relief might be denied because of its impact "on other, arguably innocent, employees"; that rationale "would if applied generally frustrate the central 'make whole' objective of Title VII." *Id.* at 774.

10. The parties here dispute, however, how seniority should be calculated for the 132 members of the shortfall group. Plaintiffs have submitted evidence that but for the City's violation of Title VII the *average* date on which members of the shortfall group would have been hired is December 4, 1998. R. 366 ¶ 87. On that basis, plaintiffs propose that members of the shortfall group each be assigned seniority retroactive to that date.

11. The City and the Union propose a different methodology for seniority. The Union thus argues that "December [4], 1998 is not a date that any class of candidates from the 1995 firefighter entrance exam [was hired]" and that "the alignment of seniority dates with actual class hire dates" would be "more empirical." Docket R. 362 at 3 *(Contentions of Local 2 In Opposition to Plaintiffs' Proposed Injunctive Order*) (8/31/2006).[3]

12. The Court considers neither method more "empirical" than the other. But

---

[3]The Union thus proposes that insofar as the May 16, 1996 Academy class would have had 21.3 additional African Americans but for the City's violation of Title VII, 21 of the 132 remedial hires should be assigned seniority dates of May 16, 1996; that insofar as 10.5 additional African Americans would have been members of the October 1, 1996 Academy class but for the Title VII violation, 10 (or perhaps 11) of the 132 should be assigned seniority dates of October 1, 1996 – and so on.

5

plaintiffs' proposal has the virtue of simplicity and also avoiding arbitrary distinctions between members of the shortfall group. If, for instance, some in the shortfall group were awarded earlier seniority dates than others, they would also be entitled to correspondingly greater wages. There is no reason to create such arbitrary disparities among members of the shortfall group.

13. The Union further contends that for purposes of promotions to engineer or lieutenant, "actual" rather than court-awarded retroactive seniority must be used. The Union cites to Section 9.3B of the current collective bargaining agreement, which requires that a firefighter must serve no less than 54 months in the position of firefighter before promotion to the position of either engineer or lieutenant. ("[N]o employee may be promoted to the position to the position of engineer or lieutenant, and shall be passed over on the eligibility list, without fifty four (54) months in the classification of firefighter and/or engineer"). The Union insists that pursuant to the collective bargaining agreement this 54 month "time in grade" requirement means 54 months of "*actual time* served in the position, i.e., with boots on the ground." Docket R. 362 at 10 (emphasis in original). Plaintiffs object that but for the City's violation of Title VII members of the shortfall group would already have satisfied the 54 months' time-in-grade requirement of Section 9.3B.

14. To the extent the Union is suggesting that the collective bargaining agreement displaces the Court's authority to attempt to restore victims of discrimination to the positions they occupy but for the unlawful discrimination, *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418 (1975), the Court rejects that argument. The Supreme Court held in *Albermarle* that district courts have "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past ...." *Id*. Title VII is not displaced by collective

6

bargaining agreements; to the contrary, collective bargaining agreements yield, where necessary, in order to remedy discrimination. *General Bldg Contractors Ass'n., Inc. v. Pennsylvania United Engineers & Constructors, Inc.*, 458 U.S. 375, 400 (1982) ("To the extent that the remedy properly imposed ... requires any adjustment in the collective-bargaining contract ..., it is entirely proper for the District Court to fashion its injunctive remedy to so provide, and to have that remedy run against petitioner as well as the Union"); *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 399 (1982) ("Equally meritless is the union's contention that retroactive seniority contrary to the collective-bargaining agreement should not be awarded over the objection of a union that has not itself been found guilty of discrimination"); *Bridgeport Guardians, Inc. v. Delmonte*, 248 F.3d 66, 74 (2d Cir. 2001).

15. The Union also contends that injunctive relief in this case should not include constructive seniority for competitive promotional purposes because of public safety concerns attendant to promoting firefighters prematurely. Plaintiffs, however, have accommodated that concern. Docket R. 333 ¶ B3.[4] Whereas the current contract requires 54 months time-in-grade before promotion to engineer or lieutenant, plaintiffs propose to reduce the required boots-on-the-ground time to 30 months but not to eliminate it. *Id.*

16. In view of plaintiffs' acceptance of a 30-month time-in-grade requirement, the issue before the Court is what effect, if any, a remedial decree that shortened the time-in-grade

---

[4]Plaintiffs' proposed injunction thus preserves a 30-month time-in-grade requirement, stating as follows: "For purposes of Section 9.3 of the current Labor Contract (July 1, 1999 to June 30, 2007), class members hired pursuant to this Order shall, subject to passing an appropriate promotional exam, be eligible for promotion to the position of Engineer of Lieutenant within 30 months after graduation from the Academy."

7

requirement from 54 months to 30 for members of the shortfall group, while preserving all other requirements for promotion, would have on public safety.

17. Plaintiffs point out that the very existence of a time-grade-requirement is recent. Until the 1995-1999 labor contract, which was not ratified until 1998, there had never been any time-in-grade requirement for promotion to lieutenant or engineer. Dec. 12, 2006 Trial Tr. at 25:21-24; 40:14-41:4. Plaintiffs also note both that in submitting its contentions before trial pursuant to Court order, the City did not contend that any time-in-grade requirement is necessary (Docket R. 358) and that the City also presented no evidence through live testimony either that public safety requires any time-in-grade requirement or that in all the years up to 1998 the absence of one was ever a problem. Only the Union has made an issue of this portion of plaintiffs' remedial request, which, plaintiffs contend, is not surprising given that seniority is almost always a primary concern for unions. Plaintiffs also point out that the Union has admitted that it can identify no situation in which people or property in the City of Chicago have ever been endangered because the lieutenant at the scene of a call was unseasoned due to having been promoted before 54 months. Union 30b6 Dep. (Mark McDermott) at 30:2-13.[5]

18. On this record, there is no persuasive evidence that a 54-month time-in-grade requirement is necessary. The Union had an opportunity to introduce probative evidence to support adherence to a 54 month time-in-grade requirement rather than the 30-month time-in-grade requirement plaintiffs stand willing to accept. The Union failed to do so. The City has not contended that plaintiffs' 30-month time-in-grade requirement would in any way compromise

---

[5]This testimony was offered and admitted into evidence pursuant to Fed. R. Civ Proc. 32 and Fed. R. Evid. 801(d)(2). Dec. 12, 2006 Trial Transcript at 8:5-12. A copy is attached as Exhibit B.

Fire Department operations. For years, there was no time-in-grade requirement whatsoever. And the selection of a 54-month period in the current contract was the product of bargaining. City 30b6 Dep. (Derrick Jackson) (9-06-06) at 52:24 - 53:15.[6] In view of these facts, the Court will not withhold relief that would otherwise further the goal of restoring class members to the place they would have been because of a negotiated 54-month time-in-grade requirement in the contract.

19. All other standing requirements for promotion, including competitive position on an eligibility list established by performance on both written and oral/proficiency criteria, are in no way affected. The Court also notes that promotional eligibility lists typically remain in place for years (see Dec. 12, 2006 Trial Tr. at 18:20 - 19:12), such that most eligible candidates for promotion to engineer or lieutenant do not receive a promotion without more than 30 months in the firefighter rank in any event.

### III. Reporting and Monitoring

20. Plaintiffs initially sought **(a)** a monitor to be present during physical abilities testing and **(b)** reporting of the results of all pre-employment screening. Docket R. 333 ¶¶ D1 & D2. Plaintiffs' requests for monitoring and reporting of results during pre-employment screening will not be adopted by the Court, at least at this time, in light of **(a)** the fact that class members selected to proceed through screening steps now will not necessarily be the same class members who would have been selected originally, and the Court's rulings **(b)** that the City must continue to screen class members until 132 are hired and **(c)** that monitoring may still be imposed if the

---

[6]This testimony was offered and admitted into evidence pursuant to Fed. R. Civ Proc. 32 and Fed. R. Evid. 801(d)(2). Dec. 12, 2006 Trial Transcript at 8:5-12. A copy is attached as Exhibit B.

9

City cannot find 132 class members who meet the screening requirements.

21. Separately, plaintiffs also seek reporting requirements and the presence of a monitor during Academy Training. Docket R. 333 D4 & D5. The Assistant Director of Training at the Quinn Fire Academy of the Chicago Fire Department, Chief Mark Nielsen, testified in a 30b6 deposition that "as far as a monitor being at the Academy, *I would actually encourage it.*" City 30b6 Dep. (Nielsen) Tr. at 129:20 - 130:16 (emphasis added).[7] In later courtroom testimony, he subsequently added that a monitor is not in his opinion "needed," which is not inconsistent with his encouraging it and its being desirable. Dec. 12, 2006 Trial Tr. at 65:25 - 66:1.

22. There has never before been a class of court-ordered remedial hires at the Quinn Academy. Nor has there ever been a class made up entirely of African Americans. Dec. 12, 2006 Trial Tr. at 74:5-13. The City has acknowledged, despite the documented history of racism within the department, that training, if any, at the Fire Academy regarding racial sensitivity is quite limited. City 30b6 Dep. (Nielsen) at 113:13-114:5.[8]

23. During the liability trial, the Court heard testimony that "there's still systematic racism within the Fire Department, and that can be a profound effect on an entry-level fireman"; that the African American Firefighters League is not allowed to recruit within the Fire Academy;

---

[7] This testimony was offered and admitted into evidence pursuant to Fed. R. Civ Proc. 32 and Fed. R. Evid. 801(d)(2). Dec. 12, 2006 Trial Transcript at 8:5-12. A copy of all prior testimony admitted by the Court on Dec. 12, 2006 is attached hereto as Exhibit B for the Court's convenience.

[8] This testimony was offered and admitted into evidence pursuant to Fed. R. Civ Proc. 32 and Fed. R. Evid. 801(d)(2). Dec. 12, 2006 Trial Transcript at 8:5-12. A copy is attached as Exhibit B.

and that the League actually warns new African American firefighters that "membership could have some detrimental effect .... on their Fire Department experience." Jan. 22, 2004 Trial Tr. at 1169:11 - 1170:1 (Testimony of Battalion Chief Nicholas Russell). The City had the opportunity and elected not to cross examine Chief Russell on this testimony.

24.     Given Chief Nielsen's candid acknowledgment that he would encourage the presence of a monitor at the Academy during training of class-member remedial hires (possibly for understandable reasons, given the emotions generated by this litigation), the Court agrees that the use of a monitor or ombudsman at the Academy to shepherd class-member remedial hires through would be desirable. Plaintiffs and the City are directed to confer in an attempt to jointly select a monitor, who will report to the Court. The parties are also directed to submit suggestions to the Court regarding the scope of responsibilities that should be assigned to the monitor.

### IV.     Monetary Relief

25.     Plaintiffs and defendant have each submitted written direct testimony of their damages experts as well as videotapes and transcripts of the cross examinations of those experts, which were conducted out-of-court.

26.     The areas of dispute between plaintiffs and the City with respect to monetary relief are well defined and relatively narrow. It is evident to the Court that from both sides, the damages experts have quite constructively narrowed the issues of dispute through concerted efforts to eliminate differences between methodologies and assumptions where possible. Indeed, based on plaintiffs' and the City's submissions to the Court, the cooperation of the experts has made it possible to reduce the areas of difference between them with respect to monetary relief

to three primary issues:

    a.    The wage level that should be used in computing "interim earnings." 42 U.S.C. § 2000e-5. The parties refer to this dispute as a disagreement about whether "Level 5" or "Level 6" blue-collar wages, as derived from data compiled for the National Compensation Survey by the Bureau of Labor Statistics, http://www.bls.gov/ncs/, serve as the best estimate of interim (or "mitigating") earnings; and

    b.    Whether back pay should include amounts for lost "moonlighting" income;

    c.    Whether prejudgment interest should be awarded at prime rate or at the lower, "small investor" rate.

27.    Although disagreements persist between plaintiffs and the City about how each of these three issues above should be resolved, there is substantial agreement on the math once these issues are resolved. Adopting numbers set forth by defendant's expert in his written direct testimony, this agreement is summarized in the matrix below:

| Assumption: Back pay is Awarded: | *With Moonlighting* and prejudgment interest at the *small investor rate* | *With Moonlighting* and prejudgment interest at the *prime rate* | *Without* Moonlighting and prejudgment interest at the *small investor rate* | *Without* Moonlighting and prejudgment interest at the *prime rate* |
|---|---|---|---|---|
| Using NCS *Level 5* Wage Rates for Interim Earnings | $22,258,306 | $22,778,533 | $20,604,792 | $21,086,522 |
| Using NCS *Level 6* Wage Rates for Interim Earnings | $14,764,665 | $15,094,139 | $13,111,151 | $13,403,724 |

28.     The figures above are subject to three provisos. *First*, the table above includes values for awards with prejudgment interest at the prime rate. The figures presented by the City's expert in his written direct testimony (R. 371 at 6 and 27), by contrast, were incomplete in that they omitted to include loss calculations for awards of prejudgment interest *at the prime rate*. Compare R. 366 (written direct testimony of Dr. Marc Bendick) ¶ 86 (including totals for damages with interest at the prime rate). As discussed later in this document (paragraph 46 below), prejudgment interest is properly awardable in this case at the prime rate.[9] The *second* proviso to the above table is that the figures in it are totals for back pay owed *through August 3, 2006*, which is a "placeholder" date used by the parties because the last day of the back pay period is, at this point, unknown. By definition, the back pay period will not end for any class member hired pursuant to this Order until his or her date of hire by the CFD. When dates of hire are known, the back pay figures above will need to brought current to those dates. *Third*, the above figures also do not account for a retroactive wage increase that resulted from a recent collective bargaining agreement reopener, which was not disclosed in time for either party's expert to include in calculations. When back pay amounts are paid, totals will also, accordingly, need to be adjusted to account for that, and any other intervening subsequent, increase(s) in wages or benefits. The parties are directed to cooperate in making these adjustments, which are mathematical, and the Court does not anticipate disputes over these adjustments.

     **A.**    **Determination of the Wage Level to be Used in Calculating Interim Earnings**

---

[9]To fill in the values for awards with prejudgment interest at the prime rate, which are missing from defendant's expert's written direct testimony, plaintiffs' counsel have provided, above, estimates of the missing amounts. Before briefing is complete with respect to these proposed findings and conclusions, precise amounts will be specifically calculated and provided to the Court.

29. It is impossible to identify the 132 members of the plaintiff class who would have been hired but for the City's Title VII violation. It is also not possible, at this juncture, to obtain earnings data from 132 actual remedial hires. Those 132 individuals have not yet been identified.

30. The City requested, but the Court denied, discovery to sample the plaintiff class at large for information about interim earnings.

31. With these constraints, both plaintiffs' and defendant's expert have used data and methodologies developed by the Bureau of Labor Statistics ("BLS") to calculate "interim earnings." 42 U.S.C. § 2000e-5(g)(1) ("Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable").

32. Specifically, the experts have relied on data from and the methodologies of the National Compensation Survey ("NCS").

33. The NCS reports wage rates by occupation and by "work level." Both sides' experts agree that wages in this case, using NCS data, should be figured from the data set for "blue collar" occupations. They differ, however, regarding the "work level" of blue collar jobs from which estimates should be made.

34. Plaintiffs' expert has used earnings data for NCS blue-collar "Level 5" employment to estimate interim earnings, whereas the City's expert has instead used NCS blue collar "Level 6" earnings data (resulting in higher interim earnings and, therefore, a lower back pay award amount). This is the largest, most material difference between their estimates.

35. The experts focus a large amount of attention, and attribute their disagreement

concerning whether Level 5 or Level 6 blue-collar-NCS-wage data provide the best estimate of interim earnings, to the difference in their respective opinions about how to "score" or "rate" two NCS "leveling factors": a factor referred to as "Scope and Effect" under an older "nine-factor" scoring system and a factor referred to as "Knowledge" under a newer "four-factor" scoring system. Compare Docket R. 366 ¶¶ 52-53, 74-76 (written direct of Dr. Marc Bendick) with Docket R. 371 ¶¶ 20-25, 38-39 (written direct of Dr. Paul White). The Court is skeptical that these dispute sheds much light on the question at hand.

36. Instead, the Court finds that Level 5 wages are the appropriate benchmark estimate of interim earnings of the shortfall group for three reasons.

37. *First*, the assumption, as made by defendants' expert, that members of the shortfall group have been earning "Level 6" wages would mean that they have been working, *on average*, for wages higher than 82 out of every 100 African American males ages 21-35 in the Chicago labor market with a high school education but no four-year college degree and wages at a level higher than more than 76 out of every 100 African American males in the Chicago labor market when the group is expanded to include college graduates. By contrast, plaintiffs' assumption that members of the shortfall group have been earning "Level 5" wages would mean that their wages are still at the top end of those of their peers, but at the 68th rather than 83rd percentile for African American males ages 21-35 with a high school education – and the 61st rather than 77th percentile when the group is expanded to include peers with a four-year college degree. The Court agrees with plaintiffs' expert that the latter set of assumptions (corresponding to Level 5 wages) are more realistic. R. 366 ¶¶ 71-72.

38. *Second*, defendant's expert scored the job of firefighter according to the job duties

a firefighter is equipped for after extensive Academy training. Trial Tr. (cross of Paul White, 9-28-06) at 91:1-5; see also R. 366 ¶ 56; Trial Tr. (cross of Marc Bendick) at 31:1 - 32:4. Having been denied fire department jobs, however, when members of the shortfall group went into the job market to search for alternative employment, they did not go into the job market with skills acquired during Fire Academy training. See R. 366 ¶ 56; Trial Tr. (cross of Marc Bendick) at 31:1 - 32:4. Fire Academy training provided by the CFD lasts for six months. It is considerably more extensive than the training, if any, provided by employers for most comparable in the economy. The Court finds it unrealistic to base a determination on defendant's estimates, which presume levels of training that members of the shortfall group did not have at the moment they were discriminated against and that many of them are unlikely to have obtained in the interim, given the comparatively more extensive training provided by the CFD at the Fire Academy that by other employers in other workplaces.

  39.   *Third*, the Court is also aware that the estimates of both experts in this case are just that: estimates. Difficulty in computing back pay does not defeat the right itself. In addition, unrealistic exactitude in proof is not required. Plaintiffs have made an adequate showing that "Level 5" wages approximate the interim earnings level of members of the shortfall group and the City has not shown that "Level 6" wages are a demonstrably better estimate.[10]

---

[10]The Court notes, in addition, that defendant's recommendation of "Level 6" wages is also suspect for at least three additional reasons.

 *First*, in applying the newer "four-factor" BLS scoring system, defendant's expert assigned the CFD entry-level firefighter position the maximum 550 points for "Knowledge." The Court agrees with plaintiffs' expert (see R. 366 ¶ 76), that in doing so defendant's expert erred. The BLS materials are explicit that 550 points is the point total for Knowledge for a position of "fire crew *chief*" (R. 371, Exhibit 6, page 40), rather than for the entry-level firefighter positions at issue in this case, which must be scored lower.

 *Second*, the Court also agrees that, as elicited by plaintiffs in their cross examination of

16

B. **Inclusion of Moonlighting Income**

40. The normal schedule for a firefighter in the CFD is 24 hours on, followed by 48 hours off. R. 366 ¶31; CBA § 4.1. This schedule results in 10 days off over a two-week period. Compared to "9 to 5 Monday to Friday" workers, firefighters have an "extra" 6 days off every two weeks, which translates to 156 days over the course of a year. R.366 ¶ 32. This explains why, compared to individuals in other jobs, firefighters are substantially more likely to work two jobs. R. 366 ¶ 324.

41. According to a survey in 1995 by the Bureau of Labor Statistics, 28.1 percent of persons employed in firefighting occupations nationwide reported holding second jobs, the highest proportion of any occupation surveyed. R. 366 ¶ 28.

42. The proportion of CFD firefighters holding second jobs is probably substantially higher. In 1994, then First Deputy Fire Commissioner (subsequently Commissioner) Edward P.

---

defendants' expert – see Trans. of Cross of Paul White at 13:10 - 14:11, 14:16 - 15:23, – defendant's expert misconstrued the following language in the BLS materials and, as a result, erred in finding this language applicable to this case: "Fights fires and carries out crash/rescue activities at a major airport handling large aircraft or located in a metropolitan area." R. 371 Exh. 6 page 40. Syntactically, the phrase "located in a metropolitan area" most logically modifies "major airport," not, as defendant's expert has misread it, "crash/rescue activities." Trans. of Cross of Paul White (9-28-06) at 14:16 - 15:23, 16:15 - 17:10. Accordingly, that sentence is not an apt description of the CFD entry-level job. CFD candidates do not receive the FAA Part 139 ARFF Certification required for aircraft rescue and fire fighting services during air carriers operations. 14 CFR Part 139. They are neither given operations training for, nor commonly assigned to, Midway or O'Hare for aircraft rescue and fire fighting operations.

*Third*, the Court notes that prior to his work in this case, defendant's expert had never before performed BLS scoring (Trans. of Cross of Paul White at 43:17 - 44:4); that he has never read a job analysis of a firefighter position (Trans. of Cross of Paul White at 44:17-21); that he was unaware whether class members in this case had or had not been trained by the CFD as EMTs before their elimination from the hiring process (Tr. of Cross of Paul White at 46:12 - 47:1); and that for the only other job he attempted to score in his report or testimony, that of a dental assistant, his scoring was at odds with and higher than the scoring of the BLS itself. Trans. of Cross of Paul White at 17:11 - 23:24.

Altman, Jr. gave sworn testimony that roughly 90 percent of firefighters in the CFD held a second job. R. 366 ¶ 30; Plaintiffs' Exh.1 (for Dec. 12, 2006 Hrg.) ¶ 56 (Final Ruling, Commission on Human Relations, *Adams v. Chicago Fire Dept.*).

43. "Make whole" relief in this case should, accordingly, take into account that by missing out on a firefighter position, the average member of the shortfall group lost not only the difference between CFD wages and benefits and "interim earnings" but also some measure of "moonlighting" income from the secondary employment that firefighters have a substantially higher propensity than other workers to hold due to their unusual work schedules.

44. Lost income from secondary or moonlighting income is analogous to lost overtime income: when a plaintiff proves that but for discrimination he or she would have earned overtime (or, analogously, moonlighting income), that lost compensation is properly included in back pay. It is income that would have been earned but for the discrimination and is properly included in figuring lost compensation. E.g., *Kossman v. Calumet County*, 800 F.2d 697, 703 (7th Cir. 1985) (overtime benefits should be considered in a back-pay award), overruled in part on other grounds, *Coston v. Plitt Theatres, Inc.*, 860 F.2d 834 (7th Cir. 1988).

45. Plaintiffs have used very conservative assumptions in calculating lost income from secondary employment, including **(a)** assuming that only 28.1 percent of CFD firefighters hold second jobs, **(b)** reducing the hours of expected secondary employment by half, and **(c)** assuming that the hourly wage rate firefighters earn in second jobs is only half the hourly wage rate they earned for "interim earnings." R. 366 ¶¶ 37-40.

C. **The Prejudgment Interest Rate**

46. Prejudgment interest is properly awardable at the prime rate. *First Nat. Bank of*

*Chicago v. Standard Bank & Trust,* 172 F.3d 472, 480 (7th Cir. 1999) ("Our practice has been to use the prime rate as the benchmark for prejudgment interest unless either there is a statutorily defined rate or the district court engages in 'refined rate-setting' directed at determining a more accurate market rate for interest. *Cement Division, National Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir.1998); *In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1332 (7th Cir.1992). We hold today that to set aside this practice and award something other than the prime rate is an abuse of discretion, unless the district court engages in such a refined calculation").

**V.     CONCLUSION**

47.     For the reasons stated above, the Court concludes that disputed issues with respect to monetary relief are resolved as follows. Back pay shall be awarded **(a)** using NCS Level 5 blue-collar wages as the wage level for "interim earnings"; **(b)** including payment for lost "moonlighting"/secondary employment income; and **(c)** with prejudgment interest at the prime rate.

Dated: December 19, 2006

                                            Respectfully submitted,

                                            /s/ Joshua Karsh
                                            One of the Attorneys for Plaintiffs

| | |
|---|---|
| Matthew J. Piers | Clyde Murphy |
| Mary M. Rowland | Laurie Wardell |
| Joshua Karsh | CHICAGO LAWYERS COMMITTEE |
| Hughes Socol Piers Resnick & Dym, Ltd. | FOR CIVIL |
| Three First National Plaza |    RIGHTS UNDER LAW, INC. |
| 70 West Madison Street, Suite 4000 | 100 N. LaSalle Street, Suite 600 |
| Chicago, Illinois  60602 | Chicago, IL  60602 |
| Telephone 312/580-0100 | |

| | |
|---|---|
| Judson H. Miner<br>MINER BARNHILL & GALLAND PC<br>14 W. Erie Street<br>Chicago, Illinois 60610 | Fay Clayton<br>Cynthia Hyndman<br>ROBINSON CURLEY & CLAYTON<br>300 S. Wacker, Suite 1700<br>Chicago, IL 60606 |
| Robert Stroup<br>NAACP LEGAL DEFENSE<br>  & EDUCATION FUND, INC.<br>99 Hudson Street, Suite 1600<br>New York, NY 10013-2897 | Patrick O. Patterson<br>Law Offices of Patrick O. Patterson, S.C.<br>7481 North Beach Drive<br>Fox Point, WI 53217 |