# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ARTHUR L. LEWIS, JR.; et al.,       )
                               )      No. 98 C 5596
                Plaintiffs,   )
                               )      Judge Joan B. Gottschall
     v.                     )
                               )      Magistrate Judge Ian H. Levin
CITY OF CHICAGO,           )
                               )
               Defendant.  )

**INJUNCTIVE ORDER OF RELIEF**

On March 22, 2005, the Court entered a judgment of liability against the City of Chicago

and in favor of plaintiffs after holding, in a memorandum opinion the findings of which shall be

incorporated herein, that the City's use of its 1995 Firefighter Test with a cut-off score of 89 had

a disparate impact on African American candidates, had not been shown to be job-related or

consistent with business necessity, was a manifest violation of Title VII and, further, that random

selection of candidates with scores of 65 and above to advance to the next steps of the hiring

process would have been both an equally valid and less discriminatory alternative.

Resolution of the claims in this case now requires specification and implementation of

the remedial relief to be provided to plaintiffs for the City's violation of Title VII.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT the City provide the relief set

forth below, in accordance with the terms set forth below:

A.      **Rightful Place Hiring**

      1.      <u>Eligibility</u>.  Within ten days after the entry of this Order, a database shall be

created containing the names of all members of the class who either have not yet advanced to

1



subsequent steps in the selection process that follow the 1995 Test or, having advanced, have not

yet been offered a position at the Quinn Fire Academy and have not been disqualified at any

subsequent step of pre-employment screening (i.e., by failing the background check, the physical

abilities test, the drug screen or the medical examination).

2.    Lottery.  Within 20 days after the entry of this Order, the names entered into the

database (referred to in paragraph A1, above) shall be placed on an eligibility list in random

order, using a software application intended for that purpose.  The random ordering of the names

shall be performed by, and on a computer owned by, an outside party that is not an agent of the

City.

3.    Offers to Class Members to Advance to the Next Steps of the Hiring Process.

Within 30 days after entry of this Order, the City shall extend offers to class members to advance

to the remaining steps of the entry-level firefighter hiring process (consisting of the physical

abilities test, background investigation, drug screen and medical examination) –  beginning with

the first name on the randomized list created by the lottery process (referred to in paragraph A2

above) and thereafter proceeding in rank order down the list.  These offers shall be made by first-

class certified mail.  The City shall, with the approval of plaintiffs' counsel, employ a skip

tracing service to update class members' address information before offers to advance to the next

steps of the hiring process are mailed, rather than simply relying on addresses provided by class

members in 1995 at the time they registered for the 1995 Firefighter Test. The City shall

continue extending offers to class members to advance to the next steps of the hiring process

until there exists a pool of at least 132 class members who have undergone and passed all steps

of the City's pre-employment screening for firefighters.  All pre-employment screening of class

members shall be completed within 120 days after entry of this Order.

4.      Offers of Employment.   Within 130 days after entry of this Order, the first 132 class members to undergo the background investigation, physical abilities test, drug screen and medical examination and to pass all of them shall be offered employment by the City as Chicago Fire Department ("CFD") candidate firefighters at the Quinn Fire Academy ("the Academy"). The City shall continue making offers of employment to class members pursuant to this Order until 132 class members have accepted such offers.

5.      Timing of Entry into the Academy.   All class members hired pursuant to paragraph A4 of this Order shall enter the Academy within 24 months of the entry of this Order.

6.      No Prejudice to Other Hiring Opportunities.   All class members not offered employment by the City as CFD candidate firefighters at the Quinn Fire Academy pursuant to paragraph A4 of this Order, and who have not been disqualified by the City from advancing in the selection process (i.e., by failing the background check, the physical abilities, the drug screen or the medical examination or by failing to report for any of these after being invited to do so), shall continue to compete for positions at the Quinn Fire Academy on the same basis as all other eligible persons with scores between 65 and 88 on the 1995 Firefighter Test.  Nothing in this Order shall in any way affect or prejudice class members' rights to be considered for employment with the CFD as part of the City's ongoing hiring of firefighters by random selection from the pool of persons with scores of 65 through 88 on the 1995 Firefighter Test.

7.      Pre-Employment Screening: "Candidate Interest Cards".   From the date of entry of this Order, class members shall be permitted to return "Candidate Interest Cards" by mail.

**B.      Retroactive Seniority**

1.    Award of both "Competitive" and "Benefits" Seniority.  As used in this Order, "retroactive seniority" shall mean crediting of seniority for all purposes for which seniority is used in the CFD.

2.    Constructive Seniority Date.  Any class member hired pursuant to the terms of this Order shall be entitled, after completion of the contractual nine-month probationary period of employment, to retroactive seniority credit dating back to December 4, 1998.

3    Eligibility for Promotion to the Rank of Engineer or Lieutenant.  For purposes of Section 9.3 of the current Labor Contract (July 1, 1999 to June 30, 2007), or any successor provision, class members hired pursuant to this Order shall, subject to passing an appropriate promotional exam, be eligible for promotion to the position of Engineer or Lieutenant within 30 months after graduation from the Academy.  Appropriate promotional examinations for the position of Engineer and Lieutenant shall be offered and administered no sooner than 18 months but no later than 28 months after class members hired pursuant to this Order graduate from the Academy.  In all other regards, class members hired under this Order shall be treated, for any purpose for which seniority is considered, as if they had been hired on December 4, 1998, including but not limited to receiving salary and vacation at the same level as the salary and vacation they would be receiving if they had been hired on that date.

4    Compensation for Delayed Promotions to the Rank of Engineer or Lieutenant. Any class member who is promoted to the position of Engineer or Lieutenant from the first eligibility list generated by exams scheduled pursuant to paragraph B3 of this Order shall, upon promotion, receive salary and benefits commensurate with having been promoted 12 months sooner.

4

**C.**     **Back Pay**

1.     Back Pay.   Within 30 days of the entry of this Order, the City shall pay to an

interest-bearing escrow account opened by plaintiffs' counsel ('the Escrow Account") the sum of

$22,778,533.  When the date(s) upon which members of the shortfall group will enter the

Academy have been determined, the City shall make an additional payment into the Escrow

Account to account for:  **(a)** the wage increase from the collective bargaining agreement

reopener in 2006 and any other intervening increase(s) in wages or benefits; and **(b)** additional

back pay owed to members of the shortfall group from the period from August 4, 2006 through

their entry into the Academy.

2.     Funding of Pension, And Any Other Applicable Benefits Plans and Programs,

Back to Retroactive Seniority Date.  On or before the date of hire of any class member pursuant

to paragraph A4 of this Order, the City shall make payments to fund each relevant benefits

policy, plan or program (including all those set forth or referenced in Article XII of the Labor

Contract between the City of Chicago and Chicago Firefighters Union Local No. 2) in order to

provide that class member, and his or her family, with the same level of fringe benefits as if the

class member had been hired on  December 4, 1998.  If necessary, the Court will direct the

Board of Trustees of the Firemen's Annuity & Benefit Fund to accept contributions by the City

to fund  benefits.

3.     Distribution of Back Pay Amounts to the Class.   No funds shall be distributed

from the Escrow Account established pursuant to Paragraph C1, above, without prior order of

Court.   Upon approval by the Court, funds from the Escrow Account shall be distributed as

follows:

5

   a.    <u>Payments to Retroactively Fund the Employee-Portion of Pension (and/or similar) Contributions Owed by Class Members Hired Pursuant to Paragraph A4 of this Order</u>. Amounts shall be deducted and paid from the Escrow Account sufficient to relieve persons hired pursuant to paragraph A4 of this Order of the burden of making out-of-pocket payments to retroactively fund their *employee*-portion of pension contributions (and/or other amounts due as payments from them to retroactively fund other benefit policies, programs or plans).

   b.    <u>Distribution of Remaining Funds to Eligible Class Members Who Do Not Receive Job Offers</u>.  The remainder of funds in the Escrow Account shall be distributed in equal shares to eligible class members (as defined in paragraph A1 of this Order) who:  **(a)** do not receive job offers pursuant to paragraph A4 of this Order and **(b)** have filed a valid claim form pursuant to paragraph C4 of this Order (below).

   c.    <u>Surplus Funds</u>.  If, after distribution of funds pursuant to paragraph C3 (a & b), above, funds remain in the Escrow Account, these shall be paid to the African American Firefighters League for use in recruiting African Americans to apply for positions within the Chicago Fire Department, training African Americans for CFD examinations, and/or renting or purchasing a facility in which to train African Americans for CFD examinations.

   4.    <u>Claims Process/Claims Forms</u>.  Within 30 days of acceptance of job offers by

               132

class members pursuant to paragraph A4 of this Order, the City shall send, by certified mail (return receipt requested), using the most current available addresses, as specified in paragraph A3 above, to all other eligible class members (as defined in paragraph A1 of this Order), a claim form, in a format developed by plaintiffs' counsel and approved by the Court.  Simultaneously,

the City shall also publish the claims form in the *Chicago Tribune* and the *Chicago Sun-Times*. The City shall bear the cost of all mailing printing and publication and any other associated expenses. Claims forms must be returned by eligible class members to plaintiffs' counsel by first class mail, postmarked no later than 30 days from the date of their mailing by the City. Any eligible class member who does not return a claims form within that period shall be deemed to have waived any right to be considered for an award of remedial relief under this Order.

D.    **Reporting and Monitoring**

1    <u>Reporting Requirements During Academy Training</u>.  The City shall notify Matthew J. Piers, as class counsel, of the grades received by every plaintiff class member entering the Academy pursuant to paragraph A4 of this Order, during every week of each class member's training at the Academy. The notification shall be in writing. In order to make it possible to evaluate plaintiff class members' standing relative to others at the Academy, the notification shall also include the grades (but need not include the names) received by any candidates at the Academy at the same time who are not members of the shortfall group.

2.    <u>Monitoring During Academy Training</u>.  A current or retired incumbent firefighter member of the plaintiff African American Firefighters League shall be recommended by class counsel and approved by the Court to monitor classroom instruction and to serve as an ombudsman for class members during their time at the Academy. All costs of such monitoring, including salary for the monitor, shall be borne by the City. Further specifics of the monitoring shall be the subject of a supplemental order of the Court.

E.    **Prejudgment Interest**

All monetary relief provided to class members pursuant to this Order shall be awarded

with compound prejudgment interest at the prime rate.

**F.**     **Postjudgment Interest**

All monetary relief provided to class members pursuant to this Order shall be awarded with postjudgment interest.

**G.**     **Attorney's Fees and Expenses**

As prevailing parties, plaintiffs are entitled to an award of attorney's fees and expenses pursuant to 42 U.S.C. § 1988, including expert fees. 42 U.S.C. § 2000e-5(k). The parties shall attempt to agree upon the amount of an award pursuant to Local Rule 54.3(d) before a fee motion is filed. Plaintiffs shall also be entitled to an award of fee and costs for monitoring and implementation of this Order after its entry.

**G.**     **Retention of Jurisdiction**

The Court shall retain jurisdiction of this action for all purposes, including but not limited to matters of construction, implementation and enforcement of the terms of this Order.


APPROVED and ORDERED this ____ day of _____, 2007.


_____

UNITED STATES DISTRICT JUDGE

# EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTHUR L. LEWIS, JR.; GREGORY S.)
FOSTER, JR.; ARTHUR C.            )
CHARLESTON, III; PAMELA B. ADAMS) 
WILLIAM R. MUZZALL; PHILIPPE H. )
VICTOR; CRAWFORD M. SMITH;       )
ALDRON R. REED, and              )
AFRICAN-AMERICAN FIRE FIGHTERS   )
LEAGUE OF CHICAGO, INC.,         )
individually and on behalf of    )
all others similarly situated,   )
                                 )
            Plaintiffs,          )
                                 )
        vs.                      )  No. 93 C 5596
                                 )
CITY OF CHICAGO,                 )
                                 )
            Defendant.           )

        The deposition of MARK ALLEN NIELSEN,

called by the Plaintiffs for examination, pursuant

to notice and pursuant to the Federal Rules of

Civil Procedure for the United States District

Courts pertaining to the taking of depositions,

taken before Susan M. Reed, Certified Shorthand

Reporter for the State of Illinois, at 70 West

Madison Street, Suite 4000, Chicago, Illinois, at

10:30 o'clock A.M., on the 30th day of October,

A.D., 2006.

**BAKER, FENNELL & ASSOCIATES, INC.**
CERTIFIED SHORTHAND REPORTERS
P.O. BOX 0787
Chicago, IL 60690
312-386-1225 FAX: 312-386-1226

REPORTED BY: Susan M. Reed, CSR

EXHIBIT
B

## PAGE 2

```
                                                          2
 1    A P P E A R A N C E S :

 2
      HUGHES, SOCOL, PIERS, RESNICK & DYM, LTD.
 3    BY:  MR. JOSHUA KARSH
           70 West Madison Street, Suite 4000
 4         Chicago, Illinois 60602
           312/580-0100
 5         appeared on behalf of the Plaintiff;

 6
      MS. NAOMI AVENDANO
 7         1676 West Webster
           Chicago, Illinois 60614
 8         773/281-8460

 9              and

10    MS. VALERIE DEPIES HARPER
      ASSISTANT CORPORATION COUNSEL
11    DEPARTMENT OF LAW, EMPLOYMENT LITIGATION
      DIVISION
12         30 North LaSalle Street, Suite 1020
           Chicago, Illinois 60602
13         312/744-5123
           appeared on behalf of the Defendant;
14
15    MR. STEPHEN B. HORWITZ
      SUGARMAN & HORWITZ
16         221 North LaSalle Street, Suite 626
           Chicago, Illinois 60601
17         312/629-2920
           appeared on behalf of Intervenor Defendant,
18         Chicago Firefighters Union, Local 2.

19
20    ALSO PRESENT:

21         Mr. Ezra McCann

22
23         *     *     *     *     *
24

          BAKER, FENNELL & ASSOCIATES (312) 386-1225
```

## PAGE 3

```
                                                          3
 1                     I N D E X

 2
      WITNESS:
 3
      MARK ALLEN NIELSEN
 4
           Examination by Mr. Karsh          4
 5         Examination by Ms. Harper       147
           Further Examination by Mr. Karsh 150
 6         Examination by Mr. Horwitz      152
           Further Examination by Ms. Harper 155
 7         Further Examination by Mr. Karsh 157

 8
 9    EXHIBITS:

10
11    Nielsen Deposition Exhibit Nos. 1     4
      and 2
12    Nielsen Deposition Exhibit No. 1     12
      Nielsen Deposition Exhibit No. 2     14
13    Nielsen Deposition Exhibit No. 3     28
      Nielsen Deposition Exhibit No. 4     95
14
15         *     *     *     *     *
16
17
18
19
20
21
22
23
24

          BAKER, FENNELL & ASSOCIATES (312) 386-1225
```

## PAGE 4

```
                                                          4
 1                  (10:45 a.m.)

 2                  (Witness sworn.)

 3                  (Nielsen Deposition Exhibit Nos. 1

 4                  and 2 were so marked.)

 5    WHEREUPON:

 6              MARK ALLEN NIELSEN

 7    called as a witness herein, having been first duly

 8    sworn, was examined upon oral interrogatories and

 9    testified as follows:

10                  EXAMINATION

11              by Mr. Karsh:

12       Q.   Mr. Nielsen, would you give me please

13    your name spelled in full and your rank?

14       A.   Sure, it's Mark, M-a-r-k, Allen, middle

15    name, A-1-1-e-n, last name Nielsen, N-i-e-1-s-e-n.

16    I'm the assistant director of training for the

17    Chicago Fire Department.

18       Q.   When did you come into the department?

19       A.   February 20, 1980.

20       Q.   Were you hired during the strike?

21       A.   Yes, sir.

22       Q.   Did you have to take an entry exam?

23       A.   Absolutely.

24       Q.   When you came out of the Academy, where

          BAKER, FENNELL & ASSOCIATES (312) 386-1225
```

## PAGE 5

```
                                                          5
 1    did you go?  I'm going to take your through your

 2    job history from then to now.

 3       A.   Engine 44, which was located at 3138 West

 4    Lake Street.

 5       Q.   How long were you there?

 6       A.   I was there for six years, a little more

 7    than six years.  We changed locations, but it was

 8    the same assignment.  We had a new house built for

 9    us in that time, which is at 412 North Kedzie.

10       Q.   During that time period did you take any

11    promotional exams, engineer, lieutenant?

12       A.   Engineer.

13       Q.   Do you remember when you took that exam?

14       A.   It was in '85.  I don't remember the

15    exact date.  I remember when I received a

16    promotion.  That's when I left there.  June 16 of

17    '86 I was promoted to the rank of engineer.

18       Q.   Did you take a lieutenant's exam at all

19    during that period?

20       A.   Yes.

21       Q.   When did you take that exam?

22       A.   I want to say it was in '86, '87.

23       Q.   Okay.  When you left Lake Street, where

24    did you go next or I should -- I don't -- not at

          BAKER, FENNELL & ASSOCIATES (312) 386-1225
```

PAGE 26

26

1      Q.   Does the City have any objection to the
2  relief requested in paragraph D5 of Exhibit 2?
3      THE WITNESS:  I can answer?
4      MS. HARPER:  Yes.  The City notes that it
5  has made a formal position in response to this
6  document.
7      MR. KARSH:  That's fine.
8  BY THE WITNESS:
9      A.   No.
10     Q.   City has no objection, okay.
11          Let's take a break.  I request that
12  you not speak to the witness during the break
13  because cross examination is still ongoing.  Okay?
14  Yes?
15     MS. HARPER:  Well, please wait.
16          (Discussion had off the record
17          between counsel for the City.)
18     MS. HARPER:  We're going to ask the
19  witness to leave then, and we want to say
20  something on the record.  We'll be right out to
21  get you.
22     MR. KARSH:  That's fine.
23          (Exit Mr. Nielsen.)
24     MS. HARPER:  We're moving to strike that

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 27

27

1  answer because the City has already made a
2  position; and he has not spokesman as to that
3  legal issue; and this calls for a legal
4  conclusion.  So the City is reaffirming its court
5  filing.
6      MR. KARSH:  You can move to strike
7  anything you want, and the court will rule.  That
8  is a subject which you just listed he is
9  testifying on today.
10     MS. AVENDANO:  Yes, and we also
11  specifically listed it as to him testifying why
12  monitoring in the Academy of their progress is not
13  necessary.  That's what we designated him for.
14     MR. KARSH:  Okay.
15     MS. AVENDANO:  If you choose not to take
16  that testimony, that's fine.
17     MR. KARSH:  I asked him whether he had an
18  objection --
19     MS. AVENDANO:  We're moving to strike
20  that --
21     MR. KARSH:  Okay, we're going to take a
22  break.  I would like you to not to talk to the
23  witness during the break as cross-examination is
24  still ongoing.

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 28

28

1      MS. HARPER:  That's fine.  How long is
2  the break going to be?
3      MR. KARSH:  Five minutes.
4          (Whereupon a recess was taken at
5          11:15 a.m. until 11:25 a.m.)
6      MR. KARSH:  Let's mark this as 3.
7          (Nielsen Deposition Exhibit No. 3
8          was so marked.)
9      MS. HARPER:  I wanted to make clear I had
10  made my objection on the record to form and to the
11  extent it calls for a legal conclusion as to the
12  last question.
13     MR. KARSH:  Okay.
14  BY MR. KARSH:
15     Q.   Mr. Nielsen, have you ever seen
16  Deposition Exhibit No. 3 before?
17     A.   No.
18     Q.   If you would, sir, please turn to page 8
19  of Deposition Exhibit No. 3, and there is a
20  heading there that says Mitigation.  Could you
21  read to yourself please the two paragraphs under
22  that heading?
23     A.   Okay.
24          (Witness peruses document.)

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 29

29

1      A.   Okay.
2      Q.   Can you tell me what are the City's
3  reasons for objecting to plaintiff's calculation
4  of mitigation earnings?
5      MS. HARPER:  I'm going to object to form
6  and to the extent it calls for a legal conclusion
7  and that this witness has not been called -- or
8  has not been designated as a Rule 30(b)(6) as to
9  this question; and I instruct him not to answer.
10  BY MR. KARSH:
11     Q.   Very well.
12          Sir, can you tell me anything about
13  the factual basis for the statements the City
14  makes in the two paragraphs under the heading
15  mitigation?
16     MS. HARPER:  Objection.  Form and to the
17  extent it calls for a legal conclusion.  You may
18  answer.
19  BY THE WITNESS:
20     A.   Could you repeat the question?
21     Q.   Yes.  Can you tell me anything about the
22  factual basis for the statements the City makes in
23  these two paragraphs?
24     A.   No, I cannot.

BAKER, FENNELL & ASSOCIATES (312) 386-1225

30

```
1        Q.   Turn please to page 9.  On page 9 there
2   is a -- excuse me, page 10.  The bottom of page 10
3   there's a section called Monitoring During Academy
4   Training.  Could you read that paragraph to
5   yourself please?
6        A.   Okay.
7             (Witness peruses document.)
8        A.   Okay.
9        Q.   Can you tell me anything about the
10  factual basis for the statements the City makes in
11  this paragraph?
12            MS. HARPER:  Objection.  Form, foundation
13  and to the extent it calls for a legal conclusion.
14  BY MR. KARSH:
15       Q.   You may answer.
16       A.   The only facts that I see here is the
17  fact that there is a general order that covers
18  discrimination, and for that fact I believe that's
19  the City's contention as to why a monitor wouldn't
20  be necessary.
21       Q.   Okay.  Is there any other basis upon
22  which the City contends that a monitor is not
23  necessary?
24            MS. HARPER:  Objection.  Form,
```

BAKER, FENNELL & ASSOCIATES (312) 386-1225

31

```
1   foundation, to the extent it calls for a legal
2   conclusion and the document speaks for itself.
3   BY THE WITNESS:
4        A.   No.
5        Q.   Do you know a student at the Academy
6   named Aaron Murdock?
7        A.   Yes.  I'm sorry, an instructor.
8        Q.   Excuse me, an instructor at the Academy
9   named Aaron Murdock?
10       A.   Yes.
11       Q.   Are you aware of his having told
12  candidates that they should not attend EMT
13  remedial classes being offered by the
14  African-American Firefighters League?
15       A.   I am, yes.
16       Q.   What do you know about that subject?
17       A.   I know that there was study groups that
18  had been set up to try to prepare students for the
19  national exam or tests that are given in the
20  Academy; and I believe the basis for his statement
21  is the fact that the candidates may be misdirected
22  with bad information, if you will.
23       Q.   Did you instruct him to give that
24  instruction to candidates?
```

BAKER, FENNELL & ASSOCIATES (312) 386-1225

32

```
1        A.   No.
2        Q.   Were you aware that he was going to give
3   that instruction before he gave it?
4        A.   No.
5        Q.   How did you find out about it?
6        A.   Through another instructor actually.
7   Aaron Murdock is actually under John McKillip's
8   command who is my counterpart on the EMS side, but
9   I heard that individuals were told to steer aware
10  from these classes because they're not good
11  information.
12       Q.   Was that Aaron Murdock freelancing, or
13  was he making that statement with authority from
14  someone else?
15            MS. HARPER:  Objection.  Form,
16  foundation.
17  BY THE WITNESS:
18       A.   I'm not sure.
19       Q.   Are you aware of anyone having approved
20  his giving those instructions before they were
21  given?
22       A.   No.
23       Q.   Was any action taken with respect to him
24  after he gave those instructions?
```

BAKER, FENNELL & ASSOCIATES (312) 386-1225

33

```
1            MS. HARPER:  Objection.  Form,
2   foundation.
3   BY THE WITNESS:
4        A.   No.
5        Q.   Do you know what basis, if any, he had
6   for feeling that people might be misdirected?
7        A.   No.
8        Q.   Do you have any basis for thinking that
9   people were being misdirected by remedial classes
10  being given by the firefighters league?
11       A.   No.
12            MS. HARPER:  Objection.  Form.  Sorry,
13  give me one second to object.
14            THE WITNESS:  Okay.
15  BY MR. KARSH:
16       Q.   What do you know about the remedial
17  classes that were being given by the firefighters
18  league?
19       A.   Also nothing.  I knew -- we had heard the
20  location.  We had passed the location along to the
21  candidates in the class if they wanted to attend,
22  and that's about it.
23       Q.   How did you pass along the information
24  about the location to candidates in the class?
```

BAKER, FENNELL & ASSOCIATES (312) 386-1225

94

```
 1    BY MR. KARSH:
 2       Q.   What did you do to prepare for today's
 3    session?
 4            MS. HARPER:  You can answer except for
 5    you cannot discuss the content of our
 6    communications.
 7    BY THE WITNESS:
 8       A.   I wrote some notes earlier this morning
 9    in regard to what our training consists of in the
10    subject areas that are covered.
11       Q.   And did you use those notes to refresh
12    your recollection before you came to testify
13    today?
14       A.   Yes.
15            MR. KARSH:  I'd ask for production of
16    those notes please.
17            Could I see the notes?  Do you have
18    them with you?
19    BY THE WITNESS:
20       A.   Yes.
21            MS. HARPER:  Before you open them, did
22    you write any notations on there --
23            THE WITNESS:  Would you like to see?  I
24    don't believe so.
```

BAKER, FENNELL & ASSOCIATES (312) 386-1225

95

```
 1            MS. HARPER:  Okay.  All right.
 2            (Document tendered to counsel.)
 3            MR. KARSH:  I'd like to break for a
 4    minute and make copies of this, and we'll make it
 5    an exhibit.
 6            MS. HARPER:  Okay.  What's your plan?
 7            MR. KARSH:  I think we have between 45
 8    and 60 minutes more.
 9            (Whereupon a recess was taken at
10             12:35 p.m. and 12:45 p.m.)
11            MR. KARSH:  This will be 4.
12            (Nielsen Deposition Exhibit No. 4
13             was so marked.)
14    BY MR. KARSH:
15       Q.   Did you meet with counsel in preparation
16    for today's session?
17       A.   Yes.
18       Q.   When?
19       A.   This morning.
20       Q.   Had you met with them prior to this
21    morning?
22       A.   No.
23       Q.   Had you ever met either one of them prior
24    to this morning?
```

BAKER, FENNELL & ASSOCIATES (312) 386-1225

96

```
 1       A.   No.
 2       Q.   Spoken to either one on the telephone
 3    prior to this morning?
 4       A.   Yes.
 5       Q.   How many times had you spoken with them
 6    on the telephone?
 7       A.   Just once.
 8       Q.   Was that merely to set up a date and
 9    time?
10       A.   No --
11            MS. HARPER:  Okay, you don't have to
12    discuss any further of the content of that
13    conversation.
14    BY MR. KARSH:
15       Q.   How long did you meet this morning?
16       A.   I'm guessing an hour and a half.
17       Q.   And how long was the prior telephone
18    conversation?
19       A.   Maybe a half hour.
20       Q.   Can you identify for us what's been
21    marked as Deposition Exhibit 4?
22       A.   Sure.  This is a summary of some of the
23    candidate training.  It's approximately 15 weeks
24    long, but the thing that makes that a variable is
```

BAKER, FENNELL & ASSOCIATES (312) 386-1225

97

```
 1    holidays that occur and special assignments that
 2    the candidates might get during their training.
 3       Q.   Is that with EMT and fire suppression?
 4       A.   Fifteen weeks is just suppression.
 5       Q.   Just suppression.
 6       A.   The part that we have them for, yes.
 7       Q.   Okay.
 8       A.   There's 21 subjects covered by the state
 9    fire marshal's office.  You can see them listed
10    there.
11       Q.   Yes.
12       A.   You don't want me to read them; do you?
13       Q.   No, but if you could tell me what PPE is?
14       A.   That's personal protective equipment.
15       Q.   Okay.
16       A.   Just the fire gear that firefighters
17    wear.  It's actually combined with safety.
18    Usually it's PPE/safety.  There are nine
19    certifications that a candidate receives upon
20    graduation.  That includes EMT and firefighter 2.
21    The hazmat awareness and --
22       Q.   Is there a hazmat test for certification?
23       A.   Test, yes, there's a state exam.
24       Q.   State exam.
```

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 110

110

```
 1          A.  An ambulance, a fire engine.
 2          Q.  Any of the vehicles that --
 3          A.  Yes.
 4          Q.  Is there an independent license, like a
 5   CDL that people have to have for that?
 6          A.  No, they do not need a CDL.  They do need
 7   a non-CDL B to drive an engine or a truck, but
 8   what we utilize for driving is an ambulance
 9   because that's what they're going to drive when
10   they're released from the Academy.  We use
11   ambulances.  So they're not certified on an engine
12   or a truck, but they're taught how to respond in
13   an emergency vehicle.
14          Q.  And I apologize if I already asked this,
15   is FSVO a required certification?
16          A.  It is not.
17          Q.  NIMS, what is NIMS?
18          A.  NIMS is the National Incident Management
19   System, and it's a course -- it's an online course
20   that's offered by FEMA.
21          Q.  What does it cover?
22          A.  Well, it covers unit of command and
23   incident command.  The emphasis of the class is
24   that different agencies can work together as one,
```

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 111

111

```
 1   water department, police department, fire
 2   department and so forth.  It covers --
 3          Q.  This isn't just the feds saying when
 4   we're on the scene you do what we say?
 5          A.  Maybe so.
 6          Q.  Okay.
 7          A.  But that's an online course.  The time
 8   varies.  It's usually only about a two- or
 9   three-hour course.
10          Q.  Required certification?
11          A.  We tell the candidates it's required; but
12   we haven't failed anyone yet; and it's a new
13   certification.
14          Q.  Do you track whether they take it or not?
15          A.  We do.  We require them to produce a
16   certificate that's printed from the online study,
17   and this is actually the first candidate class
18   that will graduate since it's been required.  So
19   I've got about half of them right now with
20   certificates.  The other half have not produced
21   them yet.
22          Q.  Is the substance of that course basically
23   communications between different agencies and
24   chain of command when different agencies are on
```

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 112

112

```
 1   the scene?
 2          A.  It kind of displays how different
 3   agencies should work together.
 4          Q.  The last certification you have there is
 5   ethics.  Is that required?
 6          A.  Yes, it's required by our City.
 7          MS. HARPER:  I passed.
 8   BY MR. KARSH:
 9          Q.  What does it cover?
10          A.  What does it cover?
11          Q.  Is it the same exam that all City
12   employees take?
13          A.  Yes.
14          Q.  What does it cover?
15          A.  It covers what's proper and not proper
16   insofar as taking gifts from individuals.  Off the
17   top of my head, I can't think of anymore.  It's
18   about an hour online or it's a 20-minute, 20,
19   25-minute videotape, which is how we train our
20   candidates.
21          Q.  Citizens with disabilities awareness is
22   not a certification?
23          A.  No.
24          Q.  But it is --
```

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 113

113

```
 1          A.  It's an awareness, how especially EMT's
 2   should deal with a person in a wheelchair, not
 3   talk down to them, come to their level when you
 4   talk to them, that kind of thing.  It's just a
 5   two-hour class.
 6          Q.  Do you cover epilepsy in that sequence?
 7          A.  I don't believe so.  No, it's mostly
 8   people in wheelchairs and with physical
 9   disabilities.
10          Q.  Sexual harassment is how many hours?
11          A.  That's an hour-and-a-half, two-hour
12   class.
13          Q.  Is there a racism course?  Racial
14   awareness, diversity?
15          A.  No.  Harassment in general is covered in
16   the sexual harassment course.  It's titled sexual
17   harassment, but all forms of harassment are
18   definitely --
19          Q.  Is the subject of diversity covered at
20   all?
21          MS. HARPER:  Objection.  Asked and
22   answered.
23   BY THE WITNESS:
24          A.  Just in the harassment class I think
```

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 114

114

1   diversity is.
2       Q.   Has there ever been discussion of having
3   a class session or more than one class session on
4   racial relations within the department?
5       A.   No.
6       Q.   Are you familiar with the Tri-Data
7   report?
8       A.   Yes.
9       Q.   Are you familiar with sections of the
10  Tri-Data report that discuss race relations within
11  the department?
12      A.   Not really, no.
13      Q.   Are there -- is there anything from the
14  Tri-Data report that to your knowledge has been
15  introduced into the Academy?
16      A.   Well, the training schedule, which
17  overlaps training classes, academies, was
18  something that was recommended and something that
19  we have adhered to.  Training is pretty much
20  nonstop.  The classes are smaller and then they
21  overlap one another so that there's a more
22  constant feed to the Academy with fresh people.
23      Q.   You've been in the department for 26
24  years; is that right?

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 115

115

1       A.   Yes.
2       Q.   During those 26 years, have you had any
3   instruction on racial awareness or diversity
4   issues?
5       A.   Yes.  Yes, we had diversity training at
6   the Fire Academy when I was a battalion chief; but
7   it was offered to everyone in the field.
8       Q.   Was it mandatory or voluntary?
9       A.   Mandatory, as far as I know.
10      Q.   What was covered in that training?
11      A.   How we should treat each other as equals
12  and not harass anyone based on race, religion,
13  creed.
14      Q.   How many hours was that training?
15      A.   I believe it was four.  It was awhile
16  ago.  I think it was a half day.
17      Q.   How many years ago?
18      A.   About ten.
19      Q.   Is there any renewal or continuing
20  education on that within the department required?
21      A.   Not to my knowledge, no.
22      Q.   What segment of the department was
23  required to attend?
24      A.   As far as I know, everyone.

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 116

116

1       Q.   Everyone in the department?
2       A.   I believe so.
3       Q.   Was that triggered by any particular
4   incident in the department?
5            MS. HARPER:  Objection.  Form,
6   foundation.
7   BY THE WITNESS:
8       A.   Not that I recall.
9       Q.   The next thing you have listed there is
10  medical legal.  What are trainees taught about
11  that?
12      A.   We have some attorneys speak to the
13  candidates about specific lawsuits that have
14  stemmed from medical runs, from EMS runs; and they
15  discuss how they can avoid such litigation, mainly
16  by documentation.
17      Q.   Having been in some of that litigation,
18  documentation is good.
19            PT is physical training; is that
20  right?
21      A.   Yes.
22      Q.   Is there any PT requirement for members
23  in the field after graduation from the Academy?
24      A.   No.

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 117

117

1       Q.   Has there, to your knowledge, ever been
2   consideration of proposing such a requirement?
3       A.   Yes, I think the closest thing we've come
4   to that is our recent physical fitness incentive
5   program that we have that offers a monetary amount
6   of 350 for anyone that can do the mile and a half
7   run in a certain amount of time and a certain
8   amount of sit-ups, sit and reach and a bench press
9   based on gender and age.
10      Q.   Are you familiar with any general orders
11  in the department on the subject of race or
12  discrimination?
13      A.   Just a discrimination order per se.
14      Q.   Is that discrimination order a subject of
15  instruction at the Academy?
16      A.   Yes.  In fact, while they're at Academy
17  South, that's when the candidates are first issued
18  general orders, special directives and department
19  memos.
20      Q.   Yes.
21      A.   And they are periodically quizzed on the
22  contents of those orders and special directives.
23      Q.   Do you know anything else about any
24  instruction on a general order on discrimination

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 126

126

1   there was two firefighters in New York that died
2   in a similar situation.
3          So we try to mimic these situations
4   and have them work through the problem.  When they
5   get entangled -- and it's inevitable that they
6   will get entangled -- we try to coach them through
7   it, and eventually they make it through on their
8   own; and, obviously, it's with a blacked-out face
9   piece to mimic a smoke condition.
10         Oh, the physical fitness part of it,
11  we have two individuals that are physical fitness
12  trainers; and if there's a need for a specific
13  program, whether it be diet, specific exercises or
14  a combination of both, that's introduced to them
15  early on so that they can lose weight if that's an
16  appropriate measure or work on their
17  cardiovascular needs.
18     Q.   If you're successful with that, you
19  should market it.
20     A.   Yeah.
21     Q.   How often do the remedial classes meet?
22     A.   On average we probably cover each subject
23  area just once.  So if a candidate ever came to me
24  and said he or she was unable to make, for

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 127

127

1   instance, forcible entry class and he or she
2   really needs it, we would make an effort to do it
3   again.  But it's done before and after.  When it
4   gets close to them taking the firefighter 2 exam,
5   that's when we begin offering the remedial
6   training.
7      Q.   I think I'm not following.
8      A.   You're talking about EMT?
9      Q.   No, I'm talking about fire suppression.
10  I'll ask you about EMT next.
11     A.   Okay.
12     Q.   In fire suppression are you talking about
13  two things, there are make-up classes if you miss
14  one?
15     A.   No, remedial.
16     Q.   Typically, am I understanding you
17  correctly that there's one remedial session for
18  each subject --
19     A.   Subject area.
20     Q.   -- in the curriculum?
21     A.   Like all the 21 subject areas that are
22  listed.  Really it's 20 subject areas because we
23  combine PPE and safety because they're relatively
24  short.

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 128

128

1      Q.   How long is that remedial session?
2      A.   They have -- usually about an hour and a
3   half.
4      Q.   Per subject?
5      A.   Per subject.
6      Q.   And then is there a separate kind of
7   remedial session that happens as you approach the
8   firefighter 2 exam?
9      A.   This would be it.
10     Q.   This would be it?
11     A.   Yes.
12     Q.   Is there any other form of remedial
13  instruction that occurs?
14     A.   If an individual is struggling early on
15  with the topic, we would certainly sit down and
16  help them out; and we make it available to them or
17  known to them if there's a need to go over
18  material, for instance, we might have an
19  instructor stay after class and they can meet with
20  him or her to go over some --
21     Q.   You rely a little on their initiative to
22  get --
23     A.   Sure.  They also get a lot of support
24  from their peers too, and the peers -- it's kind

BAKER, FENNELL & ASSOCIATES (312) 386-1225

PAGE 129

129

1   of instilled in each group that we need to make a
2   combined effort for everyone to get through it.
3      Q.   How do you instill that?
4      A.   Well, by teaching them teamwork.  You
5   know, the fire department's foundation is
6   teamwork.  And if someone in group one fails, it's
7   group one fails is how we instill that.
8      Q.   There is some research that suggests that
9   the primary skill needed for fire service is the
10  capacity for teamwork.  Would you agree or
11  disagree with that?
12     A.   I would agree.
13     Q.   Anything else that you have not discussed
14  that goes into the rubric of the efforts you take
15  to make sure that the candidates succeed at the
16  Academy?
17         MS. HARPER:  Objection.  Form.
18  BY THE WITNESS:
19     A.   No.
20     Q.   The third subject on which I have been
21  told that you are being offered for testimony is
22  why monitoring at the Academy is not necessary.
23  Let me be clear.  We have proposed that there be a
24  monitor or ombudsman at the Academy to accompany

BAKER, FENNELL & ASSOCIATES (312) 386-1225

1   the 132 through. What testimony do you have to
2   offer on that subject?
3           MS. HARPER: Objection. Form, vague,
4   hypothetical, calls for a legal conclusion.
5   BY THE WITNESS:
6       A.  The only --
7           MS. HARPER: And we incorporate our
8   response.
9           MR. KARSH: Okay.
10  BY THE WITNESS:
11      A.  The only objection I have in regard to
12  that monitoring is the fact that the City's paying
13  for it.
14      Q.  Okay.
15      A.  But as far as a monitor being at the
16  Academy, I would actually encourage it.
17      Q.  The fourth subject on which I've been
18  told that you will testify at trial are the duties
19  and activities and responsibilities of
20  firefighters. What testimony do you have to offer
21  on that subject?
22      A.  Well --
23          MS. HARPER: Objection. Form.
24

        BAKER, FENNELL & ASSOCIATES (312) 386-1225

1   BY THE WITNESS:
2       A.  Firefighters that leave the Academy now
3   can, perhaps, be detailed -- will be detailed to a
4   BLS ambulance. They'll respond to such incidents
5   that are determined by the office of
6   communications, OEMC; and they'll make
7   determinations as to the severity of -- they'll do
8   a patient assessment, determine the severity of
9   the problem and upgrade accordingly. They'll make
10  upgrades, do such skills as inserting airways,
11  administering oxygen, utilizing an automated
12  defibrillator, utilizing communication skills with
13  the resource hospital and relaying what they see
14  to the physician on the other end.
15          They may find themselves on an ALS
16  engine, which means that they would have a
17  paramedic and an EMT with them; and they would be
18  charged with administering advanced life support
19  to a victim, whether that be a car accident victim
20  or heart attack victim; but that EMT would need to
21  be proficient in some of the skills that a
22  paramedic would be able to do such as setting up
23  an IV, preparing an injectable drug for injection,
24  that kind of thing. That's about 70 percent of

        BAKER, FENNELL & ASSOCIATES (312) 386-1225

1   what we do nowadays, EMS related.
2           Then the other portion what they
3   would be expected to do is check out their
4   apparatus on a daily basis, inventory that
5   apparatus. They'd be responsible for cleaning and
6   maintaining company quarters. They would report
7   directly to a company officer; and at the scene of
8   a fire, depending on if they're assigned to an
9   engine or a truck, they would be responsible for
10  securing a positive source of water; in some cases
11  laying out a hose line, in many cases by
12  themselves to either protect an exposure or for an
13  interior attack. They would be responsible for
14  conducting interior searches of a structure,
15  looking for victims, responsible for raising
16  ground ladders. They would be responsible for
17  ventilation, whether that be horizontal or
18  rooftop.
19          On the hazmat end, they may respond
20  to a hazardous material incident; and they may be
21  given a duty to assist in decon, assist in
22  pre-entry for the hazmat team. They might be
23  ordered to begin evacuation of an area.
24          At a high-rise building, they could

        BAKER, FENNELL & ASSOCIATES (312) 386-1225

1   be ordered to search a room, an area, an
2   apartment, hopefully with a partner but not
3   always. They may even be positioned in a
4   stairwell just to assist victims down an
5   evacuation stairwell. They may be ordered to
6   communicate with the residents of a high-rise to
7   inform the residents what's going on, that we're
8   investigating a fire, that we have a fire, that
9   the residents should remain in place, that the
10  residents should evacuate, whatever the case may
11  be.
12          They may be ordered to assist in a
13  rescue effort. You might have a worker in a
14  trench. They may be the only EMT on the scene in
15  certain situations where they would have to
16  administer oxygen to that person, maybe go down
17  into the trench and make an initial assessment of
18  what's wrong with him or her. They could be
19  involved with a rope rescue, a high-angle rescue,
20  confined space. The list goes on.
21      Q.  Are these all areas in which you hope to
22  have trained people at the Academy?
23      A.  At least in the awareness level, so they
24  know at least as much to stay away from it if it's

        BAKER, FENNELL & ASSOCIATES (312) 386-1225

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTHUR L. LEWIS, JR., et al.,)
                            )
          Plaintiffs,       )
                            )
     vs.                    )    No. 98 C 5596
                            )    Hon. Joan B.
CITY OF CHICAGO,            )    Gottschall
                            )
          Defendant.        )


          The deposition of MARC McDERMOTT, called by

the plaintiffs for examination, pursuant to notice

and pursuant to Federal Rule of Civil Procedure

30(b)(6), taken before Kayla A. Paetsch, Certified

Shorthand Reporter in and for the State of Illinois,

on October 19, 2006, at 9:41 a.m., at 70 West

Madison Street, Suite 4000, Chicago, Illinois.

**BAKER, FENNELL & ASSOCIATES, INC.**
CERTIFIED SHORTHAND REPORTERS
P.O. BOX 0787
Chicago, IL 60690
312-386-1225 FAX: 312-386-1226

REPORTED BY: KAYLA A. PAETSCH, CSR

## PAGE 2

Page 2

```
 1              PRESENT:

 2

 3    HUGHES SOCOL PIERS RESNICK & DYM
      By MR. JOSHUA KARSH
 4    60 West Madison Street, Suite 4000
      Chicago, Illinois 60603
 5    312.580.0100

 6              appeared on behalf of the plaintiffs;

 7    CITY OF CHICAGO, LAW DIVISION
      By MS. NAOMI A. AVENDANO
 8    30 North LaSalle Street, Suite 1020
      Chicago, Illinois 60602
 9    312.742.5113

10              appeared on behalf of the defendant;

11

12    BURKE BURNS & PINELLI, LTD.
      By MR. VINCENT D. PINELLI
13    70 West Madison Street, Suite 4300
      Chicago, Illinois 60602
14    312.541.8600

15              appeared on behalf of the third-party
                defendant Firemen's Annuity and Benefit
16              Fund of Chicago;

17    SUGARMAN & HORWITZ
      By MR. STEPHEN B. HORWITZ
18    221 North LaSalle Street, Suite 626
      Chicago, Illinois 60601
19    312.629.2920

20              appeared on behalf of the third-party
                defendant Chicago Firefighters Union
21              Local 2.

22

23              ALSO PRESENT:

24    Mr. Joel Burns
```

BAKER, FENNELL & ASSOCIATES, INC.
312.386.1225

## PAGE 3

Page 3

```
 1                   I N D E X

 2    WITNESS:  MARC McDERMOTT

 3                                          Page

 4    EXAMINATION BY:

 5        MR. KARSH                          4

 6        MR. HORWITZ                       33

 7

 8                   EXHIBITS

 9        Exhibit Nos. 1-2 marked            4

10        Exhibit Nos. 3-5 marked            6

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

BAKER, FENNELL & ASSOCIATES, INC.
312.386.1225

## PAGE 4

Page 4

```
 1         (Deposition Exhibit Nos. 1-2 were marked
 2         for identification.)
 3              MARC McDERMOTT,
 4    having been first duly sworn, was examined and
 5    testified as follows:
 6              EXAMINATION
 7    BY MR. KARSH:
 8        Q  Mr. McDermott, my name is Josh Karsh, and I
 9    represent -- I'm one of the lawyers representing the
10    plaintiffs in this case.  Would you state your name,
11    please, for the record?
12        A  Marc McDermott.
13        Q  And your position with the union?
14        A  Director of contract enforcement.
15        Q  How long have you been director of contract
16    enforcement?
17        A  Approximately a year and a half.
18        Q  Let me put before you what's been
19    pre-marked as Deposition Exhibit No. 1.  This is the
20    notice for the deposition.  On the second page -- or
21    the third page is a summary of the topics of the
22    deposition.  Have you seen this document before?
23        A  I have not.
24        Q  If you would, take a moment and read Roman
```

BAKER, FENNELL & ASSOCIATES, INC.
312.386.1225

## PAGE 5

Page 5

```
 1    Numeral I, deposition topics.
 2        A  Okay.
 3        Q  All right.  Do you understand that you're
 4    here on behalf of the union today as a corporate
 5    representative to testify to these topics?
 6        A  Yes.
 7        Q  Okay.  What if anything did you do to
 8    prepare for today's deposition?
 9        A  I just reviewed the contract sections, some
10    of the contract sections, and basically that's about
11    it.
12        Q  Okay.  You see Roman Numeral II asks for
13    production of all documents relating to Roman
14    Numeral I.  Have you brought any documents with you?
15        MR. HORWITZ:  We have some, yes.
16        MR. KARSH:  Okay.
17        MR. HORWITZ:  Do you have the contract?
18        MR. KARSH:  I have -- I don't think -- I
19    have 9927.
20        MR. HORWITZ:  That's the one.
21        MR. KARSH:  Okay, yeah.
22        MR. HORWITZ:  And we have -- let's see.  We
23    have the announcement for the fire engineer
24    exam No. 32013.
```

BAKER, FENNELL & ASSOCIATES, INC.
312.386.1225

PAGE 6

Page 6

1          MR. KARSH:  Okay.
2          MR. HORWITZ:  We have the announcement for
3    the lieutenant exam, 39903.
4          MR. KARSH:  Uh-huh.
5          MR. HORWITZ:  And I think that is it.  We
6    do refer to -- we have one -- another -- a memo
7    concerning the lieutenant promotional exam for
8    1999, but it's not the announcement.  I thought
9    I had the announcement here, but I guess I
10   don't.  I must have left it at the office.
11         MR. KARSH:  Okay.  Are there any other
12   documents responsive to Roman Numeral II?
13         MR. HORWITZ:  That we -- not that I know
14   of, no.
15         MR. KARSH:  Okay.
16         MR. HORWITZ:  What we refer to in our
17   objections and all that, but that would be it.
18         MR. KARSH:  Okay.  Let's get them on the
19   record.  Please mark the documents just handed
20   to me by Mr. Horwitz as Deposition Exhibits 3,
21   4, and 5.
22         (Deposition Exhibit Nos. 3-5 were marked
23            for identification.)
24   BY MR. KARSH:

PAGE 7

Page 7

1          Q    Mr. McDermott, let me put in front of you
2    now what's been marked as Deposition Exhibit 2.  Do
3    you recognize that document?
4          A    Yes.
5          Q    Have you read that document?
6          A    I believe I have at some point.
7          Q    Okay.  Does that document contain a
8    complete statement of the union's objections to the
9    relief that plaintiffs seek in this case?
10         A    Yes.
11         Q    How long have you been an employee of --
12   well, let me ask it a different way.  Are you
13   yourself a firefighter?
14         A    Yes, I am.
15         Q    Okay.  And which entry level exam did you
16   take?
17         A    The 1985 exam.
18         Q    When did you graduate -- or when did
19   you enter the academy?
20         A    1987, August of '87.
21         Q    How long were you in the academy?
22         A    Approximately three months.
23         Q    And where was your first station?
24         A    Truck 28 on 1901 North Damen Avenue.

PAGE 8

Page 8

1          Q    Any other members of your family also
2    firefighters for the Chicago Fire Department?
3          A    No, sir.
4          Q    Have any been in the past?
5          A    No.
6          Q    Did you ever take an engineer's exam?
7          A    Have I taken an engineer's exam?
8          Q    Yes.
9          A    I have not.
10         Q    Did you ever take a lieutenant's exam?
11         A    I have.
12         Q    When did you take the lieutenant's exam?
13         A    Approximately 1999, 1999 or 2000.
14         Q    Have you been promoted to the rank of
15   lieutenant?
16         A    I have not.
17         Q    Where were you on the list?
18         A    I'm No. 436.
19         Q    When did you leave ranks to work for the
20   union?
21         A    Approximately May -- May of '05, May 1st,
22   '05.
23         Q    And did you go directly to contract
24   enforcement?

PAGE 9

Page 9

1          A    That's correct.  I was elected.
2          Q    Did you participate in the most recent
3    round of contract negotiations?
4          A    I did.
5          Q    During your time in the firefighter rank,
6    did you ever hold a second job?
7          A    Yes, I did.
8          Q    Okay.  When and which jobs?
9          A    I used to work for Arrow Motor Service
10   driving a truck, basically.
11         Q    Okay.
12         A    Approximately from 1987 through maybe '92,
13   '93.
14         Q    Any other jobs while you were in the
15   firefighter rank?
16         A    No, not really.
17         Q    Okay.  What were your hours for Arrow?
18         A    Well, it was basically on my days off, you
19   know, a couple -- two or three times a week, 8 to 4,
20   give or take.
21         Q    And what was your hourly wage?
22         A    Now you're really stretching it.  I don't
23   remember.
24         Q    More than minimum?

## PAGE 18

Page 18

1     Q   Do you know people who were promoted to
2 lieutenant or engineer before 54 months?
3     A   Yes.
4     Q   Do you know anyone who was ever demoted
5 after being promoted to lieutenant or engineer
6 because of a judgment that they were insufficiently
7 experienced to hold that position?
8     A   Demoted, no.
9     Q   Okay. Do you know anyone who was ever
10 discharged from a lieutenant or engineer position
11 because of a judgment that they were insufficiently
12 experienced to hold that rank?
13     A   Discharged from the job?
14     Q   Yes.
15     A   There's been many -- many people discharged
16 from their job for various things.
17     Q   Do you know of anybody who was specifically
18 discharged because it was judged that they were
19 insufficiently experienced to hold the rank of
20 engineer or lieutenant?
21     MR. HORWITZ: Does that include people
22   whose performance did not satisfy the city that
23   they could properly perform the job?
24     MR. KARSH: Only if it was due to a

BAKER, FENNELL & ASSOCIATES, INC.
312.386.1225

## PAGE 19

Page 19

1 judgment that they were insufficiently
2 experienced, that they didn't have enough
3 incumbency to hold the position.
4     MR. HORWITZ: You mean length of time?
5     MR. KARSH: Length of time.
6     A   Not that I know of.
7 BY MR. KARSH:
8     Q   Okay. Do you know of any engineer or
9 lieutenant who has ever had any action taken against
10 them based on a judgment that they were
11 insufficiently experienced to be a lieutenant or
12 engineer?
13     A   I know of actions that have been taken
14 against lieutenants and engineers --
15     Q   Sure.
16     A   -- for things that they've done, judgments
17 that they've made --
18     Q   Yes.
19     A   -- that they've taken action, that's
20 correct.
21     Q   Okay.
22     A   If that's what you're asking.
23     Q   No, I'm asking specifically if the action
24 was based on the fact that they were insufficiently

BAKER, FENNELL & ASSOCIATES, INC.
312.386.1225

## PAGE 20

Page 20

1 experienced to hold the position of engineer or
2 lieutenant.
3     MS. AVENDANO: Objection to form.
4     A   It's pretty hard to tell why that would be.
5 I mean, you could surmise that's their reason or you
6 could surmise it wasn't, you know. If they did
7 something -- if they made a judgment call that
8 caused them to be disciplined, and it does happen
9 many, many times, one can certainly surmise that
10 maybe that person didn't have the experience or
11 time.
12 BY MR. KARSH:
13     Q   Can you name any engineer or lieutenant who
14 was promoted to that position before 54 months who
15 was disciplined for exercising a judgment?
16     A   I personally cannot name any, but I'm --
17 I'm sure that there are some. I only know a couple
18 myself, but I know that there's more people promoted
19 than I know personally.
20     Q   Okay. You were not personally aware of
21 that ever having happened?
22     A   Not -- because I was not on the executive
23 board at the time, so I wasn't privy to that
24 information.

BAKER, FENNELL & ASSOCIATES, INC.
312.386.1225

## PAGE 21

Page 21

1     Q   Okay. And who are the people that you know
2 who were promoted to engineer or lieutenant before
3 54 months?
4     A   I believe there was a Frank Rusello
5 (phonetic), and don't ask me to spell his name, I
6 think a John Conroy (phonetic), just those two off
7 the top of my head.
8     Q   Okay. Do you know what Frank Rusello's
9 rank is today?
10     A   I think he's a captain.
11     Q   Do you know what John Conroy's rank is
12 today?
13     A   Lieutenant.
14     Q   Did the fact that either one of them was
15 promoted before 54 months as a firefighter in any
16 way compromise their performance as a lieutenant or
17 engineer?
18     MR. HORWITZ: Object to the form of the
19   question. You can answer it if you know -- if
20   you know about it.
21     A   Could you rephrase that again?
22 BY MR. KARSH:
23     Q   Sure. I want to know whether you know
24 whether the fact that they were promoted before 54

BAKER, FENNELL & ASSOCIATES, INC.
312.386.1225

1    BY MR. KARSH:

2      Q    Can you identify any situation in which

3    people or property in the city of Chicago have been

4    endangered because the lieutenant at the scene of a

5    fire or other call was promoted before 54 months?

6         MS. AVENDANO:  Objection to form.

7      A    Is that an opinion or is that a factual --

8    it would be an opinion, would it not?

9    BY MR. KARSH:

10     Q    I don't know.  Sometimes it's a fact.  Tell

11   me what you know.

12     A    I couldn't identify anybody specifically,

13   no.

14     Q    Okay.  Could you identify any situation

15   generally?

16     A    Generally there are situations that occur

17   on the fire scene that are indicative of someone who

18   may not have enough experience --

19     Q    Uh-huh.

20     A    -- to hold that position.

21     Q    But you have no specifics for 54 months?

22     A    Not specifics.

23     Q    Okay.

24     A    I do imagine that's why the 54 months was

1    put in there originally.

2      Q    But you weren't party to those

3    negotiations, right?

4      A    I was not.

5      Q    So you have no personal knowledge about

6    that?

7         MS. AVENDANO:  Objection to form.

8      A    I have personal knowledge of the fact that

9    I was a member who voted for the contract and who

10   understood the -- understood the reason for the

11   union to have that in there.

12   BY MR. KARSH:

13     Q    And today you are here as a deponent

14   representing the union.

15     A    Yes.

16     Q    Okay.  Do you know for a fact what the

17   reason for introducing a 54 requirement was?

18     A    I know what was explained to me as a member

19   from the executive board at the time, and what was

20   explained to me was that that was the reasoning.

21     Q    Which is what?  What was the reason that

22   was explained to you?

23     A    That experience is very important, and

24   promotions on the fire department are very different

1    than promotions in maybe another corporate world or

2    another type of field.  Promotions should be --

3    should not be taken lightly.  They are very serious

4    because it is a very serious safety hazard.  There's

5    many studies that the first three minutes on a fire

6    scene is going to determine if you did the right or

7    wrong thing in the outcome.  And it's very, very

8    serious when you have somebody with no experience

9    who may get promoted for various reasons or not

10   experienced or for whatever the reason is that they,

11   you know, don't have that amount of time on a job.

12   It's very -- it could be very detrimental.

13     Q    And when you said promoted for various

14   reasons, what other reasons are people promoted for?

15     A    There's affirmative action promotions,

16   there's performance selection promotions.

17     Q    Uh-huh.  What's a performance selection

18   promotion?

19     A    We call it a merit promotion.  It's in the

20   contract.

21     Q    And I think we're now on the last topic.

22   What opportunities and perks does seniority control

23   in the fire department?  Greater seniority gives you

24   what rights?

1      A    Gives you preferences for vacation,

2    furlough picks.

3      Q    Uh-huh.

4      A    If you have somebody -- if you're more

5    senior to somebody.  It also gives you seniority

6    points towards promotional exams.  It gives you

7    preferences on choosing spots to -- if you want to

8    change firehouses, transfer.

9      Q    Anything else?

10     A    Of course -- if there's a need for acting

11   out, of course seniority would take precedent for

12   the reasons described earlier.  That's about all I

13   can think of at the moment.

14        MR. KARSH:  I have no further questions.

15        MR. HORWITZ:  I just have a few.

16              EXAMINATION

17   BY MR. HORWITZ:

18     Q    Getting back to the last question that

19   Mr. Karsh asked you about what benefits you derive

20   from seniority, in the promotional process, does

21   seniority play a factor?

22     A    Yes, I think I said that.

23     Q    Okay.

24     A    You get points for --

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTHUR L. LEWIS, JR., et al.,  )
                               )
            Plaintiffs,        )
                               )
      vs.                      )    No. 98 C 5596
                               )    Hon. Joan B.
CITY OF CHICAGO,               )    Gottschall
                               )
            Defendant.         )

received 9/26/06

      The deposition of Defendant CITY OF

CHICAGO, by and through its designated

representative, DEREK JACKSON, taken pursuant to

Federal Rule of Civil Procedure 30(b)(6), taken

before Charles R. Zandi, CSR, FCRR, a Certified

Shorthand Reporter in the State of Illinois, at

70 West Madison Street, Suite 4000, Chicago,

Illinois, on the 6th day of September, 2006, at the

hour of 1:00 p.m.

**BAKER, FENNELL & ASSOCIATES, INC.**
CERTIFIED SHORTHAND REPORTERS
P.O. BOX 0787
Chicago, IL 60690
312-386-1225 FAX: 312-386-1226

REPORTED BY: CHARLES R. ZANDI, CSR, FCRR

PAGE 10

10

1    Q    Okay.  How long was that meeting?

2    A    I don't know.

3    Q    When was that meeting?

4    A    Yesterday or the day before yesterday.

5    Q    Can't remember which it was?

6    A    Maybe it was yesterday or the day before

7 yesterday.

8    Q    Day before yesterday was Labor Day.

9    A    Labor Day, so it had to be yesterday.

10    Q    Yesterday.  How long did you meet for?

11    MS. AVENDANO:  Objection.  Asked and answered.

12 He said he doesn't know.

13 BY MR. KARSH:

14    Q    How long did you meet for, sir?

15    A    I don't know.

16    Q    Was it more or less than an hour?

17    A    I said I don't know.

18    Q    I understand.  Do you --

19    A    I said I don't know.

20    Q    Do you know whether it was more or less

21 than an hour?

22    A    I said I don't know.

23    Q    Do you know whether it was more or less

24 than half an hour?

PAGE 11

11

1    A    I said I don't know.

2    Q    Is it your testimony that you can give

3 no description of the length of the meeting?

4    A    That's correct.

5    MS. AVENDANO:  Objection to --

6 BY MR. KARSH:

7    Q    Did you review any documents during that

8 meeting?

9    A    No.

10    Q    Were any documents or portions of

11 documents read to you during that meeting?

12    A    No.

13    Q    Who did you meet with?

14    A    Who or --

15    Q    Yes.

16    A    You want a name?

17    Q    Yes.

18    A    Naomi Avendano.

19    Q    Okay.  Was anyone else present?

20    A    I think the attorney next --

21    Q    Mr. Robling?

22    A    Robling.  I can't remember his name.

23    Q    Was anyone else present?

24    A    No, I don't think so, no.

PAGE 12

12

1    (Whereupon, Mr. Piers entered

2    the deposition proceedings.)

3    MR. KARSH:  Let me break for a moment.

4    (Discussion held off the record.)

5    MR. KARSH:  Back on the record.

6 BY MR. KARSH:

7    Q    Mr. Jackson, you were last deposed in

8 this case in March of 2002.  If I remember

9 correctly, at that point, you were the deputy fire

10 commissioner for administrative services, is that

11 correct?

12    A    In 2002, yes, I was.

13    Q    Okay.  And at that point in time, I think

14 in that capacity, you had oversight over labor

15 relations?

16    A    That's correct.

17    Q    Medical?

18    A    That's correct.

19    Q    Finance?

20    A    That's right.

21    Q    I think finance was subsequently removed

22 and given to someone else, is that correct?

23    A    That was correct, yes.

24    Q    Okay.  You also had oversight over the HR

PAGE 13

13

1 function, is that correct?

2    A    That's correct.

3    Q    And you had oversight over the training

4 division, is that correct?

5    A    That's correct.

6    Q    Has your job title or have your

7 assignments changed since then?

8    A    Yes, it has.

9    Q    Okay.  What is your current job title?

10    A    I'm the deputy fire commissioner of

11 employee relations.

12    Q    And what are your job duties and

13 assignments in that role?

14    A    I'm over labor relations, employee

15 relations, contract enforcement, and human

16 relations.  And I'm still on the pension board.

17 I'm still the president of the Fireman's Pension

18 Fund.

19    Q    Okay.  And to the extent that your job

20 today involves labor relations and contract

21 enforcement, did you also have those duties when

22 you were deputy commissioner for administrative

23 services?

24    A    Yes, um-hum.

46

1 officers who have ideas, bring them to training, and
2 say, "I'd like to see this training take place."
3         And this was a vehicle which the union
4 allowed us to do.  We negotiated so that we could
5 bring select groups of individuals down instead of
6 bringing the whole apparatus down.
7     Q    Yes.  And do you bring in select
8 individuals for the purpose of giving them training
9 to become a lieutenant or a higher officer rank?
10    A    No.  No, we don't.
11    Q    Okay.
12    A    No, we don't.  As a practice, no, we
13 don't.
14    Q    What is the City's position with respect
15 to how seniority dates should be determined for the
16 132 class members who will be hired?
17    A    I don't know.  I --
18    MS. AVENDANO:  I'm going to object as to the
19 extent it calls for any legal arguments.
20 BY THE WITNESS:
21    A    I really don't know anything about that.
22 BY MR. KARSH:
23    Q    Okay.  Are you aware of the provision in
24 the labor contract that requires a firefighter to

47

1 have 54 months in grade as a firefighter before he
2 can be -- he or she can be promoted to the position
3 of lieutenant?
4     A    You have to have 54 months in the grade
5 of firefighter and/or engineer before you can be
6 promoted to lieutenant, yes.  Yes, sir.
7     Q    And how long have you been with the fire
8 department?
9     A    28 years.
10    Q    When you started with the fire department,
11 did that 54-month requirement exist?
12    A    No.
13    Q    What was the requirement -- the
14 time-in-rank requirement for promotion to lieutenant
15 at the time you came in to the department?
16    A    That's a long time ago.  I don't -- I
17 don't remember.  I knew you couldn't be a candidate
18 and get promoted to lieutenant, but other than that,
19 I don't remember being any -- I just don't remember
20 if there was any.
21    Q    Do you remember that during your tenure
22 with the fire department, for a while, the
23 requirement was 12 months?
24    A    Yes, it was 12 months, because candidacy

48

1 at that time was 12 months.  Probationary period was
2 12 months.
3     Q    Okay.  And at that time, did that mean
4 that once you were out of your probationary period,
5 which was 12 months, you were immediately eligible
6 for promotion to lieutenant if you passed a
7 promotional examination?
8     A    Yes, yes.
9     Q    At some point, the requirement was
10 lengthened beyond 12 months.  Do you know what it
11 was lengthened to?
12    A    Which one are you talking about?
13 Probationary period or --
14    Q    No, no.  Let me make sure that I've
15 understood your testimony.  As I understand what
16 you've just said, that there was a period in time
17 during your employment with the fire department
18 that the time-in-rank requirement for promotion to
19 lieutenant was the same as the probationary period.
20 After you finished the probationary period of
21 12 months, you could become a lieutenant if you
22 passed the appropriate examinations.  Am I
23 understanding you correctly?
24    A    In the labor agreement, there wasn't

49

1 necessarily -- there wasn't a provision, as I
2 remember, the only thing I can remember is you could
3 not get promoted or take an exam while you were a
4 probationary employee.  That's what it was.
5     Q    Okay.
6     A    There wasn't anything that --
7     Q    There was no time-in-rank requirement?
8     A    Years ago, no, there was not.
9     Q    Okay.  When did that change?
10    A    It wasn't this contract.  It wasn't the
11 one -- this one.  I think it was the contract before
12 this one we negotiated, the '95 to '99 contract, I
13 believe.
14    Q    Okay.  And when it changed, did it change
15 to 54 months, or was there an intermediate step?
16 Wasn't there a time where the time-in-rank
17 requirement for promotion to lieutenant was
18 30 months?
19    A    No, I don't remember that.  There was a
20 combination change.  There was a combination where
21 we put in the 54 months for an engineer or fireman
22 to become a lieutenant, and then there was the
23 30 months between lieutenant and captain or a
24 captain to battalion chief.  That was put into the

PAGE 50

50

1   contract at the same time.
2       Q    Okay. Was there a time-in-rank
3   requirement for promotion to lieutenant that was
4   ever shorter than 54 months?
5       MR. PIERS:  Other than the 12-month
6   probationary period.
7   BY MR. KARSH:
8       Q    Other than the 12-month probationary
9   period, right.
10      A    Not that I can ever remember. Now that
11  right now I'm thinking about it, no, I don't
12  remember any other time, other than the probationary
13  time period. No, I don't remember any.
14      Q    Were you involved in the negotiation of
15  the '95 contract?
16      A    Yes.
17      Q    Who brought to the table in those
18  negotiations the concept of introducing a
19  time-in-rank requirement for promotion to
20  lieutenant?
21      A    I think it was Local 2.
22      Q    Okay. Do you have an understanding of
23  why Local 2 brought that issue to the table?
24      A    Yes.

PAGE 51

51

1       Q    What is your understanding?
2       A    They wanted to -- they wanted to be able
3   to have seniority to mean more than just the
4   12 months. They were concerned that we were
5   promoting to lieutenant and/or captain, chief, a
6   lot of younger employees who were not seasoned,
7   and that because someone did well on an exam and
8   will answer the oral questions correctly was not
9   necessarily the best candidate for the job.
10      Q    Okay.
11      A    That was their -- basically their
12  position.
13      Q    And that's on the basis of things that
14  they stated?
15      A    Yeah. That was their -- the union's
16  always pro-seniority.
17      Q    Prior to the '95 contract, are you aware
18  of anyone who was promoted to the rank of lieutenant
19  who, as a result of being promoted before 54 months,
20  in your opinion, had performance problems?
21      MS. AVENDANO:  Objection to form and
22  foundation.
23  BY THE WITNESS:
24      A    I couldn't answer that question. I don't

PAGE 52

52

1   know.
2   BY MR. KARSH:
3       Q    As you sit here today, can you think of
4   anyone who should not have been promoted to
5   lieutenant before 54 months before 1995?
6       MS. AVENDANO:  Same objection. Speculation.
7   BY THE WITNESS:
8       A    That would be speculating. I don't know.
9   I mean, I'm sure there were guys that maybe I can
10  think of that may -- but I don't know.
11  BY MR. KARSH:
12      Q    Can you think of anybody right now?
13      A    No.
14      Q    Okay.
15      A    No.
16      Q    As a negotiator for the City on the 1995
17  contract, let me ask you, had the City identified
18  any performance problems related to not having a
19  time-in-rank requirement for promotion to lieutenant
20  before the negotiation of the '95 contract?
21      A    I don't remember. I don't -- I really
22  don't remember if we had -- did a study or anything
23  like that. I really don't remember.
24      Q    Okay. Regardless of having done a study,

PAGE 53

53

1   did the City -- had the City identified anyone whom
2   it believed -- had the City identified any need for
3   a time-in-rank requirement before the union put
4   that issue on the table in the 1995 contract
5   negotiations?
6       A    It's hard to answer that question, because
7   in negotiations, there's a give-and-take type of
8   thing. So, to say that we had identified something,
9   they gave a proposal. We negotiated with them, and
10  that's what we came out with.
11           I will tell you that their original
12  proposal wasn't 54 months. It was much higher
13  than the 54 months, but I don't remember what
14  it was. We settled in on 54 months, but it was
15  higher than that.
16      Q    Am I right that coming in to the
17  negotiations, the City didn't have on its wish
18  list putting a time-in-rank requirement into the
19  contract for promotion to lieutenant?
20      A    I won't say that. I don't remember.
21  We may have, but I really don't remember.
22      Q    Does the City come into contract
23  negotiations with a list of things that it wants
24  to achieve in the upcoming contract?

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

received
9/26/06

ARTHUR L. LEWIS, JR., et al., )
                              )
            Plaintiffs,       )
                              )
    vs.                       )    No. 98 C 5596
                              )    Hon. Joan B.
CITY OF CHICAGO,              )    Gottschall
                              )
            Defendant.        )

        The deposition of Defendant CITY OF

CHICAGO, by and through its designated

representative, DEREK JACKSON, taken pursuant to

Federal Rule of Civil Procedure 30(b)(6), taken

before Charles R. Zandi, CSR, FCRR, a Certified

Shorthand Reporter in the State of Illinois, at

70 West Madison Street, Suite 4000, Chicago,

Illinois, on the 6th day of September, 2006, at the

hour of 1:00 p.m.

---

**BAKER, FENNELL & ASSOCIATES, INC.**
CERTIFIED SHORTHAND REPORTERS
P.O. BOX 0787
Chicago, IL 60690
312-386-1225 FAX: 312-386-1226


EXHIBIT
C

REPORTED BY: CHARLES R. ZANDI, CSR, FCRR

PAGE 14

14

```
 1    Q    Okay.  Have those duties expanded or
 2  contracted in any way, or you have the same duties
 3  but a different title today?
 4    A    Same duties, different title.
 5    Q    Okay.  Are you no longer assigned
 6  medical?
 7    A    No, medical is not under my command
 8  anymore.
 9    Q    And are you no longer assigned training?
10    A    Training is not under my command anymore.
11    Q    Is there anything under your command now
12  that was not under your command when you were deputy
13  commissioner for administrative services?
14    A    No.
15    Q    Were there any steps in between the two
16  job titles?  That is, in 2002, you were deputy
17  commissioner for administrative services.  Now
18  you're deputy commissioner for employment relations.
19  Did you have any job title between the two?
20    A    No, I didn't.
21    Q    When was your job title changed to
22  employment relations?
23    A    Probably June '04.
24    Q    Okay.  At any point since 2002, have you
```

PAGE 15

15

```
 1  been back in the field instead of in administration?
 2    A    I'm always back in the field.  I think
 3  what you're trying --
 4    Q    Have you ever -- have you been in a
 5  position that was not an exempt rank?
 6    A    I don't quite understand what you mean.
 7    Q    Go ahead.  You were about to say --
 8    A    All exempt rank title -- and I'm just
 9  trying to clarify.
10    Q    Yes.
11    A    We're all in the field.  We all respond to
12  stuff.  I think -- but I think what you're asking me
13  is what?
14    Q    Have you been in an exempt rank since
15  2002?
16    A    Yes, yes.  I've always -- yes, since
17  2002, yes, I've been an exempt title.
18    Q    You have not been returned to a post as
19  battalion chief at any point during that time?
20    A    Oh, no, no, no.  I'm sorry.  No, I have
21  not.
22    Q    Okay.  Do you have an understanding --
23  well, let me start this question this way:  One of
24  the forms of relief the plaintiffs request in this
```

PAGE 16

16

```
 1  case is that there be a hiring of 132 additional
 2  African-Americans into the fire department.  Those
 3  would be people who took the 1995 firefighter
 4  examination and scored 65 or above but less than 89.
 5  In your parlance, I think you'd refer to those folks
 6  as the qualified pool.  Okay?
 7        So, one of the forms of relief we seek is
 8  the hiring of 132 additional African-Americans from
 9  that qualified pool.  Okay?
10    A    Okay.
11    Q    All right.  In order to identify 132
12  African-Americans who would have those positions,
13  we are going to have to make a list of
14  African-Americans who took the test and are still
15  eligible for hire.
16    A    Okay.
17    Q    Does the City have a position with respect
18  to how that list should be constructed?
19    MS. AVENDANO:  I'm going to object that that's
20  outside the scope of our objections.  As I was
21  saying before I was cut off, the City can designate
22  the people to testify to certain topics.  In the
23  30(b)(6).  That's not one of the topics that we've
24  designated Chief Jackson for.
```

PAGE 17

17

```
 1    MR. KARSH:  Okay.  Are you planning to
 2  designate somebody with respect to that topic?
 3    MS. AVENDANO:  I'm not sure.
 4    MR. KARSH:  Okay.  I'm going to ask him the
 5  questions.  You can have your objection.
 6    MS. AVENDANO:  And I'm going to tell him not
 7  to answer.  It's outside the scope of what we have
 8  designated him for.
 9    MR. KARSH:  I am entitled to ask the question.
10  Your objection is on the record.  What is your basis
11  for an instruction not to answer?
12    MS. AVENDANO:  Because under 30(b)(6), a
13  corporation can designate witnesses for certain
14  topics.  If it takes more than one witness to answer
15  the 30(b)(6) notice --
16    MR. KARSH:  When do you plan to somebody for
17  additional topics?
18    MS. AVENDANO:  If we're going to designate
19  someone, we'll do it by the end of this week.
20    MR. KARSH:  Okay.
21  BY MR. KARSH:
22    Q    Sir, do you have a position with respect
23  to how that list of -- that list should be
24  constructed from which we would then choose 132
```

PAGE 18

18

1  people?
2      MS. AVENDANO:  Objection.  I'm instructing him
3  not to answer.
4      MR. KARSH:  I'm not asking him to testify as a
5  representative of the City.  I asked if he has an
6  opinion.
7      MS. AVENDANO:  This is a 30(b)(6) notice.
8      MR. KARSH:  30(b)(6) does not limit questions
9  in an individual capacity.  The law is quite clear
10 on that.
11     MS. AVENDANO:  You just told him at the
12 beginning that all of his testimony today is in his
13 official capacity as a representative of the City.
14     MR. KARSH:  What I told him is it is in his
15 official capacity unless I say otherwise in the
16 question.  In this question, I have said otherwise.
17 And the law allows me to ask him a question as a
18 fact witness in a 30(b)(6) deposition.  I am now
19 doing that.
20 BY MR. KARSH:
21     Q    Sir, do you have an opinion as to how we
22 should go about constructing a list of qualified
23 African-Americans from which we would then wind up
24 with a list of 132 to be hired?

PAGE 19

19

1      MS. AVENDANO:  I'm going to object that it's
2  outside the 30(b)(6) and his designated capacity to
3  answer this 30(b)(6) notice.
4      MR. KARSH:  Objection noted.
5  BY MR. KARSH:
6      Q    You may answer, sir.
7      A    I have no answer to that.
8      Q    You do not have a position?
9      A    No.  I have no answer to that.
10     Q    Well, I'm unclear what your response is.
11 Is your response, "I have no position," or is your
12 response, "I can't answer that question"?
13     A    My response is I have no answer to that
14 question.
15     Q    Okay.  What is it about the question that
16 makes it that you don't have an answer?
17     A    Nothing.  I just don't have an answer
18 for it.
19     Q    Because you don't have an opinion?  Is
20 that the reason?
21     A    I don't have an answer.
22     Q    Why don't you have an answer?
23     A    Because I don't have an answer.
24     Q    Very well.

PAGE 20

20

1      MS. AVENDANO:  I'm going to object that this
2  is -- besides being ridiculous, but that's not a
3  good objection, simply outside the scope.
4      MR. KARSH:  Very well.  Your objection is
5  noted.
6      MR. PIERS:  Time out.
7               (Recess had.)
8      MR. KARSH:  Let's mark Deposition Exhibit
9  No. 2.
10              (Jackson Deposition Exhibit No. 2 was
11              marked for identification, as of
12              9/6/06.)
13 BY MR. KARSH:
14     Q    Sir, I've put in front of you what has
15 been marked as Deposition Exhibit No. 2.  Have you
16 ever seen that document before?
17     A    No.
18     Q    Okay.  If you would turn, please, to
19 page 2 of that exhibit, and on page 2, to
20 paragraph A-3.
21     A    Excuse me?  What did you say?
22     Q    To paragraph A-3.
23     A    No. 3?
24     Q    Yes, it is the paragraph numbered 3 on

PAGE 21

21

1  page 2.
2      A    Okay.
3      Q    Okay?
4      A    Yes, I have it.
5      Q    All right.  One of the things that the
6  plaintiffs request in this case is that within
7  130 days after the Court enters an order providing
8  for the hiring of 132 people, that the City should
9  offer people who have then passed the physical
10 abilities test, the background check, the drug
11 screen, the medical examination, an offer of
12 employment.  Okay?
13          As you see here in the first paragraph
14 of -- the first sentence of A-3, the City objects
15 that 120 days is not long enough and that the
16 period should be 180 days.  Do you know what the
17 basis for that objection is?
18     MS. AVENDANO:  I'm going to object again.  Are
19 you asking him now for his personal opinion?
20 Because he's certainly not a 30(b)(6) witness on
21 this issue.
22 BY MR. KARSH:
23     Q    Sir, do you know what the basis for that
24 objection is?

PAGE 22

22

1     MS. AVENDANO: Josh, are you asking him in his
2 individual capacity or his official capacity as a
3 City official? Because it makes a difference.
4     MR. KARSH: Right now, I'm asking him in his
5 capacity as a City official.
6     MS. AVENDANO: Then I object, and I'm
7 instructing him not to answer, because it's outside
8 of the scope of what we designated him for.
9     MR. KARSH: I'm now asking him in his personal
10 capacity.
11 BY MR. KARSH:
12    Q   Do you know what the basis is?
13    A   I'm not answering it. I don't know.
14    Q   Okay. You are familiar, are you not,
15 from your long experience in the department, with
16 training of cadets and recruits?
17     MS. AVENDANO: Objection. Outside the scope
18 of the designation.
19 BY MR. KARSH:
20    Q   Are you familiar?
21     MS. AVENDANO: And you're asking him in his
22 individual or official capacity?
23     MR. KARSH: You know, for the question, "Are
24 you familiar," it doesn't matter.

PAGE 23

23

1 BY MR. KARSH:
2    Q   Are you familiar?
3     MS. AVENDANO: Yeah, it does, because it
4 depends on the scope of the question and where
5 you're going --
6 BY MR. KARSH:
7    Q   Are you familiar with the training of
8 recruits and cadets, sir?
9     MS. AVENDANO: Objection.
10 BY THE WITNESS:
11    A   Do I know they train cadets? Yes, I know
12 they train cadets.
13 BY MR. KARSH:
14    Q   Okay. And are you familiar with the steps
15 that cadets go through for screening before they are
16 offered employment at the academy?
17     MS. AVENDANO: Objection to form, foundation,
18 and whether or not it's in his individual or
19 official capacity.
20 BY THE WITNESS:
21    A   No, I don't -- I don't really -- I don't
22 do this anymore, so it's not under my command. So,
23 I don't know what they do now.
24

PAGE 24

24

1 BY MR. KARSH:
2    Q   Yes. You have previously testified in
3 this case that the steps are as follows: First,
4 not necessarily in this order, all recruits are
5 given a physical abilities test. That is true,
6 correct?
7    A   I --
8     MS. AVENDANO: Same objections.
9 BY THE WITNESS:
10    A   I'm not in that command anymore, so I
11 really can't answer for what they do now. It's not
12 under my jurisdiction anymore, so I would just
13 speculate on what they do.
14 BY MR. KARSH:
15    Q   Are you aware of whether recruits today
16 are given a physical abilities test before they're
17 offered employment at the academy?
18     MS. AVENDANO: Same as all of my previous
19 objections. I also want to note that when he was
20 deposed back in 2002, he was in administrative
21 services, so he did have that knowledge.
22 BY MR. KARSH:
23    Q   Are you aware of whether recruits today
24 are given a physical abilities test before they are

PAGE 25

25

1 offered a position at the academy?
2    A   I would only be assuming. I assume they
3 are, but I don't know for certain because it's not
4 under my command anymore.
5    Q   Are you aware of whether they are
6 administered a medical examination?
7     MS. AVENDANO: Same objections.
8 BY THE WITNESS:
9    A   I really don't know. I can't answer that
10 question.
11 BY MR. KARSH:
12    Q   Are you aware of whether they are given a
13 drug test?
14     MS. AVENDANO: Same objections.
15 BY THE WITNESS:
16    A   I don't know. It's not under my command.
17 BY MR. KARSH:
18    Q   Are you aware of whether they are given a
19 background check?
20     MS. AVENDANO: Same objections.
21 BY THE WITNESS:
22    A   I don't know. You'd have to -- it's not
23 my command.
24

PAGE 26

26

1   BY MR. KARSH:
2       Q    Okay.  Once all of those checks have been
3   administered and a recruit has passed all of those
4   checks, are you aware of anything else that has to
5   be done before they can be offered a position at
6   the academy?
7       MS. AVENDANO:  Same objections.
8   BY THE WITNESS:
9       A    I really don't know.
10  BY MR. KARSH:
11      Q    Okay.  If a recruit is given all of those
12  checks and passes them, do you know of any reason
13  why it would take 180 days rather than 120 days
14  before the department could offer them employment?
15      MS. AVENDANO:  Objection to outside the scope
16  of the notice, form, and foundation.
17  BY THE WITNESS:
18      A    I really don't know.
19  BY MR. KARSH:
20      Q    For purposes of seniority in the fire
21  department, what is a new firefighter's date of
22  hire?
23      A    Could you say that again?
24      Q    Yes.  For purposes of calculating

PAGE 27

27

1   seniority within the fire department, what is
2   the date of hire for a new firefighter?
3       A    For purposes of seniority, what is the
4   date of hire?  What does it signify?  What does it
5   mean?
6       Q    No.  When -- what date is the date of
7   hire?
8       A    The date they come in to the academy.
9       Q    Okay.  Does the City have any objection
10  to giving plaintiffs in this case an award of
11  retroactive seniority upon their hire into the
12  department?
13      MS. AVENDANO:  Objection to the extent it
14  calls for a legal conclusion.
15  BY THE WITNESS:
16      A    I wouldn't know.  I'm not involved in
17  that.  I don't know that.
18  BY MR. KARSH:
19      Q    What purposes is seniority used for within
20  the fire department?
21      A    Pursuant to the labor contract, seniority
22  is used for -- once you're a non-probationary
23  employee, it's used for picking assignments.
24  Seniority is somewhat used in the calculations for

PAGE 28

28

1   when you're taking a promotional exam.  Seniority
2   is used for picking of furloughs or vacation
3   periods.
4          Those are the three major areas I can
5   think of right off.
6       Q    Okay.  When you say for the picking of
7   assignments, what kinds of assignments, and what
8   does that mean?
9       A    Pursuant to the labor contract, once
10  you're a non-probationary employee, you are -- you
11  can pick assignments.  We have open bids for open
12  assignments three times a year, and individuals can
13  apply or put in a request for a vacancy if they
14  meet the requirements; and unless it's an asterisk
15  position where you need specific requirements,
16  individuals are given assignments based on their
17  overall seniority as they bid on them.
18      Q    And when you say assignments, what does
19  that mean?  What is an assignment?
20      A    An assignment is your -- is where,
21  pursuant to 16-7 in the contract, it talks about
22  where you are -- where you are -- where you --
23  where your paperwork or where you're assigned to,
24  what company or fire apparatus you're actually

PAGE 29

29

1   assigned to.
2       Q    Are there separate assignments for company
3   and for fire apparatus?
4       A    Fire apparatus and company is the same
5   thing.  I shouldn't be intertwining -- apparatus
6   could be an engine or truck, and each engine or
7   truck or squad is a company within itself.  So, when
8   you say Engine 1, it's Engine 1 company, or you can
9   call it an apparatus, but it's a company to itself.
10      Q    How many companies are there to a station
11  house?
12      A    It depends on the station house.  Some
13  station houses are small, where they just have one
14  apparatus or fire company there; or some firehouses
15  are larger that may have an engine, truck, squad,
16  an ambulance, a command van.  It depends on how big
17  the firehouse is.  So, it could have multiple
18  companies or up to one or two.
19      Q    So, if I am past my nine-month
20  probationary period and I am bidding one of these
21  three times a year for a vacant position, am I
22  bidding for more than a station house?  Am I also
23  bidding for a particular vehicle within that station
24  house?