**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ARTHUR L. LEWIS, JR.; GREGORY S.** | ) | |
| **FOSTER, JR.; ARTHUR C. CHARLESTON,** | ) | |
| **III; PAMELA B. ADAMS; WILLIAM R.** | ) | |
| **MUZZALL; PHILIPPE H. VICTOR;** | ) | |
| **CRAWFORD M. SMITH; ALDRON R. REED;** | ) | |
| **and AFRICAN AMERICAN FIRE FIGHTERS** | ) | |
| **LEAGUE OF CHICAGO, INC., individually,** | ) | **No. 98 C 5596** |
| **and on behalf of all others similarly** | ) | |
| **situated,** | ) | **The Honorable Joan B. Gottschall** |
| | ) | |
| **Plaintiffs** | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' REPLY TO DEFENDANT CITY OF CHICAGO'S PROPOSED
FINDINGS AND CONCLUSIONS WITH RESPECT TO REMEDIES**

Plaintiffs, by their attorneys, reply as follows to the Defendant City of Chicago's

Proposed Findings and Conclusions With Respect To Remedies ("Defendant's Proposed

Findings").

## I. Introduction

Plaintiffs submit that the Court should reject Defendant's Proposed Findings, as well as

the Proposed Findings of Fact and Conclusions of Law of Rule 19(a) Defendant, Chicago Fire

Fighters Union Local N. 2, Limited to Seniority Related Relief Sought By the Plaintiff Class

("Local 2 Proposed Findings"), and enter Plaintiffs' Proposed Findings and Conclusions With

Respect to Remedies ("Plaintiffs' Proposed Findings"), filed on December 19, 2006.  Most of

1

Defendant's Proposed Findings are legally or factually inaccurate, or otherwise legally objectionable, as detailed below. For ease of the Court's reference, plaintiffs present below all of Defendant's Proposed Findings but specifically reply herein (in bold) only to those which are (1) materially inaccurate, (2) legally objectionable, or (3) otherwise require response or explanation. In addition, plaintiffs are withdrawing paragraph A.7. and modifying paragraphs A.5. and C.2. of plaintiffs' proposed Injunctive Order of Relief (Exhibit A to Plaintiffs' Proposed Findings), as indicated below in reply to Defendant's Proposed Findings Nos. 9, 4 and 21, respectively. Attached hereto as Exhibit A is a proposed Revised Injunctive Order of Relief, reflecting these changes.

### Defendant's Proposed Findings and Plaintiffs' Replies Thereto

1.      The plaintiffs, a class of approximately 6000 African-Americans who applied for a limited number of entry-level firefighter jobs with the Chicago Fire Department and who scored between 65 and 88 on the 1995 firefighter written entrance examination, obtained a liability finding against the City on March 22, 2005, on their claim that the City violated Title VII, 42 U.S.C. §2000e, *et seq*. pursuant to the disparate impact theory of employment discrimination

**Plaintiffs' Reply: The plaintiff class includes those who scored between 65 and 88, inclusive (i.e. including those who scored either 65 or 88).**

2.      The subsequent steps of the hiring process - the physical agility test, background check, medical examination and drug screening - were not challenged by the plaintiffs.

2

Docket R. 1. Specifically, plaintiffs never claimed disparate treatment for any portion of the hiring process, including the written examination, nor did they ever claim disparate impact regarding any other step in processing or regarding training. Accordingly, the Court's Order entering liability was limited to holding that "the City's use of the 1995 Test with a cut-off score of 89" violated Title VII. Docket R. 274, March 22, 2005 Order.

**Plaintiffs' Reply: This proposed finding, while accurate, is irrelevant in the context of the remedial order, since the law is clear that the Court has the power, and indeed the obligation, to modify terms and conditions of employment as necessary in order to provide make whole relief as a remedy for the City's violations of Title VII. *See, Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418 (1975) (district courts have "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future"); *Franks v. Bowman Transp. Co., Inc.,* 424 U.S. 747, 770 (1976). *See also* cases cited in Plaintiffs' Reply Brief in Opp. to Local No. 2's Proposed Findings of Fact and Conclusions of Law, filed simultaneously herewith, at 2, 4.**

3. Plaintiffs filed a proposed injunctive order on June 28, 2006, and the City filed its objections to the proposed order on August 30, 2006. Docket R. 333, 358. In addition, an evidentiary hearing and video taped testimony with respect to monetary and non-monetary relief were held on (September 13, 2006, September 28, 2006 and December 12, 2006.) On December 19, 2006, after the conclusion of the evidentiary hearing, plaintiffs filed a revised proposed injunctive order which contained several new provisions. Docket R. 375-2.

**Plaintiffs' Reply: All of Plaintiffs' Proposed Findings are well supported by the facts presented to the Court and the applicable statutory and case law.**

## I.    Remedial Hiring

4.      The timetable and procedures that plaintiffs set out in paragraphs A.1 through A.7 of their December 19, 2006, proposed injunctive order differ in several ways from paragraphs four through seven of plaintiffs' proposed findings and conclusions.  One significant difference relates to the provision "Timing of Entry into the Academy".  Paragraph six of plaintiffs' proposed findings truncates the time table for Academy matriculation and states that all class members hired pursuant to the Court's order shall enter the Academy no later than 12 months after the entry of the Order.  However, plaintiffs' proposed injunctive order, paragraph five, states that all class members so hired shall enter the Academy within 24 months of the entry of the Order.

**Plaintiffs' Reply: It has consistently been plaintiffs' position that remedial entry into the Academy should be done within 12 months of the entry of the order. Plaintiffs' Proposed Injunctive Order, filed on June 28, 2006, provides entry into the Academy within 12 months, *not* 24 months, *see* Proposed Injunctive Order of Relief at 3, ¶5, as does Plaintiffs' Proposed Findings, filed on December 19, 2006. Plaintiffs' Proposed Findings at 3 ("Timing of Entry into the Academy"). However, there is a typographical error in the proposed Injunctive Order of Relief, attached to Plaintiffs' Proposed Findings as Exhibit A, which erroneously states (at paragraph A.5.) that incorrectly states the time proposed as 24 months. Plaintiffs apologize for any confusion caused by this**

4

**error. See proposed Revised Injunctive Order of Relief, attached hereto as Exhibit A, at**

**paragraph A.5.**

5.      This Court finds that the City shall have up to 24 months to matriculate all class members hired pursuant to the Order to the Academy.   The Court has considered the evidence the City offered at the December 12, 2006 hearing pertaining to operational concerns and difficulties involved with having very large classes (over 60 candidates) assigned to the Academy at any one time.   Dec. 12, 2006 Trial Tr. at 67-68.   In particular, the Court finds that it could be a disadvantage to the class members, as well as the City, to have more than 60 candidates in each class.   The Court further finds that the City has presented unrebutted evidence that it is under contractual obligations with CCFU Local 2, and that its operational needs dictate that at least 10% of each class at the Academy be comprised of paramedic cross-overs.   Id. at 39-40, 68.   For these reasons, the Court has determined that the City is in the best position and should have the discretion to determine the class sizes provided that all class members hired pursuant to this Order have entered the Academy within 24 months of this Order.

**Plaintiffs' Reply:** *See* **Plaintiffs' Reply to Proposed Finding No. 5, above. In addition, no evidence was presented that would support the conclusions that the City cannot easily accommodate back-to-back successive classes of 66 remedial hires in each. The City has successfully trained far larger classes at the Academy. For example, Local 2's witness, Marc McDermott, was hired by the Chicago Fire Department in 1987, and was trained in the Academy in a class of "[a]round a hundred" cadets. *See* December 12,**

2006 Transcript of Trial Proceedings at 12. In addition, the record cited by the defendant above merely contains testimony that currently, Academy classes are "about 60 people. That's pretty much what we can comfortably hold." December 12, 2006 Trial Transcript at 67-68. A class of 66 is "pretty much" "about 60 people." The testimony from Deputy District Chief Mark Nielsen, the Assistant Director of Training for Fire Suppression and Rescue at the Training Academy, also notes that (1) in the past the Academy has handled more than one hundred cadets in a single class, (2) the Academy training that Nielsen received twenty-six and one-half years ago was "fine," (3) the Academy has a classroom which accommodates up to 120 cadets, and (4) there can be accommodations made when extra classes need to be trained. *Id.* at 51, 67-68, and 75.

More importantly, in response to the Court's questioning, Nielsen revealed that the classes are staggered so that a class is graduated every three months. *Id.* at 74-75. Therefore, even if it were necessary to keep class sizes at 60 or less, the remedial hires could easily complete the six month training program in three classes of 44, staggered at three month intervals over a one year period.

In addition, the contractual obligations under the contract with Local 2 to have 10% of each class be comprised of paramedic crossovers is neither a legal nor a logical impediment. First, such a contractual obligation cannot override the Court's remedial powers and obligations under Title VII. Second, according to Deputy Commissioner Derrick Jackson, there are no more paramedics to train, so the provision cannot be complied with at this time in any event. *Id.* at 39 ("We ran out of cross-over medics some time ago."). Third, even if there were more paramedics to train, there is no reason why

6

the classes could not be comprised of either 44 or 66 remedial hires plus an additional

10% (either 4 or 7) paramedics.

Finally, neither the class size or the paramedic training concerns are relevant or

material to the speed with which the remedial hiring should be undertaken, as they are -

at the very most - resource issues, and there is no evidence that the City could not

reasonably commit the resources necessary to matriculate the remedial hires into the

Academy withing 12 months of the entry of the Injunctive Order of Relief.


6. Plaintiffs' proposed findings and conclusions also propose, for the very first

time in these proceedings, that the City "employ a skip tracing service to update class

members' address information before offers to advance to the next steps of the hiring process

are mailed, rather than simply relying on addresses provided by class members in 1995 at the

time they registered for the 1995 Firefighter Test." December 19, 2006, Plaintiffs' Proposed

Findings and Conclusions ("Dec. 19, 2006 PPFC") at ¶ 7. As this was not proposed until

after discovery and the evidentiary hearings had concluded, the City was never given an

opportunity to contest that proposal. The Court finds that it is an expensive and unnecessary

burden for the City to employ a skip tracing service for the following reasons. First, there are

over 6000 class members and the cost of employing a skip tracing service for so many

individuals would be prohibitive. Second, it is the obligation of all test takers to inform the

City each time they incur a change in address. All persons who took and passed the 1995

entrance examination were informed of that obligation at the time they received their score

letters. See Exhibit A. Third, if any class member did not update his/her address, it is fair to

7

assume that person is less interested in the position. In view of these factors, plaintiffs have not shown that there is a need for the City to incur the large costs of a skip tracer, nor have they demonstrated that the class members were not notified of their obligation to send in notice of changes in their addresses. Further, the Court finds that plaintiffs waived this proposal by submitting it after the close of discovery, the time period for filing contentions to the proposal, and the evidentiary hearing itself. Accordingly, notice to class members of offers to advance to the remaining steps of the hiring process shall be made in the normal and customary way that the City has been sending those notices since 1996.

**Plaintiff' Reply: Plaintiffs cannot imagine what evidentiary discovery or proceedings would conceivable be relevant to this proposal to make reasonable efforts to provide notice to persons selected for processing pursuant to the provisions of the Injunctive Order of Relief. Such notice of relief is a legal requirement of the resolution of a class action, and is the City's obligation as the losing party. *See, e.g., Macarz v. Transworld Systems, Inc.,* 201 F.R.D. 54, 59 (D.Conn. 2001) ("where notice is to occur *after* liability has been determined, the defendant appropriately bears the costs"; citing other cases). In any event, plaintiffs are not proposing that a skip tracer be employed to locate the "over 6000 class members" as misrepresented by the City, but rather the proposal applies only to the approximately 400 persons that the City has estimated based on past experience would have to be screened in order to arrive at 132 matriculated remedial hires. Given the resources available on the internet, the expense of updating addresses for 400 people is modest.**

7.     Plaintiffs' proposed injunctive order sets out a detailed timetable for when certain events should occur.  The City's contentions to that proposed order pointed out that based on the City's experience with the selection process, plaintiffs' timetable would not provide the City with sufficient time to complete the physical agility tests, background checks, medical examinations and drug screening tests.  Plaintiffs' proposed order would give the City only four months in which to complete all those steps for hundreds of people in order to create a pool of 132 class members who passed all the required screening.  Dec. 19, 2006 proposed order at A(4).  The City will use its best efforts to complete the screening process within 200 days from entry of the Order, and if it cannot do so, it will so inform the Court of when it expects to complete the screening requirement.[1]

**Plaintiff' Reply: As noted in Plaintiffs' Proposed Findings, at 4, n. 2, the City refused to provide plaintiffs with any discovery regarding  potential difficulties in the implementation of these provisions of the proposed remedial order, and thus should not now be allowed to make objections to them, particularly such objections without any factual basis in the record.**

8.     As to the lottery process that will be used to select the class members who will undergo the subsequent screening process, this Court finds that no evidence was presented to show that the current random selection process already conducted by an outside contractor is not a fair process.  Nor did plaintiffs present any evidence to justify the additional expense or

---

[1] The City is not waiving its right to appeal any order nor its right to request a stay of an order pending an appeal.  Each time that the terms of an "order" is referenced throughout this document, the City restates and incorporates this reservation .

administrative burden that their proposal puts on the City. Accordingly, that process will be used to randomly select the class members, from those who remain on the eligibility list, to proceed to the next step in the processing sequence.

**Plaintiffs' Reply: Plaintiffs submit that the terms of the proposed Injunctive Order of Relief are not in conflict with manner in which the City currently conducts the random selection process, and the City has not identified any such conflict. Plaintiffs, accordingly, submit that the proposed lottery provision should be included in the remedial order. Plaintiffs' have no objection to the City continuing to use the same outside contractor, as long as the selection process is random, and not in any way controlled, directed or influenced by the City or any other outside source.**

9. Finally, with regards to the processing requirements, plaintiffs request, for the first time in their December 19, 2006 proposed injunctive order, that all class members be permitted to return "Candidate Interest Cards" by mail. Docket R. 375-2 at A(7) (Plaintiffs' proposed injunctive order dated December 19, 2006). The City never had the opportunity to present contentions or evidence as to this issue as plaintiffs failed to raise it in a timely manner, and accordingly, plaintiffs waive the right to request this. Further, plaintiffs did not adduce any evidence to show why this deviation from the practice that has been followed since early 1996 should be allowed. Therefore, this Court finds that the same procedure that everyone up to date has followed since 1996, i.e., returning the "Candidate Interest Cards" in person to the City, shall also apply to the class members. There has been no reason presented as to why class members should be accorded an opportunity that no other person selected for

further processing to date has been accorded.

**Plaintiffs' Reply: Plaintiffs withdraw this provision (paragraph A.7.) of the proposed Injunctive Order of Relief. See proposed Revised Injunctive Order of Relief, attached hereto as Exhibit A.**


II.     **Retroactive Seniority**

10.     The City's position is that if retroactive seniority is credited, it should be based on the shortfall from each class. This is the same position the Union takes. The "make whole" concept of Title VII relief would best be achieved by placing the class member most closely in the position they would have been had the City randomly selected from those who passed the written examination, instead of beginning with selection from the well-qualified list. Albermarle Paper Co. v. Moody, 422 U.S. 405, 421 (1975)(quoting 118 Cong. Rec. 7168 (1972). This means that class members will be randomly assigned, for purposes of a seniority date, to the classes that matriculated between May 16, 1996 and November 1, 2002, according to the number of shortfall for each class. The chart setting out the shortfall for each such class is set out in Table I of the proposed findings and conclusions of law that the Chicago Fire Fighters Union Local No. 2 filed on January 4, 2006. Docket R. 378 at p.4.

**Plaintiffs' Reply: It makes no sense to apply an arbitrary distribution of actual seniority dates among class members. Plaintiffs have proposed that all class members hired as part of the remedy in this case ("the shortfall group") be assigned seniority retroactive to December 4, 1998, the average date on which class members would have been hired in the absence of discrimination. *See* Plaintiffs' Proposed Findings and**

Conclusions at 5-7, ¶¶ 10-14. Plaintiffs submit that assigning the average seniority date they would have obtained to all members of the shortfall group will make them whole with respect to their seniority rights to the extent that it is reasonably possible to do so. As the courts have recognized for decades, Title VII's grant of remedial authority "should be broadly read and applied so as to effectively terminate the [illegal] practice and make its victims whole." *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 721 (7th Cir. 1969). In order to carry out this statutory mandate, courts have the power to fashion classwide remedies which provide effective relief without requiring either "unreasonable exactitude" or a "quagmire of hypothetical judgments." *Pettway v. Am. Cast Iron Pipe Co.,* 494 F.2d 211, 260 (5th Cir. 1974). Each class member lost the same opportunity to be considered for a job, and thus it is more logical and equitable to give each member of the shortfall group the same average seniority date, as plaintiffs propose to do. *See* Plaintiffs' Reply Brief In Opposition to Rule 19(a) Defendant Chicago Fire Fighters Union Local No. 2's Proposed Findings of Fact And Conclusions Of Law at 2-4. The only result of the City's proposal would be to increase the arbitrariness of the remedy. Further, the City's approach offers no financial savings to the City, and therefore does not even provide benefits from the defendant's perspective.

11.     Plaintiffs also seek a reduction to 30 months from the 54 month "time in grade" requirement contained in Section 9.3B of the collective bargaining agreement, should they be eligible for promotion to the rank of Engineer or Lieutenant after taking such an examination. December 19, 2006 Proposed Order at B(3). Pursuant to that collective bargaining agreement,

no employee may be promoted to the position of engineer or lieutenant without having completed 54 months in the classification of firefighter and/or engineer.

      **Plaintiffs' Reply:** *See* **Reply to No. 12, below.**


12.     The Court has weighed the testimony the Union and the City presented regarding the time in grade requirement, and rejects plaintiffs' argument that such a requirement can be reduced because it did not exist prior to the 1994-1999 contract and therefore is not necessary.  Plaintiffs' Proposed findings at § 17;  Tr. P. 25, l. 18-25.   The Court rejects that position in view of the fact that the job of firefighting is more difficult today than it was in the past.  Tr. P. 38, l. 8-18.  The Court further finds that the job of Lieutenant, which is a supervisory rank, is an important job and plaintiffs did not adduce evidence demonstrating that an individual is as good a Lieutenant after only 30 months on the job as a firefighter as he/she would be after 54 months on the job.  Tr. P. 35, l. 14-25; p. 36, l. 1-14; p. 37, l. 7-16.  Plaintiffs failed to show that Section 9.3B of the collective bargaining agreement is not necessary to have a good firefighting force.  Dec. 12, 2006 Tr. 42, l.7-12.

      **Plaintiffs' Reply:  As was pointed out in paragraph 17 of Plaintiffs' Proposed Findings, the City never contested this aspect of the proposed remedial order in the court-ordered pretrial contentions of the parties. The City should not be allowed to do so now.** *See also***, Plaintiffs' Reply Brief In Opposition to Rule 19(a) Defendant Chicago Fire Fighters Union Local No. 2's Proposed Findings of Fact And Conclusions Of Law at 4-6.**

13.     The Court notes that plaintiffs' December 19, 2006, proposed injunctive order contains two  provisions for which plaintiffs presented no evidence in support thereof, and for

which they do not raise any proposed findings or conclusions.   Specifically, plaintiffs' proposed Order would require that the City offer and administer promotional examinations for the ranks of Engineer and Lieutenant no sooner than 18 months, but no later than 28 months after class members hired pursuant to the Order graduate from the Academy.   December 19, 2006, Proposed Order at B(3).   In addition, the proposed Order states that any class member who is promoted to the position of Engineer or Lieutenant from the above promotional exams shall, upon promotion, receive salary and benefits commensurate with having been promoted 12 months sooner.   Id. at B(4).   The Court rejects both provisions of the proposed Order because plaintiffs did not provide any evidence or legal support to sustain such findings.

**Plaintiffs' Reply: In order to provide effective make-whole relief, the remedial order must not only address the fact that the plaintiff class members lost the opportunity to be considered for hiring in a timely manner as a result of the City's illegal use of the 1995 hiring examination, but also that the opportunity is only now being provided by the remedial order many years later. Therefore, as a necessary part of make whole relief, those plaintiffs who are hired as part of the remedy must receive redress for not only the lost hiring opportunity, but also the potential loss of their opportunity to be promoted during the time they were illegally denied the opportunity to be hired. This is particularly important given that the passage of time necessarily means that the remedial hires will be more than 10 years older when they become firefighters than they would have been if the test had been properly used by the City in a nondiscriminatory manner, and their careers are accordingly likely to be shorter than they would otherwise have been. Plaintiffs therefore propose that the City be required to give promotional examinations for the**

14

ranks of Engineer and Lieutenant to all eligible firefighters (including, but not limited to the remedial hires) no sooner than 18 months and no later than 28 months after the remedial hiring. Any remedial hire who receives a promotion as a result of his or her performance on these examinations would then be given salary and benefits as if the promotion had occurred 12 months earlier.

This provision is essential in order to redress the lost promotional opportunities as a result of the City's violation of Title VII. The City must be required to give promotional examinations within a reasonable period of time after the remedial hiring in order to ensure that the remedial hires are not permanently deprived of their promotional opportunities, as would occur, for example, if the City give promotional examinations only shortly before the remedial hiring, and/or many years later. These are not unreasonable scenarios, given that (1) it has been more than ten years since the last lieutenant's examination was given and the City is still making promotions from the list generated by that examination, and (2) the City has now (finally) come out and firmly stated that it intends to appeal this case. December 12, 2006 Trial Transcript at 18-19; Defendant's Proposed Findings at 10. If the next rounds of promotional examinations are given while the case is on appeal and then again only many years later, the opportunity to be promoted will be effectively lost to the remedial hires forever. If, in addition, they are given the opportunity to take such examinations and are promoted, but do not receive any enhancement of benefits, there will be no redress for denial of the promotion which would likely have occurred if the hiring examination had been administered in a nondiscriminatory manner, and hiring and promotional opportunities had been thus been

made available years ago. **The need for such relief is apparent from the nature of the violation, and the facts that the discriminatory hiring began in April 1996, and since then, the City has given promotional examination for Engineer in 1997 and 2001, and for Lieutenant in 1999.** *See* **Defendant City of Chicago's Contentions with Respect to Plaintiffs' Proposed Injunctive Order of Relief at 5-6; Defendant's Proposed Findings at 8, ¶15, n.2.**

14.     In addition, the Court finds the City's contentions to those provisions to be persuasive.  As stated in those contentions, this case never challenged any promotional process and was brought solely as a disparate impact challenge to the written examination for the 1995 firefighter entrance examination.  Accordingly, any relief sought now for promotions or for promotional exams to be given at a certain time is outside the scope of plaintiffs' EEOC charges as well as outside the scope of their complaint.

**Plaintiffs' Reply: It is simply not relevant that the plaintiffs did not challenge the legality of the promotional process, just as it is irrelevant that the plaintiffs do not challenge the legality of the seniority provisions of the Local 2 collective bargaining agreement. The basis of the requested relief is the requirement under Title VII that the Court provide make-whole relief to redress the established violations.** ***See Albemarle Paper Co. v. Moody,*** **422 U.S. 405, 418 (1975);** ***Franks v. Bowman Transp. Co., Inc.,*** **424 U.S. 747, 770 (1976).** ***See also*** **cases cited in Plaintiffs' Reply Brief In Opposition to Rule 19(a) Defendant Chicago Fire Fighters Union Local No. 2's Proposed Findings of Fact And Conclusions Of Law, at 2, 4.**

15.     Even if the Court were to find that plaintiffs could seek relief for any "loss of a chance" to be promoted to a higher rank than firefighter, the compensation plaintiffs seek for the "delayed promotions to the rank of Engineer or Lieutenant" is based solely on speculation that all plaintiffs would have been eligible and would have performed well enough[2] on the competitive promotional examinations to even be promoted.  See e.g. Biondo v. City of Chicago, 382 F.3d 680, 685-690 (7th Cir. 2004);  Bishop v. Gainer, 272 F.3d 1009, 1015-1017 (7th Cir. 2001).  Plaintiffs did not provide any sort of evidence to support such a finding, and this Court cannot award compensation that has no factual or legal basis.

**Plaintiffs' Reply: Plaintiffs are only proposing to promote those remedial hires who actually take and pass the appropriate promotional examinations, thus the qualifications of "all plaintiffs" is not an issue.  The qualifications of those promoted will be determined**

---

[2]  There is even an issue as to which exams class members would have been eligible to take had they been hired sooner.  For example, only people who were actually employed and had completed their probationary period nine months prior to the written portions of those examinations would have been able to take the competitive 1997 and 2001 Engineer promotional exams and the 1999 Lieutenant exam.  Accordingly, only the shortfall of class members from the classes hired May 16, 1996, October 1, 1996, and March 4, 1997 were eligible to take the 1997 engineer examination.  Only the shortfall of class members from the classes hired May 16, 1996, October 1, 1996, March 4, 1997, October 1, 1997, February 2, 1998 and February 16, 1999, were eligible to take the 1999 lieutenant examination.  Only the shortfall of class members from the classes hired May 16, 1996, October 1, 1996, March 4, 1997, October 1, 1997, February 2, 1998, February 16, 1999, December 1, 1999 and July 17, 2000 were eligible to take the 2001 engineer examination.

**Plaintiffs' Reply: This would only be an issue in the extremely unlikely event that the number of the 132 remedial hires who (1)  take the examination and (2) are promoted by the City exceeds the number of shortfalls that would have been eligible to take the previous examinations. It is an issue that should be addressed, if at all, by limiting the salary and benefits enhancement to the first 105 remedial hires to be promoted to Engineer (the number who, according to the City and Local 2, would have been eligible to take one or both of the prior Engineer's promotional examinations), and the first 72 remedial hires to be promoted to Lieutenant (the number who, according to the City and Local 2, would have been eligible to take the prior Lieutenant's promotional examination).**

by the City's own promotional process. Just as with the remedial hiring, the evidence that supports the appropriateness of the promotional aspects of remedy is the undisputed loss of opportunity as a result of the City's violation of Title VII. Neither *Biondo* nor *Bishop* provide any support for the City's objections, indeed both cases support the remedy proposed by the plaintiffs, as in both opinions, the Seventh Circuit held that the "'loss of chance' method is the best way to handle probabilistic injuries" in cases where illegal discrimination had caused loss of promotional opportunities. *Biondo*, 382 F.3d at 688, citing *Bishop*, 272 F.3d at 1015-1016. Indeed, the City, the defendant in *Biondo*, agreed with this approach. What the Seventh Circuit found to be inappropriate in *Biondo* and *Bishop* was (1) the award of promotions to plaintiffs who had not passed promotional examinations for the positions in question and had not presented sufficient evidence of the probability that they would have done so, and (2) the award of full promotional back pay to plaintiffs who had established only a small likelihood that they would have been promoted. *Biondo*, 382 F.3d at 688-89; *Bishop*, 272 F.3d at 1015-17. Plaintiffs here are not proposing to promote any of the remedial hires who do not take and pass the appropriate promotional examinations, and are not proposing to award full promotional back pay to those who do.

16.     Indeed, plaintiffs have not attempted to even analyze what the class members' chances for promotion could have been had they even been eligible to take the Engineer and Lieutenant competitive exams, and therefore any promotional projections are too speculative and entirely devoid of any probative data that would support any finding regarding lost

18

promotional opportunities.   See Biondo, 382 F.3d at 688.

**Plaintiffs' Reply: This concern is resolved by the fact that plaintiffs are not proposing to promote or award any promotional back pay to any remedial hire unless and until he or she actually receives a promotion by the City to the rank in question.** ***See*** **Reply to No. 15, above.**

17.     Because this case never challenged any promotional process, was brought solely as a disparate impact challenge to the written examination for the 1995 firefighter entrance examination, and because plaintiffs presented no data, evidence or analysis to support any "loss of chance" to obtain promotions to Engineer or Lieutenant, no relief will be granted for any compensation for "delayed promotions".  Nor will the Court enter any Order commanding the City to give promotional examinations at any given time.

**Plaintiffs' Reply: The lack of challenge to the legality of the promotional process is irrelevant to the question of the propriety of the proposed relief.** ***See*** **Replies to Nos. 13-15, above.**

### III.    Procedure for Payment and Distribution of Back Pay

18.     Plaintiffs' December 19, 2006, proposed injunctive order sets forth for the first time their proposal as to how the back pay and pension payments should be made, as well as how plaintiffs intend to distribute the back pay award.  Dec. 19, 2006 PPFC at C(1-4). Because plaintiffs failed to present this proposal to the City prior to the evidentiary hearing, the City was unable to present any evidence or contentions to this proposal.  Further, plaintiffs

did not present any evidence to support a finding that the City should be ordered to follow a procedure for making such payments that is contrary to the City's usual and customary manner of paying judgments entered against the City.

**Plaintiffs' Reply: Plaintiffs' proposal presents a reasonable and customary approach to payment and distribution of back pay upon the determination of liability in a class action. The "evidence" necessary to support the judgment is the evidence upon which the determination of liability is based. Plaintiffs cannot imagine what additional evidence the City might wish to present with regard to the monetary terms of the judgment, and the City has not suggested what (if anything) that might be. The entry of a monetary judgment, of course, creates an obligation to pay the judgment, and the City is no exception to this rule. Since the City intends to appeal the judgment, the appropriate recourse for the City is to seek a stay of judgment, either from this Court or, failing that, from the Seventh Circuit. The City does not present the Court with any proposal as to how and when the judgment is to be entered and paid - only objections as to plaintiffs' proposals. This appears to be yet another example of the City's unfortunate (if understandable) pattern of attempting to delay the outcome of this case as long as possible. The Court should enter a complete judgment at this time, subject only to the monetary adjustments to back pay and benefits necessary to bring the amounts current at the time of hiring (due to the passage of time and any adjustments as a result of changes in revisions to the Local 2 collective bargaining agreement). Otherwise, the plaintiffs and the Court face the prospect of greatly delaying the outcome of this litigation as the City would likely appeal first the partial order now entered by the Court, and then, following**

20

**affirmance by the Seventh Circuit, a subsequent appeal of the entry of the monetary portion of the judgment – all for the purpose of delay. This should not be allowed.**

19.     Plaintiffs propose that within "30 days of the entry of this Order, the City shall pay to an interest bearing escrow account opened by plaintiffs' counsel … the sum of $22,778,533." Dec. 19, 2006, PPFC at C(1). The Court will shortly address the amount of backpay requested, but for purposes of this discussion, the Court will not order the City to pay to an interest bearing escrow account the amount of the backpay that will be ordered for the following reasons: First, plaintiffs have not provided the Court with any evidence to support such a request. For example, there is no evidence that the City has ever not paid a judgment ordered against it, or that it has not paid the appropriate post judgment interest. In other words, plaintiffs fail to show there is a need for such a measure. Second, an interest bearing account would provide a windfall for the plaintiffs. They would have the benefit of the interest generated by such an account as well as additional postjudgment interest as plaintiffs are seeking additional back pay amounts at future dates. Id. In contrast, the City would be deprived of interest payments it normally receives on its investments up to the day the payment is made, while at the same time it also would have to pay postjudgment interest. This is especially important because the parties and the Court have all acknowledged that the final judgment order will be appealed. An appeal will take months before a resolution is reached, and during that time the City would not have use of the money that would be in the escrow account.

**Plaintiffs' Reply:** *See* **Reply to No. 18, above. In addition, plaintiffs note that the**

City misunderstands the role of postjudgment interest. Obviously, if a judgment is paid, either to plaintiffs or, as here, to an interest bearing escrow account, the City would not be responsible to also pay post-judgment interest. Post judgment interest is payable only to compensate for the delay in payment of a judgment. *See Kaiser Aluminum & Chem.Corp. v. Bonjorno*, 110 S.Ct. 1570, 1576 (1990) ("the purpose of postjudgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant") (internal citations omitted).

20.     Likewise, the Court will not order the City to make the back pension payments to the Firemen's Annuity & Benefit Fund on or before the date of hire of any class members, as requested in the December 19, 2006 proposed order.   See Dec. 19, 2006 PPFC at C(2). Again, because plaintiffs failed to inform the parties, including the Firemen's Fund of this proposal prior to the hearing, the parties were deprived of the opportunity to present evidence as to the normal and customary manner in which the City makes such back pension payments to the Fund.   It is further noted that plaintiffs did not present any evidence to support a finding that would contradict the normal and customary manner in which those payments are made. Accordingly, this Court holds that the City's portion of contributions for the back pension credits that will be awarded to plaintiffs shall be made in accordance with the regular and customary manner in which all such City contributions to the Pension Fund are made.  To wit, the Fund will present a bill to the City that will then be paid from the appropriate City fund to the Fund.

22

**Plaintiffs' Reply:** *See* **Reply to No. 18, above. In addition, the City has not explained to the Court or plaintiffs what it means by the "regular and customary manner in which all such City contributions are made," or when and how the City is billed by the fund. Plaintiffs should not be left to such an uncertain fate.**

21.     Plaintiffs further seek contributions to other fringe benefits separate and apart from the pension credits.  December 19, 2006 proposed order at C(2).  However, both Drs. Bendick and White have already credited plaintiffs with the value of fringe benefits dating back to May 16, 1996.  See Dr. Bendick's written testimony at p. 6; Dr. White's written testimony at pp. 6-7, 25.  Therefore, to make the City pay amounts over and above what it already is paying the plaintiffs for those fringe benefits would provide an enormous windfall to the plaintiffs.  This Court will not award such a windfall.  Plaintiffs are thus only entitled to receive the benefit of the City's contributions to the Firemen's Pension Annuity & Benefit Fund for purposes of their retroactive pension credits, as well as the backpay amount that already includes the monetary value of all lost fringe benefits.

**Plaintiffs' Reply:  The City is correct that the calculations of monetary relief include fringe benefits.  They do not, however, include the City's contribution to the Pension Fund.  Therefore, Section C.2 of the Injunctive Order of Relief should apply only to the City's contributions to the Pension Fund, and should read as follows:**

> **On or before the date of hire of any class member pursuant to paragraph A4 of this Order, the City shall make payments to the Fireman's Annuity & Benefit Fund in order to provide that class member, and his or her family, with the same level of pension funding as if the class member had been hired on December 4, 1998.  If necessary, the Court will direct the Board of Trustees of the Fireman's Annuity & Benefit Fund to accept contributions**

23

by the City to fund benefits.

*See* **proposed Revised Injunctive Order of Relief, attached hereto as Exhibit A, at Section C.2.**

22.     Although the issue has been raised in the past as to how the backpay will be distributed to the class members, it was not until the December 19, 2006 proposed injunctive order that plaintiffs revealed their proposed plan.  See Dec. 19, 2006 proposed order at C(3). Plaintiffs' proposal is that 1) the amount representing the out of pocket employee-portion of pension contributions will first be deducted from the backpay award for those who are hired; 2) the remainder of the funds would then be distributed in equal shares to eligible class members as they are defined in paragraph A1 of the proposed order who are also a) not hired, and b) file a valid claim form; and 3) that if any funds remain after those two distributions, the remainder will be paid to the African American Firefighters League ("AAFL") for use in recruiting and training African Americans for CFD examinations.

23.     The City notes that according to the definition in A(1) of the proposed order, all class members who have in the past been invited to the subsequent screening steps but who were disqualified as a result of that screening, would not be eligible to share in the proceeds from the fund, while class members who have not been screened, but who if screened would also fail, are eligible for a payment.  This appears to be a conflict between class members that plaintiffs fail to address.  Accordingly, the Court cannot at this time enter such an order, but, if an appeal by the City is unsuccessful, the Court will at that time hold a fairness hearing.

**Plaintiffs' Reply: There is no conflict between (1) persons who have been disqualified by the City as a result of the screening process and (2) class members who**

24

**have never been screened by the City. The first group are not class members, as they have not been denied hiring opportunities as a result of their scores on the hiring examination, but rather as a result of the City's post-test screening process. *See* Complaint, ¶ 7. In addition, there is no rationale or requirement for a "fairness hearing" as a part of an adjudicated class action and the court ordered remedy following determination of liability as opposed to a class action settlement. *See* Fed.R.Civ.P. 23(e)(1)(C); *Armstrong v. Bd. of School Directors of City of Milwaukee,* 616 F.2d 305, 313-15 (7th Cir. 1980) ("The goal of the fairness hearing is to adduce all information necessary to enable the judge intelligently to rule on whether the proposed *settlement* is 'fair, reasonable, and adequate.'") (emphasis added), overruled on other grounds by 134 F.3d 873 (7th Cir.1998).**

24.　　As to the distribution of any remaining funds to the AAFL for training purposes, the City objects because any training the AAFL were to conduct for entrance examinations[3] that is funded through the backpay award from the City would first have to be coordinated with the City to avoid providing conflicting information given to applicants. Due to the inherent difficulties the City would have monitoring such training, and due to potential liability issues that could be raised against the City were an applicant trained by the AAFL given incorrect information that harmed that person's performance on an examination, the

---

[3] Although not specified in the proposed order, paragraph C(3-c), the City assumes that the part referring to "CFD examinations" means only entrance examinations as it is only an entrance examination that is the subject of this matter.
　　**Plaintiffs' Reply: The City's assumption is incorrect. *See* Replies to Nos. 13-17, above.**

Court refrains at this time from entering such an order. Again, if an appeal by the City is unsuccessful, the Court can address this issue at a later fairness hearing.

**Plaintiffs' Reply: The African American Firefighters League is the appropriate and logical recipient of any remainder funds, not only because of its status as a plaintiff in this lawsuit, but also because of its long history of fighting against racial discrimination in the Chicago Fire Department. The City's assertion that any training of applicants for hire or promotion by the AAFL would have to "coordinated with the City" is nonsense. The AAFL has engaged in such training for years, and there is no legal or logical reason to conclude that such activities could or would lead to "potential liability issues that could be raised against the City." *See also*, Reply to No. 23, above.**

## IV.   Reporting and Monitoring

25.   Injunctive relief regarding post-Written Exam screening and training goes beyond "make whole" relief available under Title VII.   This is a disparate impact case challenging the written examination only and there is no claim of disparate treatment. Moreover, there is no evidence of discrimination in the Fire Academy.   Accordingly, plaintiffs have failed to meet their burden and present evidence that a monitor is needed.

**Plaintiffs' Reply: The only reporting requirement proposed by plaintiffs is that the progress of the remedial hires in the Academy be reported to class counsel. This is minimally burdensome, and an appropriate aspect of relief given the unusual nature of the classes in the Academy which will be comprised of remedial hires. Likewise, the only monitoring proposed by plaintiffs is that an experienced member of plaintiff AAFL be**

**allowed to serve as an ombudsman in the Academy during these admittedly unusual classes of remedial hire cadets. This is a reasonable provision given the critical importance of successful Academy training to the fair implementation of the hiring remedy in this case.**

26.     This Court has already rejected plaintiffs' request for monitoring and reporting pre-employment screening.  See Docket R. 349, Order of July 13, 2006.  There is no evidence or reason to believe that 132 class members will not meet screening requirements and the Court has made clear there is no need for monitoring if 132 members pass the screening requirements and are offered employment.  Id.

   **Plaintiffs' Reply:** *See* **Reply to No. 25, above.**

27.     This Court also denies plaintiffs' request for Academy reporting and monitoring.  Not only does this request go beyond "make whole" relief, there is also no evidence of intentional discrimination.  The record is void of any evidence that African-American candidates have been treated unfairly at the Academy or that a remedial class will be treated unfairly at the Academy.  To the contrary, the Academy consistently has a diverse body of candidates, instructors and commanders; and there have been no complaints of racial discrimination. 12/12/06 Trial Tr. at 60:20-61:24; 62:8-63:1-21. (Testimony of Nielsen).  Further, the Department has every incentive for candidates, including court-ordered remedial hires, to succeed at the Academy.   12/12/06 Trial Tr. at 55:305; 63:20-21 (Testimony of Nielsen).

**Plaintiffs' Reply:** *See* **Reply to No. 25, above.**


28.     This Court finds there is no need for post-offer monitoring.   As Nielsen

testified, a "monitor is not needed at the Fire Academy".   There is enough self-monitoring.

12/12/06 Trial Tr. at 65:25-66:1-6 (Testimony of Nielsen).   As an initial matter, the CFD

prohibits discrimination at the Academy. 12/12/06 Trial Tr. at 62:8-63:1-22 (Testimony of

Nielsen).  As Nielsen testified, "We have zero tolerance for harassment."   12/12/06 Trial Tr.

at 63:18-21 (Testimony of Nielsen).   There are procedures in place to report harassment,

allowing candidates to complain to instructors or bypass them and complain of discrimination

to an officer outside the academy.   12/12/06 Trial Tr. at 62:8-63:1-22 (Testimony of

Nielsen).[4]   There are further checks in place at the Academy to make sure training is fair.

For example, the commanders, including Nielsen, monitor to make sure that "training is done

fairly."  12/12/06 Trial Tr. at 64:18-21 (Testimony of Nielsen).   The anti-discrimination

policy has been effective because there have been no problems at the academy with harassment

or discrimination.  12/12/06 Trial Tr. at 62:8-63:1-21 (Testimony of Nielsen).

**Plaintiffs' Reply:** *See* **Reply to No. 25, above.**


29.     Plaintiffs' reasons for requesting monitoring at the Academy lie on baseless

--------

[4]Further, in addition to the CFD's own prohibitions and procedures, class members may always file a charge of discrimination with the Equal Employment Opportunity Commission or otherwise pursue another legal remedy.
     **Plaintiffs' Reply: Plaintiffs did so here, and eight years later, they are still waiting to receive the remedy for the City's illegal conduct. Obviously, it is preferable to take reasonable efforts to avoid problems, rather than rely on legal redress thereafter.**

speculation. There is no evidence that a class of court-ordered remedial hires will be trained or treated any differently than other candidates. In fact, not a single witness testified that they experienced or witnessed discrimination at the Training Academy. To the extent plaintiffs cite a snippet of opinion from Battalion Chief Nicholas Russell, it is irrelevant. His opinion did not address Academy training. Jan. 22, 2004 Trial Tr. 1169:11-1170:1. Rather, he was testifying regarding the African-American firefighters league's recruiting efforts. Jan. 22, 2004 Trial Tr. 1169:11-1170:1.

**Plaintiffs' Reply:** *See* **Reply to No. 25, above.**


30.     Also, contrary to plaintiffs' unsupported assertions, there is no evidence a remedial class would  be composed entirely of African-American candidates. The Collective Bargaining Agreement requires 10% of the class be paramedic cross-overs and more need to be hired to make up for a deficit when the cross-over pool was exhausted from the well-qualified list.   In addition, paramedic cross-overs are an added benefit to the class because the candidates often look to the paramedic cross-overs for support since they have been in the field and paramedic cross-overs help out with EMT training as well as preparation for the national registry exam.  12/12/06 Trial Tr. at 68: 9-22 (Testimony of Nielsen).

**Plaintiffs' Reply:** *See* **Reply to No. 25, above.**


31.     The Court also notes that plaintiffs' proposal for a monitor is nebulous. Plaintiffs have asked for a monitor from the CFD itself but the scope of the monitor's function lacks any guidelines and is therefore only likely to be an unnecessary layer of bureaucracy.

Additionally, instructors are already assigned to assist candidates. The instructors meet regularly with an assigned small group of candidates to respond to their needs and offer additional training and help with practical skills. 12/12/06 Trial Tr. at 55-56 (Testimony of Nielsen).

**Plaintiffs' Reply:** *See* **Reply to No. 25, above.**

32.    The Court declines to institute any reporting requirements during Academy Training. While plaintiffs' proposed injunctive order seeks to have class counsel notified of all Academy members' grades, class counsel withdrew such a request at the hearing.[5] 12/12/06 Trial Tr. at 58:18-20 & 59:1-4 (Ms. Harper: Plaintiffs had proposed that they be monitors of some of the grades, as the attorneys…. Mr. Piers: "We're not proposing that any plaintiff[ ]s' counsel be a member of the academy. There isn't a plaintiffs counsel in this case that would be qualified to be a monitor at the academy.").

**Plaintiffs' Reply:** *See* **Reply to No. 25, above.**

33.    Finally, the City notes that should a monitor be ordered, it should be an incumbent member of the CFD recommended by both the City and plaintiffs, rather than unilaterally by plaintiffs.[6] The City should not have to bear the cost of employing a retired

---

[5]Class counsel also had asked for all candidates grades, including non classmembers but there is also no need to evaluate plaintiff class members' standing relative to others at the Academy because as many candidates as meet the qualifications may become firefighters. 12/12/06 Trial Tr. at 55:305; 63:20-21 (Testimony of Nielsen).

[6]Chief Nielsen's testimony that "as far as a monitor being at the Academy, I would actually encourage it" merely speaks to his support if the court ordered a monitor, not to its necessity. As he clearly testified, Nielsen testified, a "monitor is not needed at the Fire

firefighter for the purpose of monitoring. The City should also have an equal voice in selecting an incumbent CFD member as it is the City that is most familiar with the qualifications of its employees.

**Plaintiffs' Reply:** *See* **Reply to No. 25, above.**

V.  **Monetary Relief**

34.      The parties are in agreement that the three major differences between them with respect to monetary relief are the wage level that should be used in computing "interim earnings", whether backpay should include "moonlighting" income, and whether - if prejudgment interest is awarded over the City's objection - it should be at the prime rate or the "small investor" rate.

**Plaintiffs' Reply: Plaintiffs make no reply to Defendant's Proposed Findings 34-54, and 56-57, but rather refer the Court to the corresponding paragraphs of Plaintiffs' Proposed Findings.**

35.      The Court adopts the Level 6 mitigation earnings, rejects plaintiffs' claim for "moonlighting" income, and rejects plaintiffs' claim for prejudgment interest. Accordingly, judgment is entered against the City in the amount of $ 12,220,381.  <u>See</u> Exhibit B attached hereto (Exhibit B is a duplicate of Exhibit 11 to White Direct Testimony).

---

Academy."  There is enough self-monitoring.  12/12/06 Trial Tr. at 65:25-66:1-6 (Testimony of Nielsen). "We have zero tolerance for harassment."  12/12/06 Trial Tr. at 63:18-21 (Testimony of Nielsen).  Further, Nielsen testified that the academy would be committed to making every effort to have fair training for the classes hired as part of this lawsuit.  12/12/06 Trial Tr. at 76:1-4 (Testimony of Nielsen).

A.     Determination of the Wage Level to be used in Calculating Interim Earnings

36.     In determining the appropriate mitigating earning levels for the class, the Bureau of Labor Statistics' ("BLS")  National Compensation Survey ("NCS") allows for estimating mitigating earnings of the plaintiff class.[7]

37.     Both parties' economic experts agree that the appropriate occupation to analyze is the job of firefighter because, as plaintiffs' expert, Dr. Bendick explained, "this was one job they were presumably willing and able to perform."  White Direct Testimony, ¶ 18 (quoting Dr. Bendick July 2002 report, ¶ 41).

38.     Both parties' experts assigned points to each of the nine factors that the BLS uses to evaluate the "level" of the firefighter position in Chicago.  White Direct Testimony, ¶ 18.  The documentation produced by the BLS, including instructions, for the nine-factor scoring system is provided as Appendix C of White's January 20, 2003 report, attached as Exhibit 2 to his direct testimony.

39.     Level 6 is the appropriate level for the job of firefighter with the City of Chicago.  White Direct Testimony, ¶ 32.  Although Dr. Bendick opined the job to be Level 5, he did so by inappropriately assigning the lowest possible points to the "Scope and  Effect" category.  Id.  Dr. Bendick assigned the firefighter job only 25 points; yet, such a low score is appropriate only for "specific, routine operations [where the]  [e]ffect is on immediate organization, not broader."  Dr. White Testimony, ¶¶  20-21.   But the job of firefighter is not "routine."  Dr. White Testimony ¶ 22 (noting life-saving activities in emergency situations can be far from routine).

40.     In deflating the points awarded to the "Scope and Effect" category, Dr. Benedick

---

[7]The City sought discovery regarding plaintiff-specific information but was denied such discovery.  See Defendant's Motion for Reconsideration of the Court's 06/01/06 Ruling with respect to the Denial of Representative Sample Discovery.  See also Paragraph 57 below.

relied on his own interpretation of the word "routine" -- one that directly conflicts with the BLS' definition. White Direct Testimony, ¶ 22. According to Wayne Shelly, an Economist at the BLS, the word "routine" in the NCS instructions refers to "simple, repeated, predictable tasks that do not involve judgment calls and are capable of being reduced to written instructions." White Direct Testimony, ¶ 22. In contract, Dr. Bendick says –without any authority – that "routine" is more appropriately referred to as "routinized" which he in turn defines as "operations which a person has been trained to quickly assess a certain situation, to understand which of the prior set of skills and equipment. . . had been trained to use he should apply." Dr. White Testimony ¶ 23 (citing Dr. Bendick's September 13, 2006 testimony).

41.     Dr. Bendick also scored the "Scope and Effect" category too low. The lowest scoring applies only if the effect of a job is restricted to the immediate organization. Dr. White Testimony ¶¶ 21-22. However, "[o]f course, a firefighter's job affects people outside of their immediate organization." Dr. White Testimony ¶ 22. Thus, Dr. Bendick's 25 point score for the Scope and Effect criteria also ignores the undeniable broader affect of the firefighter's job for the higher rating.

42.     The error of Dr. Bendick's scoring of the "Scope and Effect" criteria is further manifested by the fact that he assigns a lower score for the "Scope and Effect" of a firefighter than the BLS assigns for the "Scope and Effect" of a dental hygienist. See Dr. White Testimony ¶ 25.

43.     Accordingly, Dr. White appropriately gave the score of 150 for the Scope and Effect criteria for a firefighter. The BLS described jobs at that level as ones impacting the "social, physical and economic well-being of persons." Dr. White Testimony ¶ 24. As the trial record shows, the firefighter position certainly qualifies for the higher rating.

44.     The BLS's recent conversion to a four-factor scoring system re-enforces that Level 6 is the appropriate level.  Dr. White Testimony ¶¶ 28-31.  A primary difference with the new four-factor system is that the "Knowledge" factor is reported for several different broad occupational categories, of which Protective Service workers is one.  Dr. White Testimony ¶ 28-31, Ex. 6.  Exhibit 6 to Paul White's Written Testimony contains the BLS documentation of the four-factor scoring system.

45.     The BLS provides multiple examples of characteristics of protective services jobs that apply to each point level.  One of the examples provided by the BLS in the 550-point category is a person who "[f]ights fires and carries out crash/rescue activities at a major airport handling large aircraft, or located in a metropolitan area."  Dr. White Testimony ¶¶ 29, 38.  This is what firefighters do in a major metropolitan area like Chicago.  Id.

46.     The NCS documentation specifies that protective service jobs at the 550-point level  include administering CPR and automatic external defibrillators as an EMT, consistent with the EMT qualifications and duties of Chicago firefighters. Dr. White Testimony ¶ 38.

47.     Under the new BLS scoring system, the firefighter job scores at the 550 point level in the Knowledge category and therefore, along with the other points accorded by both experts in the three remaining categories, qualifies as a Level 6 position: one level higher than Dr. Bendick scored the job.

48.     A significant shortcoming of Dr. Bendick's analysis is that he evaluated the position using a "day one approach."  His approach excludes the possibility that the plaintiffs, during the mitigation period, could obtain training in alternative employment or through schooling and thus increase their mitigating earnings after a training period.   Dr. White Testimony ¶ 34 (c).

49. For the firefighters who were hired by the City, an initial period of relatively low earnings is often followed by a substantial pay raise in the next two years after they have completed training. Dr. White Testimony ¶ 34(c).

50. However, under Dr. Bendick's methodology, "the mitigating earnings are set at a low level and are never assumed to substantially increase with the acquisition of training and the enhancement of skills." Dr. White Testimony ¶ 34(c). Dr. Bendick "assumes with 100% certainty that [classmembers] projected City of Chicago Firefighter job will have a large post-training increase in pay, but on the other hand, he assumes there is a 0% chance the same will happen in mitigation." Dr. White Testimony ¶ 34(c).

51. Because the backpay award is measuring losses across a number of years (and not just on the first day), Dr. Bendick's approach fails to allow the plaintiffs to enhance their skills in mitigation but credits them with developing their skills in the Firefighter job.

52. Plaintiffs' expert's use of Level 5 mitigating earnings overstates the resulting amount of economic loss. Dr. White Testimony ¶ 32.[8]

53. Plaintiffs rely heavily on a comparison of firefighter wages to 2000 Census earnings levels by making much of the percentage of the workforce at earnings level commensurate of Level 5 and Level 6 in arguing for Level 5. See PPFF ¶ 37. But their argument is misleading because the Census earnings levels are not representative of the earnings of those who most likely would have been hired as firefighters. Dr. White Testimony ¶ 36.

54. In analyzing the interim earning of the plaintiff class, the Court notes that the class has already distinguished itself from the general labor market. For instance, each member

---

[8]Even if this Court were to apply Dr. Bendick's "day one" reasoning to the mitigating earnings, Level 5 would only extend for the six-month academy training period, after which the mitigating earnings would increase to the Level 6 earnings.

of the class has applied for the position of firefighter and passed the Written 1995 Firefighter exam, which was written at a twelfth-grade reading level. March 22, 2005 Order, p. 6.

55. Morever, the census data is irrelevant here because it does not hone in on persons who registered for, took the firefighter test, passed the firefighter test; and for persons who would pass the background screening, physical abilities test, medical examination and drug screening; and who are still interested in the position. Dr. White Testimony ¶ 36. Further, Dr. Bendick restricted the census pool he examined to included only African American males, aged 21-35, and whom had worked full-time 52 weeks in a calendar year. Dr. Bendick written testimony at p. 16. However, the record shows that African American females are also class members, and that not all class members are aged 21-35. Furthermore, by looking at only persons who worked a total of 52 weeks per calendar year, Dr. Bendick eliminated individuals who worked during a year, but not for the entire 52 weeks.

**Plaintiffs' Reply: Dr. Bendick's use of census data regarding African American males was reasonable and appropriate given that this data was most comparable to the class members, about 83% of whom are male. *See* Plaintiff's Trial Exhibit 23, Firefighter Exam Score List. In addition, women applicants fail the physical fitness test at a far greater rate than do men. Given these facts, it would have made no sense to use either data for African American women, or all African Americans (i.e. men and women combined), as either would have been less comparable to the class.**

**In addition, it is hard to understand why the City is complaining that Dr. Bendick used only census data regarding persons who worked for 52 weeks in a year. This data was used for comparison purposes with regard to the estimate of mitigation earnings, and if he had used data which included persons who were employed for less time during a year, it**

36

**would have decreased the estimated mitigation earnings and increased the projected wage loss.**

56.     Additionally, plaintiffs are merely comparing the earnings at the probationary level whereas wages jump significantly after the probationary period.  For these reasons, Dr. Bendick's census data is unreliable and provides no support for his opinion that Level 5 is more appropriate than Level 6.

57.     The City sought discovery regarding plaintiff-specific information but was denied such discovery.   "A next-best alternative [to examining the 132 plaintiffs who should have been hired] is to examine the actual earnings data of a well-constructed sample of the plaintiff class." Dr. White Testimony ¶ 43.  Given that we do not know the exact 132 shortfall plaintiffs in advance, a statistically representative sample of the earnings of 400 class members would "provide a more accurate representation of mitigating earnings, compared to a government survey of the general population."  Id.

**B.     Moonlighting Income**

58.     Plaintiffs seek the extraordinary remedy of requiring the City to pay plaintiffs additional money for secondary employment they believe plaintiffs may have engaged in had they been hired by the City as firefighters at an earlier date.  Plaintiffs have not carried their burden.  They fail to provide any reliable analysis that shows what percentage of CFD firefighters who were hired off the 1995 Written Exam actually have secondary jobs, nor have they provided any evidence for those who do have such jobs as to how many hours, what types of jobs, or what income they make.  Significantly, plaintiffs do not provide this Court with a single case that supports a finding that the City has to pay from its funds, money that plaintiffs claim would have possibly come from secondary employers.  In short, plaintiffs have not

tendered any reliable evidence as to the issue of secondary employment as it pertains to the CFD, nor do they have any case law to support their claim for the City to pay them for "moonlighting." Their claim for moonlighting is speculative at best.

**Plaintiffs' Reply: There is nothing "extraordinary" about including loss of secondary employment (or "moonlighting") income, as the opportunity to work a second job is a significant and common opportunity available to firefighters due to the unusual hours of their jobs. Compensation for the loss of this income is an inherent part of make whole relief for loss of employment as a firefighter. The evidence introduced by plaintiffs is unrebutted, and was used by Dr. Bendick in an extremely conservative manner.**

59.     The scant evidence plaintiffs rely upon for their "moonlighting" request cannot form the basis for such an award.  They offer only two pieces of evidence in support of their request: 1) a 1995 survey by the Bureau of Labor Statistics which reports that 28.1% of persons employed nationwide in firefighting occupations reported holding second jobs, and 2) one sentence from the 1995 findings of the Chicago Commission on Human Relations in a case called <u>Hugh Adams and Chicago Fire Department and Edward Altman</u>, 92-E-72 which states "[a]ccording to First Deputy Commissioner Altman, roughly 90 percent of the firefighters have a second job."  R. 366, Plaintiffs' Exh. 1 (for Dec. 12, 2006 Hrg.)¶ 56.  Plaintiffs have no other evidence, and they did not present a single witness from the CFD to testify on the issue of moonlighting.

**Plaintiffs' Reply:** *See* **Reply to No. 58, above.**

60.     Regarding the 1995 Bureau of Labor Statistics report (which is hearsay), there is

no evidence in that report that pertains strictly to Chicago.   Additionally, the report is stale - it is over eleven years old.  Any reliability that such a report may have is not sufficient to satisfy the burden plaintiffs carry to prove the damages the City owes them.  In short, there is no evidence that the report is relevant to the moonlighting rate of firefighters hired off the 1995 exam.  For instance, no witness identified any candidates who moonlighted while at the Academy and the Academy "discourag[es] [moonlighting] because of the workload that candidates have." 12/12/06 Transcript p. 72 ll. 17-19 (Nielsen testimony).

**Plaintiffs' Reply:** *See* **Reply to No. 58, above.  In addition, the 1995 BLS Report is appropriate for an estimate of moonlighting income for a class of applicants who were denied employment as firefighters beginning in 1996.  Further, the BLS Report is not hearsay pursuant to Federal Rule of Evidence 803(8), and in any case, hearsay may be considered by an expert witness as a basis for his opinion. Federal Rule of Evidence 703.**

61.     Plaintiffs' second piece of evidence is equally, if not even more, unreliable.  One sentence in a finding from a 1995 case cannot support, even together with the 1995 Bureau of Labor report, a conclusion that the City must pay more than $1 million to plaintiffs for the speculative loss of "moonlighting" income.  See Chart set out in ¶27 of PPFC.  Plaintiffs did not even tender the actual testimony of former First Deputy Commissioner Altman (who was not the named respondent in the Adams litigation).  Instead, they rely solely on one sentence in one finding of fact that is contained in a thirty-one page decision that has seventy-one (71) findings of fact.  That one sentence does not even state the basis for Altman's statement in Adams. R. 366, Plaintiffs' Exh. 1 (for Dec. 12, 2006 Hrg.)

**Plaintiffs' Reply:** *See* **Reply to No. 58, above.  In addition, plaintiffs note that First**

**Deputy Commissioner (and later Chicago Fire Commissioner) Altman was testifying as <u>the
City's witness,</u> at a hearing held before a City Commission, and was a basis of the
adjudicated determination made by that Commission.  The City's admission through
Altman's testimony (*see* Fed. R. Ev. 801(d)(2)(d)) stands unrebutted.  Presumably, if the
City has a good faith basis to question the accuracy of this admission, they would have
introduced evidence explaining or limiting its meaning.**

62.     Even if the Court were to overlook the absence of reliable evidence to support
plaintiffs' claim for moonlighting, they have failed to provide the Court with any legal precedent
for such a demand.  They cite only to a case that states "overtime benefits should be considered
in a back-pay award".   PPFC at ¶ 44; <u>Kossman v. Calumet County</u>, 800 F.2d 697, 703 (7th Cir.
1985).  That case does nothing to advance plaintiffs' cause as it is undisputed that an employer
may have to pay for overtime losses in a backpay award.   But there is nothing in the <u>Kossman</u>
case that supports the proposition that the City must pay for the speculative "moonlighting"
wages that could have come from employers other than the City of Chicago.  Plaintiffs make no
argument, nor can they, that "moonlighting" is part of the job of firefighter.  Accordingly,
plaintiffs' demand for "moonlighting" income is denied as it is not supported by the evidence nor
any precedent.

**Plaintiffs' Reply: *See* Replies to Nos. 58-62, above.**

**C.     <u>Prejudgment Interest</u>**

63.             This Court declines to award prejudgment interest in this case.  Contrary
to plaintiffs' intimation, an award of prejudgment interest is not automatic and falls within the

sound discretion of the trial court. <u>Cement Division, National Gypsum Co. . City of Milwaukee</u>, 144 F.3d 1111, 1114 (7th Cir. 1998).

**Plaintiffs' Reply: The law is clear in the Seventh Circuit that prejudgment interest should be awarded at prime rate. *See* case law authority presented in Plaintiffs' Proposed Finding 46.**

64.     The United States Supreme Court has stated that discretionary awards of prejudgment interest are permissible under federal law in certain circumstances.  Under the Court's analysis, the award should be a function of  "the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statue involved, and/or (iv) such other general principles as are deemed relevant by the court." <u>Wickham Contracting Co., Inc. v. Local Union No. 3 International Brotherhood of Electrical Workers</u>, 955 F.2d 831, 835-36 (2d Cir. 1992), cert. denied, 506 U.S. 946, 113 S.Ct. 394 (1992), citing <u>Loeffler v. Frank</u>, 286 U.S. 549, 557-58, 108 S.Ct. 1965 (1988), and <u>Blau v. Lehman</u>, 368 U.S. 403, 414, 82 S.Ct. 451 (1962).   The Seventh Circuit has stated that the decision to award prejudgment interest "involves a balancing of the equities between the parties under the circumstances of the particular case." <u>Myron v. Chicoine</u>, 678 F.2d 727, 734 (7th Cir. 1982).  "An award of prejudgment interest is a compensatory remedy and should not be made where it would overcompensate a plaintiff." <u>Nielsen v. Greenwood</u>, No. 91 C 6357, 1996 WL 563539, at *9 (N.D. Ill. Oct. 1, 1996) (J. Pallmeyer), citing <u>Commercial Union Assurance Co. v. Milken</u>, 17 F.3d 608, 614 (2d. Cir. 1994).

**Plaintiffs' Reply: *See* Reply to No. 63, above.**

41

65.     In this case, the equitable factors mitigate against awarding prejudgment interest. First, the backpay damages associated with this Court's finding that the City violated Title VII are speculative and uncertain**.**   The speculative nature of the damages is one factor the court should consider in determining whether an award of prejudgment interest is appropriate under the "current 'equitable' and discretionary rule" governing prejudgment interest.  Wickham, 955 F.2d at 835-36.  The Court calculated the mitigating earnings of the plaintiff class based on statistical data from governmental surveys, rather than on the actual earnings data of the 132 plaintiffs who should have been hired or on a random sample of the plaintiff class.  Although government surveys are often useful for determining the earnings levels of the general population, they may not be an accurate representation of the plaintiff class to the extent that the characteristics of the class differ from that of the general population.  Docket R. 371, ¶ 49(b) (Written direct of Dr. Paul White).

**Plaintiffs' Reply:** *See* **Reply to No. 63, above. In addition, as noted above, Dr. Bendick's estimate of mitigation earnings were extremely conservative.**


66.     In addition, this case has been pending for more than 8 years.  There were significant litigation delays that are not attributable to the City and, as a result, the interest has mounted dramatically.  Finally, this is not a case of withholding wages that are due to an employee for work actually performed.  Thus, there is no element of unjust enrichment on behalf of the City.  See Heiar v. Crawford County, Wisconsin, 746 F.2d 1190, 1203 (7th Cir. 1984)(noting for purposes of prejudgment interest the Court should consider that County lacked the benefit of the plaintiffs' work after forcing them to retire).

**Plaintiffs' Reply:** *See* **Reply to No. 63, above.  The Court is well aware of the role the**

42

**City has played in unduly prolonging this litigation.**

67.     In the event this Court concludes that plaintiffs are entitled to prejudgment interest, the maximum rate of return should be the small investor rate.  Although the Seventh Circuit has stated that the prime rate is the "best starting point" for prejudgment interest, it has also made clear that district courts have discretion to set a rate that is more appropriate to the circumstances of the particular case.  National Gypsum Co., 144 F.3d at  1114.  Plaintiffs have cited no evidence or reason to believe that they would have invested at a rate higher than the small investor rate of return.  Furthermore, both experts calculated back pay interest using the small investor rate. Docket R. 371, ¶ 45( c) (Written direct of Dr. Paul White); R. 366, Trial Tr. 77:12 - 78:6; Docket R. 366, Trial Tr. (Cross of Marc Bendick) at 82:15-83:11.  Significantly as well, plaintiffs' own expert indicated that for purpose of computing "make whole relief" in this case, he would use the small investor rate.  Docket R. 366, Trial Tr. (Cross of Marc Bendick) at 83:4 - 84:10.

     **Plaintiffs' Reply: *See* Reply to No. 63, above.**

68.     The Court adopts the Level 6 mitigation earnings, rejects plaintiffs' claim for "moonlighting" income, and rejects plaintiffs' claim for prejudgment interest.  Accordingly, judgment is entered against the City in the amount of $ 12,220,381. [9]  See Exhibit B attached hereto (Exhibit B is a duplicate of Exhibit 11 to White Direct Testimony).

---

[9] If the Court awards prejudgment interest, it should be at the small investor rate and the amount, absent moonlighting income,  is $13,111,151.  See PPFC at ¶ 27.
     **Plaintiffs' Reply: *See* Reply to No. 63, above.**

**Plaintiffs' Reply: Plaintiffs make no reply to Defendant's Proposed Findings 68-70, other than to refer the Court to Plaintiffs' Proposed Findings.**

## Conclusion

69.     The City has prepared  two draft injunctive orders that are consistent with the law and facts of this case.  The first proposed order is a red lined draft of plaintiffs' December 19, 2006 proposed order and is attached as Exhibit C.  The second proposed order is simply the version in final form of the previous red lined draft.  See Exhibit D.  By submitting these draft orders, the City expressly does not waive its right to appeal the March 22, 2005, liability finding, nor any finding pertaining to the remedial phrase of these proceedings.

70.     The City respectfully requests that this Court now enter a final and appealable F.R.Civ.P. 54 Order, terminating these proceedings.

DATED:   January 11, 2007

Respectfully submitted,

/s/ Matthew J. Piers
One of the Attorneys for the Plaintiffs

Matthew J. Piers
Mary M. Rowland
Joshua Karsh
Hughes Socol Piers Resnick & Dym, Ltd.
Three First National Plaza
70 West Madison Street, Suite 4000
Chicago, Illinois   60602
Telephone 312/580-0100

Clyde Murphy
Laurie Wardell
CHICAGO LAWYERS COMMITTEE
FOR CIVIL
   RIGHTS UNDER LAW, INC.
100 N. LaSalle Street, Suite 600
Chicago, IL  60602

Judson H. Miner
MINER BARNHILL & GALLAND PC
14 W. Erie Street
Chicago, Illinois 60610

Fay Clayton
Cynthia Hyndman
ROBINSON CURLEY & CLAYTON
300 S. Wacker, Suite 1700
Chicago, IL  60606

Robert Stroup
NAACP LEGAL DEFENSE
  & EDUCATION FUND, INC.
99 Hudson Street, Suite 1600
New York, NY 10013-2897

Patrick O. Patterson
Law Offices of Patrick O. Patterson, S.C.
7481 North Beach Drive
Fox Point, WI  53217