# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ARTHUR L. LEWIS, JR., et al., ) | |
| ) | |
| Plaintiffs, ) | No. 98 C 5596 |
| ) | |
| v. ) | Judge Joan B. Gottschall |
| ) | |
| CITY OF CHICAGO, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

On March 22, 2005, following a bench trial, this court entered a judgment of liability against defendant, City of Chicago ("the City"), having found that the manner in which the City hired firefighters based on the 1995 written Firefighters Examination discriminated against African-Americans. *Lewis v. City of Chicago*, No. 98 C 5596, 2005 WL 693618, at *1 (N.D. Ill. March 22, 2005). The court joined for remedial purposes Chicago Firefighters Union Local #2 ("the Union") and The Firemen's Annuity and Benefit Fund of Chicago as non-aligned parties for the limited purpose of granting relief. The plaintiffs, the City, and the Union have presented live witnesses, videotaped testimony, and briefs on the subject of remedies. This opinion is intended to resolve most, if not all, of the remaining disputes concerning the subject of remedies.

The plaintiff class is composed of approximately 6,000 African-Americans who applied for entry-level firefighter jobs with the City and scored from 65 to 88 (inclusive) on the 1995 firefighter written examination. The parties are in agreement that but for the hiring practices found by the court to be discriminatory, 132.4 additional African-

Americans would have been hired by the Chicago Fire Department ("CFD"). In order to remedy such unlawful discrimination, 132 class members shall be hired ("the shortfall group"). These 132 positions will be offered by lot to members of the plaintiff class. The court is aware of no substantial disagreement between the parties concerning the manner in which these 132 persons shall be identified. In the Order which follows, the court resolves the parties' modest disagreements as to the identification, hiring and training of the shortfall group, and resolves the more contentious disagreements over the subject of monetary remedies.

### I. SKIP-TRACING

Plaintiffs have requested that the court order the City to hire a skip tracing service to update class members' address information before offers to advance to the next steps of the hiring process are mailed. The City responds that such an order will cause it substantial unnecessary (albeit unspecified) expense. Moreover, according to the City, persons who took and passed the 1995 entrance examinations were informed that they were obligated to keep the City apprised of their current address.

Given that test-takers were told to keep the City updated as to their current address, it is reasonable to assume that persons still interested in the firefighter job did so. The court therefore concludes that hiring a skip tracer as a requirement of this order is premature. If large numbers of mailed notices cannot be delivered, hiring a skip tracer may be necessary. At this point, the parties should figure out some way to determine the number of undeliverable mailings and to inform the court if the number of undeliverable mailings becomes significant.

The court rejects the City's contention that plaintiffs "waived" this proposal. Proposals to avoid likely problems are useful and will not be deemed "waived" because suggested late.

## II. TIME REQUIREMENT FOR PRE-EMPLOYMENT SCREENING OF THE SHORTFALL GROUP

Plaintiffs have proposed a timetable for the hiring of the shortfall group which sets a 120 day deadline for pre-employment screening of the shortfall group. The City maintains that four months is insufficient, and a minimum of 200 days is necessary. No one knows at this point how difficult and time-consuming this process will be. The court will allow 180 days, basically six months, for this pre-screening to take place. The City shall use its best efforts to complete this process more expeditiously if possible. The parties should propose a method by which the court can monitor the progress of pre-employment screening.

## III. RANDOM SELECTION OF MEMBERS OF THE SHORTFALL GROUP; REQUIREMENT OF IN-PERSON RETURN OF CANDIDATE INTEREST CARDS

The court has been given no reason to believe that the City's current random selection process conducted by its usual outside contractor is inadequate for the selection of the class members who will undergo screening. Accordingly, it finds no reason to disturb the City's normal procedure. Nor does the court find any reason to disturb the City's usual practice of mandating the return of "Candidate Interest Cards" in person. Since it is possible, however, that some members of the shortfall group no longer live in the Chicago area but would return if offered a position as firefighter, the City should be willing to waive this requirement for good cause shown (as is too often the case, the parties have not informed the court of why their difference on this point matters to them

or to anyone else; that the concern is over people who have moved out of the Chicago area is a guess).

## IV. TIME LIMIT FOR ENTRANCE TO ACADEMY OF MEMBERS OF SHORTFALL GROUP

Plaintiffs ask the court to order that all 132 members of the shortfall group enter the CFD Academy ("the Academy") within twelve months of the entry of the Injunctive Order. The City seeks twenty-four months, arguing that there are operational difficulties with having more than sixty candidates in the Academy at any one time. The City is also obligated by its union contract to include 10% paramedic crossovers in each Academy class. The court agrees with the City that it is in the best position to exercise modest discretion to determine class sizes, and requires that all class members hired pursuant to this order enter the Academy within twenty-four months. The court intends and expects that the shortfall class will be promptly trained and promptly integrated into the ranks of firefighters; it does not want its intention and expectation dashed because the City has been forced to provide Academy training on a basis which it believes is faster than appropriate.

## V. TIME-IN-GRADE REQUIREMENT

Plaintiffs seek a reduction to thirty months from the collective bargaining agreement's fifty-four month "time-in-grade" requirement for promotion to the rank of engineer or lieutenant after taking a promotion examination. Section 9.3B of the collective bargaining agreement between the City and the Union provides for this fifty-four month time-in-grade requirement, and it provides that no employee may be promoted to engineer or lieutenant who has not completed fifty-four months in his/her

4

prior classification. The parties' presentation of this issue is characterized by much heat and little light. Each party charges the others with failing to offer evidence in support of its position. The plaintiffs argue, without evidentiary foundation, that the time-in-grade requirement serves no important (safety-related or other) function and the City and the Union argue the opposite. Apparently recognizing that giving the plaintiffs immediate promotions would be impossible for many reasons, plaintiffs suggest that the fifty-four month requirement be lowered to thirty months. Whether fifty-four months serves safety interests and whether thirty months is its equivalent is something no one has established.

In order to ignore a requirement which must necessarily have the effect–whether or not this is its purpose–of promoting more experienced rather than less experienced individuals to higher ranks, the court would have to be satisfied that the time-in-grade requirement serves no important safety interests. It is not so satisfied. Indeed, the evidence was wholly insufficient to demonstrate that the time-in-grade requirement, whatever its purpose, does not have the effect of delaying promotions until individuals have more experience and are better qualified. The court accordingly will not override the union contract on this issue, and will leave the time-in-grade requirement in place for the shortfall group.

In addition, the court does not believe there was sufficient evidence to compel the City to give promotional examinations on an expedited schedule. Requiring promotions when the City's operational needs do not require promotions seems on balance to be more disruptive to the CFD than compensatory to the plaintiffs.[1] If plaintiffs so request,

---

[1] The plaintiffs' claim that the time-in-grade requirement should be shortened, and that the City should be compelled to give promotional exams reasonably close to a date when members of the shortfall group will be eligible to take them, is comprehensible as a

the court can consider giving some monetary relief to the shortfall group for lost promotion opportunities.

## VI. SENIORITY FOR THE SHORTFALL CLASS

The parties agree that the 132 persons hired from the plaintiff class should receive retroactive seniority. They disagree, however, on the way that seniority should be calculated. Plaintiffs propose that the court adopt an "average" seniority date, which would have been December 4, 1998, and that all members of the shortfall group shall be credited with seniority retroactive to that date. The City, with the support of the Union, argues that the shortfall group should be credited by lot with seniority between May 16, 1996, and November 1, 2002, according to the number of shortfall for each class. That is, class members would be randomly assigned to each Academy class which matriculated between May 16, 1991 and November 1, 2002, according to the number of

---

matter of logic–if the court's objective is to make the plaintiff class whole, then the court must allow the shortfall group to make up for lost promotion opportunities and, assuming their competence, catch up with the class of which they would have been members absent discrimination. But that such relief should be ordered because it is *logically* necessary if the plaintiffs are to end up where they would have been but for the illegal discrimination does not mean that it is prudent to order it. Plaintiffs have failed to offer evidence from which the court can determine the effect on the CFD of ordering promotional exams on any given schedule or giving the plaintiffs promotions with less time in grade than other firefighters. These requested forms of relief suggest the possibility of real disruption of the CFD's public safety mission. The court is not dealing here with an attempt to compensate the shortfall group monetarily for lost promotion opportunities; it is being asked to move them through the ranks more quickly than would otherwise be possible. The parties' factual submissions on these points were close to non-existent; their legal briefing was hopelessly slipshod. This court is unwilling to require that the City advance the date of promotional exams and expedite plaintiffs' eligibility for promotion without a thorough evidentiary presentation and legal analysis of the consequences and propriety of ordering such relief.

shortfall for each class. This better achieves, the City argues, the "make whole" concept of Title VII relief.

As is true in all aspects of the relief in this case, it is impossible to put an individual back in the same position that individual would have been in had there been no discrimination in the 1995 exam. That is because each class would have been chosen by lot, and all the court can do at this point is to choose individuals in the same way; it cannot choose the same individuals. Since no one is arguing that the plaintiffs' proposed seniority calculation will yield different results monetarily from that proposed by the City and the Union, the only question seems to be which method will be most fair and workable in the present context of this dispute.

The plaintiffs' proposed method has the advantage of great simplicity. All 132 members of the shortfall group would have the same seniority date, easily calculated. The plaintiffs' proposed method has another advantage: it does not try to achieve precision when precision is impossible: it is therefore honest. In other words, it does not attempt to give certain persons advantages that others, not they, would have enjoyed had the test not been employed in a discriminatory manner. There is no way to determine who would have benefited from 1996 through 2002 seniority, and an average appears to be a more honest way of compensating the shortfall group. The court therefore adopts plaintiffs' proposal of an average seniority date applicable to all members of the shortfall group.

### VII. APPOINTMENT OF A MONITOR

Plaintiffs seek the appointment of a monitor to report on the progress of relief and to act as an ombudsman for the shortfall group during Academy training. The City

opposes this request as unnecessary. The court disagrees. There has never been a class of court-ordered remedial hires at the Academy and there has never been a class made up largely of African-Americans. The court notes the likelihood that individuals hired pursuant to this decree may be older, and have different life experiences and different training challenges, than the usual Academy student.

The court is of the view that a monitor/ombudsman would be useful to the cadets, to the Academy, and to the court. That is, someone should have responsibility for addressing the special needs and problems of people entering the Academy as a result of this lawsuit. Further, someone should be responsible for reporting to the court, if necessary, on the progress of the shortfall group. The court agrees with the City than the monitor should be an incumbent member of the CFD acceptable to both the City and the plaintiffs.

### VIII. MONETARY RELIEF

There appear to be three major areas of disagreement between the parties as to how monetary damages should be calculated. They are: (1) in calculating the amount of backpay, what figure should be subtracted as presumed mitigating employment wages; (2) should backpay include an amount for moonlighting earnings–secondary jobs the plaintiff class could have held if they had been hired as firefighters; and (3) should prejudgment interest be calculated at the small investor or prime rate. These issues will be resolved in turn.

#### A. Mitigation Earnings

As in all calculations of backpay, the court must deduct from the backpay award wages the members of the plaintiff class made because they were not firefighters:

8

amounts earned in mitigation. The major difference between the parties is their respective experts' difference of opinion as to whether mitigation earnings should be calculated at Level 5 under the Bureau of Labor Standard's ("BLS") National Compensation Survey ("NCS"), as plaintiffs' expert Dr. Marc Bendick ("Dr. Bendick") asserts is the proper level, or at Level 6, as defendant's expert Dr. Paul White ("Dr. White"), asserts is the proper level.[2] Determining which level should be used for the calculation of mitigation earnings is monetarily significant.[3]

The experts agree that, assuming plaintiff-specific information is not utilized, the best source of statistical data for estimating mitigating earnings is the NCS. BLS' NCS reports wage rates by occupation and work level. By reference to various wage-determining factors, it is possible to predict average wage levels for various jobs. It is clear, however, that in at least one respect the NCS does not provide information which fits perfectly with the court's concerns. The NCS provides the wage rate for a given position which has been properly defined. It does not provide information on the question which is critical here: how much someone would make who wanted a given position but did not get it, especially when that position involves extensive training and

---

[2]Actual damage figures will depend on when this order is entered and when actual damages are paid.

[3]The court earlier rejected the City's argument that mitigation earnings should be determined by means of a sampling of approximately 100 members of the 6,000 member class. The court ruled that a consideration of the costs and benefits of sampling, as well as the burden it would place on members of the class who might not be eligible for significant relief, counseled in favor of the use of statistical materials to come up with an assumed mitigation wage, rather than a sampling. *Lewis v. City of Chicago*, No. 98 C 5596 (N.D. Ill. March 30, 2006) (minute order). While the City urged the court to employ a sampling technique, both parties agree that if sampling is not permitted, the best source of wage data is BLS' NCS.

diverse experience. As will be made clear, this is a significant limitation to the NCS data as applied here. The experts' disagreement in essence comes down to whether they describe the job based on the attributes of an entry level firefighter (that is, a person hired but not yet trained or otherwise experienced in the job) or an experienced one: in other words, how to define the likely job prospects of someone who applied to be a firefighter and passed the firefighter examination but was not hired as a firefighter.

The experts' disagreement between the applicability of Level 5 or Level 6 is based on only one of the factors which distinguishes Level 5 from Level 6 positions. The NCS used a nine-factor test during most of the relevant time period and recently converted to a four-factor test. The experts conducted their analyses using both tests and, as to both tests, disagree on a single factor. With respect to the nine-factor test, the experts disagree on the rating of the factor called "Scope and Effect." Dr. Bendick, for the plaintiffs, rated this factor at "25," a rating which corresponds to this description: "Specific, routine operations. Effect is on immediate organization, not broader." Dr. White, for the City, rated this factor at 150, corresponding to this description: "The work involves treating a variety of conventional problems, questions, or situations in conformance with established criteria. The work product or service affects the social, physical, and economic well-being of persons." Under the recently-adopted four-factor NCS test, the experts' disagreement centers around the factor called "Knowledge." Dr. Bendick scored "Knowledge" at 350 points while Dr. White gave it 550 points. Dr. Bendick found this description of "Knowledge" most apt: "Controls and extinguishes structural and wild fires, operates hose lines, and makes forced entries to combat structural fires. Gives first aid for minor burns, cuts and/or sprains; takes vital signs, and

performs cardiopulmonary resuscitation (CPR) in connection with fires, auto accidents, swimming or skiing mishaps, and/or other similar incidents." Dr. White scored "Knowledge" based on this definition: "Fights fires and carries out crash/rescue activities at a major airport handling large aircraft or located in a metropolitan area." Dr. White's report makes clear that he believes this definition sets up airports and metropolitan areas as alternatives, and that a firefighter in a major metropolitan area like Chicago would fit into this definition; plaintiffs strongly disagree that Dr. White is reading this standard properly and contend that the definition is inapplicable to anything but airport firefighting. Scoring these factors differently led to the two experts' disagreement about the level of the job that should be assumed for mitigation earnings.

The experts' testimony made clear that their difference in scoring depends on whether they assumed the "Scope and Effect" or "Knowledge" of a working Chicago firefighter or the "Scope and Effect" and "Knowledge" of an individual who wanted to be (and received a passing score on the exam) but was not chosen to be a Chicago firefighter. The court is satisfied that Dr. White has more accurately rated the job of an accomplished urban firefighter and Dr. Bendick has more accurately rated the typical blue collar job of a competent high school graduate without firefighter training. Which is the better profile of the plaintiff class between the time its members passed the firefighter exam but were never hired and the present is the question which must be resolved: in other words, which rating more accurately describes the plaintiff class during the years when its members should have been, but were not, Chicago firefighters.

The evidence made clear that the job of firefighter is immensely attractive for a person with only a high school education; that person's alternative job prospects are

11

limited, and public sector jobs in general would be highly desirable. It is easy to imagine, however, that for many individuals with more than a high school education who would qualify for higher level than blue collar jobs, the firefighting job might also be an attractive opportunity because of the physical demands, high pay, risk, and public service aspects of the job. The difficulty in coming up with a mitigating wage rate is that the class is presumably composed of both types of people: those for whom the job of firefighter would be far better than other jobs for which they are qualified and those qualified for better jobs who choose to be firefighters because of the special characteristics of that position. During the years when such persons should have been but were not offered jobs as firefighters, it can be assumed that some held jobs comparable to those at Level 5 and some held jobs comparable to Level 6.

Because sampling seems both expensive and unlikely to lead to more precision, the court will adopt the parties' use of the NCS and will set the job level at 5.5, halfway between the wages earned by a Level 5 worker and a Level 6 worker. The NCS exists to set wage rates, not to provide a basis for assumptions about what people not employed could make at other jobs available to them. That is, it is a tool designed to rate jobs, not a tool designed to rate people. Since it is easy to assume that the plaintiff class is composed of people who, if they had worked, would not have been able to find employment above Level 5 and people whose choices were much greater, a mid-point level assumption and wage rate seems to make sense. The court notes that defendant's expert, Dr. White, admitted something like this when he testified that a reasonable compromise might be to set the wage rate at Level 5 for the period during which the plaintiff class could be assumed to have been in training and Level 6 thereafter.

The problem is, the plaintiff class did not go through training and never reached the competence of a Chicago firefighter. The court makes the assumption, and believes it is the best possible under the circumstances, that some substantial number of members of the plaintiff class did worse in their employment prospects than a firefighter job offered and some did better. In the absence of any reasonably inexpensive way to achieve more precision, the court adopts the wage rate of hypothetical Level 5.5 as presumed mitigating earnings.[4]

## B. The Prejudgment Interest Rate

Plaintiffs contend that prejudgment interest should be awarded at the prime rate, citing *First National Bank of Chicago v. Standard Bank & Trust,* 172 F.3d 472, 480 (7th Cir. 1999). Defendant argues that there should be no prejudgment interest in this case because backpay damages are speculative and uncertain, given that backpay is being calculated based on statistical data from government surveys rather than from actual earnings data of the 132 plaintiffs who should have been hired. In addition, the City argues, the case has been pending for eight years and has involved significant litigation delays not all attributable to the City; further, this case does not involve wages that were withheld for work actually performed. If prejudgment interest is awarded, however, the City argues that the small investor rate of return would be more appropriate in this case since it is more like what plaintiffs could have realized.

The City has made no credible argument against the award of prejudgment interest in this case. Title VII is clearly a statute with a remedial purpose and, while the

---

[4] The census data submitted by the parties similarly counsels in favor of a wage rate between the two suggested by the parties' experts.

13

blame can be shared among all the involved parties, the City's responsibility for the delays in this case can nowhere be seen more clearly than in its vociferous and yet barely reasoned argument against the award of prejudgment interest. The only argument it makes which gives the court some pause is its argument that the damages in this case cannot be awarded to the specific persons who were denied employment, because there is no way to tell who would have received the 132 jobs in question if such persons had been chosen when they should have been chosen, rather than years later. The City has cited nothing suggesting that the difficulty of determining precisely which plaintiffs in the plaintiff class would have been hired had the City hired without discrimination is a basis for denying prejudgment interest. The City is responsible for the court's inability to determine with certainty who would have been hired had the City hired properly, and it does not seem appropriate to deny the class make-whole economic relief because the City's conduct has injected imprecision into the award.

The Seventh Circuit has made it pellucidly clear that in the absence of "refined rate-setting," prejudgment interest should be awarded at the prime rate. *First National Bank of Chicago,* 172 F.3d at 480. This rate should not be modified to reflect the closeness of the case, the defendant's good faith or the parties' relative fault. *Id.* Its sole purpose is to make the victim whole. *Id.* Prejudgment interest on an award of backpay is appropriate. *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 757 (7th Cir. 2002). Thus, the City's argument that the prime rate is too high for work not actually performed as a result of discrimination is without merit. The fact that the prime rate yields an imprecise estimate is no reason not to apply it. *Cement Div., Nat'l Gypsum Co. v. City of*

14

*Milwaukee,* 144 F.3d 1111, 1114 (7th Cir. 1998). Accordingly, prejudgment interest will be awarded at the prime rate.

## C. Compensation for the Lost Opportunity to Moonlight

The normal schedule for a Chicago firefighter is unusual: twenty-four hours on, followed by forty-eight hours off, resulting in ten days off (rather than the more common four) over every two-week period. Comparing a CFD firefighter to a conventional Monday through Friday, nine-to-five worker, a firefighter has an extra six days off every two weeks, translating to 156 days off during the course of a year that a typical worker does not have. This schedule leaves firefighters with more time off than is common; the large amount of time off, and the ability to use that time for a second job with additional income, is a benefit of the firefighter position. A 1995 survey by the BLS found that 28.1% of firefighters nationwide reported holding second jobs. Plaintiffs also cite testimony of then First Deputy Fire Commission (subsequently Commissioner) Edward P. Altman, Jr. ("Altman"), cited in a ruling of the Commission on Human Relations in a 1995 case called *Adams v. Chicago Fire Department* estimating that roughly 90% of Chicago firefighters at that time held a second job. Plaintiffs argue that make-whole relief in this case requires the court to account for the fact that by missing out on a firefighter position, a member of the plaintiff class also missed out on this opportunity to hold a second job. Plaintiffs suggest that the BLS' 28.1% be adopted as a conservative estimate of the number of firefighters holding second jobs, that the hours of expected secondary employment be reduced by half (from 156 days to 78 days) and that the court assume the hourly wage rate for such second jobs is half the hourly wage rate assumed for interim or mitigation earnings.

The City views the plaintiffs' proposed moonlighting remedy as "extraordinary." The City cites to the absence of caselaw authorizing compensation for the possibility of secondary employment as part of make-whole relief, as well as plaintiffs' lack of reliable evidence. As to the BLS information, the City notes that it is hearsay (the court rejects this objection; reliance on official government reports is indispensable in this case), stale (eleven years old) and does not pertain only to Chicago. The City also points out that the Altman statement was a finding of fact in a lengthy decision; the City notes that plaintiffs have not tendered the Altman testimony and that the court decision referring to it does not indicate the foundation, if any, for Altman's statement.

The plaintiffs appear to rely on the Altman statement not as a basis for calculating moonlighting earnings but as some evidence that the BLS information is relevant to Chicago firefighters; by not relying on the Altman statement for very much, plaintiffs appear to argue, its problems as evidence are rendered less significant. Altman's statement at least indicates that moonlighting is at least as common, and probably more common, among Chicago firefighters than among firefighters considered nationwide.

To justify their claim for moonlighting earnings, plaintiffs urge the court to consider overtime benefits as analogous to secondary employment. The Seventh Circuit has held that it is appropriate to determine whether, and to what extent, overtime benefits should be included in a backpay award. *See Kossman v. Calumet County*, 800 F.2d 697, 703 (7th Cir. 1986), *rev'd on other grounds, Coston v. Plitt Theaters, Inc.,* 831 F.2d 1321, 1336 (7th Cir. 1987).

There is an obvious analogy between overtime and moonlighting earnings. Both allow individuals to accumulate earnings additional to what their normal working hours

16

provide and both do so because normal working hours do not exhaust the working capabilities of the workers involved. A job that does not exhaust its workers' time or energies permits the accumulation of earnings from secondary employment, which can easily be considered a benefit of such a job. But moonlighting and overtime are different in that overtime hours are required to meet the needs of the employee's primary employer; by looking at the experiences of other employees of the employer involved, it is possible to come up with a reasonable estimate of the likely overtime hours that a given employee would have worked. Moonlighting, in contrast to overtime, has nothing to do with any needs or requirements of the CFD. More significantly, it can be assumed that the moonlighting experiences of different firefighters are vastly different, in terms of the hours worked and the jobs involved. Neither element of plaintiffs' proof–the estimates of Deputy Commissioner Altman or BLS Survey–tells the court anything about who worked at what jobs and for how many hours each year.

The court agrees with the defendants that the quality of this evidence is troublesome. Plaintiffs try to mitigate the potential lack of relevance of the non-Chicago BLS study with Altman's testimony, but Altman's testimony is hearsay (as far as this court is aware, referenced only in a single plaintiff ruling of the Chicago Commission on Human Relations) and this court knows nothing about what, if any foundation, he had for his estimate. While plaintiffs' efforts to use this evidence only to come up with a conservative estimate is admirable, the court is reluctant to make any part of this award dependent on such unsatisfactory evidence.

In the court's view, moonlighting income is simply too remote from anything for which defendant is responsible, and the evidence of the amount of moonlighting income

17

is too speculative, to compensate the class for moonlighting income they possibly could have made. On the continuum from basing backpay on actual wages to making defendants pay for such intangibles as loss of other employment opportunities because of lack of firefighter training, moonlighting income falls, the court believes, on the too-speculative side of the line. The court will not include an estimate of potential moonlighting earnings in the backpay awarded to the plaintiff class.

## IX. CONCLUSION

The parties should draft an injunction order in conformity with this opinion and agreed as to form. The parties should appear before the court on Wednesday, March 28, 2007, with that draft order. At that time, the parties can advise the court of any additional matters that must be resolved before final judgment is entered.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

Dated: March 20, 2007